UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| JOHN HARTWELL COCKE, as Executor of the Estate of WILLIAM BYRON COCKE, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CV419-169 |
| UNITED STATES OF AMERICA, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

### ORDER

Plaintiffs, the Executors of the Estates of William Byron Cocke and Catherine Crichton Cocke and the Guardians and Conservators of William and Catherine Cocke's four minor children, along with their now-adult son, William Ruffin Coleman Cocke, filed this case against Defendants the United States of America, Aviation Development Group, LLC ("ADG"), and Thomas Huff, arising out of an airplane crash on August 28, 2017, that resulted in the deaths of William and Catherine Cocke. *See* doc. 387 at 2-8 (Fourth Amended Complaint). The parties engaged in a lengthy discovery process. *See* docs. 152, 205, 220, 257, 304, 317, 322, 336, 341 & 350; *see also* doc. 364 at 2. Now, the parties have

1

filed numerous motions to exclude various experts pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See* docs. 408, 409, 410, 411, 412, 413, 414, 415, 416, 418, 439, 440, 441, 442, 443, 444, 445, 446, 447 & 448. Also pending are the United States' Motion for Summary Judgment, doc. 417, and Motion to Dismiss for Lack of Jurisdiction, doc. 428, ADG and Huff's Motion for Summary Judgment, doc. 438, and the Plaintiffs' request related to the role of the jury during trial, doc. 419. To streamline these proceedings as much as possible, the Court has divided the pending Motions into groups for more efficient dispositions. Currently before the Court are the following *Daubert* Motions:

- United States' Motion to Exclude Certain Testimony from ADG/Huff's Experts, doc. 408;

- United States of America's Motion to Exclude the Testimony of Plaintiffs' Expert Mark N. Callender, Ph.D., doc. 409;

- United States of America's Motion to Exclude the Testimony of Plaintiffs' air traffic control ("ATC") Expert John D. Canoles, doc. 410;

- Defendants Aviation Development Group, LLC and Thomas Huff's Corrected Motion to Exclude in part Expert Testimony of John D. Canoles, doc. 439;

2

- United States of America's Motion to Exclude the Testimony of Plaintiffs' Expert Jameel F. "J.F." Joseph, doc. 411;

- Defendants Aviation Development Group, LLC and Thomas Huff's Corrected Motion to Exclude the Testimony of J.F. Joseph, doc. 443;

- United States of America's Motion to Exclude the Testimony of Plaintiffs' Expert Charles Pereira, doc. 412;

- Defendants Aviation Development Group, LLC and Thomas Huff's Corrected Motion to Exclude in part Expert Testimony of Charles Pereira, doc. 446;

- United States of America's Motion to Exclude the Testimony of Plaintiffs' Expert Colin Sommer, doc. 416;

- Defendants Aviation Development Group, LLC and Thomas Huff's Corrected Motion to Exclude in part the Testimony of Colin Sommer, doc. 448;

- Defendants Aviation Development Group, LLC and Thomas Huff's Corrected Motion to Exclude in part Expert Testimony of Marc Fruchter, doc. 441; and

- Defendants Aviation Development Group, LLC and Thomas Huff's Corrected Motion to Exclude in part Expert Testimony of Darren Gaines, doc. 442.

## I.    GENERAL BACKGROUND[1]

At approximately 8:29 a.m. local time on August 28, 2017, a single-engine Beechcraft A36 Bonanza airplane registered as N87RY and

---

[1] Where necessary, the Court includes more specific factual background below when analyzing the challenges to a particular expert's testimony.

piloted by Randall Hunter ("Pilot Hunter") took off from the Savannah/Hilton Head International Airport with Catherine and William Cocke onboard. *See* doc. 417-1 at 1; 438-2 at 6; doc. 479-45 at 1-2. At 1230:02 Coordinated Universal Time ("UTC"), which was approximately 8:30 a.m. local time, Pilot Hunter first contacted the air traffic controller ("the Controller") working at the North Radar Position in the Savannah Air Traffic Control Tower Terminal Radar Approach Control facility ("TRACON"). Doc. 417-1 at 2; doc. 479-45 at 2. Approximately five minutes into the flight, at 1235:46 UTC, Pilot Hunter contacted the Controller to declare an emergency, and at 1235:52 UTC reported to the Controller he had "an engine failure" and needed to land. Doc. 417-1 at 2; doc. 479-45 at 3. At 1235:55 UTC, the Controller asked Pilot Hunter whether he "want[ed] to go to Savannah [airport] or Statesboro [airport]." Doc. 417-1 at 2; doc. 479-45 at 3. At 1235:58 UTC, Pilot Hunter indicated he would fly to Statesboro; however, after the Controller informed him that Statesboro was a twenty-mile flight, at 1236:35 Pilot Hunter told him "I'm not sure I'll make twenty miles . . . I might." Doc. 417-1 at 2-3; doc. 479-45 at 3-4. The Controller then informed Pilot Hunter at 1236:39 UTC: "you got Cypress Lakes it's about

4

ah eight miles to your south ah actually seven miles if you turn left heading one seven zero one seven zero you can go straight to Cypress Lakes." Doc. 417-1 at 3; doc. 479-45 at 4-5. Pilot Hunter responded at 1236:49 that he was "heading one seven zero we're going there . . . ." Doc. 417-1 at 3; doc. 479-45 at 5. The Controller stated that he lost radar contact with Pilot Hunter at 1240:22 UTC. Doc. 417-1 at 4; doc. 479-45 at 6-7. The airplane crashed in a wooded area approximately five miles from Cypress Lakes. Doc. 417-1 at 4; doc. 479-45 at 7. Pilot Hunter and William and Catherine Cocke all died as a result. Doc. 417-1 at 1; doc. 479-45 at 1-2; doc. 478-76 at 18.

Plaintiffs' Fourth Amended Complaint alleges negligence claims against Defendant United States of America under the Federal Tort Claims Act. *See* doc. 387 at 17-23. As Plaintiffs summarize, they allege that the Controller's response to Pilot Hunter, at 1235:55 UTC, asking whether the Pilot "'want[ed] to go to savannah or Statesboro' . . . set the stage for this tragic crash." Doc. 487 at 2. Plaintiffs contend that when the Controller provided Savannah or Statesboro as the only options, "two other airports were significantly closer to, and reachable by, N87RY" including one airport that was depicted on the Controller's radar video

5

map ("RVM"). *Id.* at 4. As they assert in their Fourth Amended Complaint, "had the [Controller] provided [Pilot Hunter] with the location of the Cypress Lakes Airport at the time of the declaration of the initial emergency, as he was required to do, the subject aircraft would have reached Cypress Lakes Airport in a position to safely land, as it was well within the subject aircraft's glide range at the onset of the emergency." Doc. 387 at 14. They additionally assert that "in addition to Cypress Lakes Airport, another airport, namely Briggs Field Airport, was likewise much closer to the subject aircraft's position at the time of the onset of the emergency than was Statesboro Airport, and had the [Controller] provided the subject aircraft with the location of Briggs Field Airport, as he was required to do, the subject aircraft would have been able to reach Briggs Field as it too was well within the glide range of the powerless aircraft at the onset of the emergency." *Id.*

Specifically, Plaintiffs allege the United States, through the Federal Aviation Administration ("FAA"):

a. failed to provide reasonable, timely and/or proper care in directing, warning, vectoring, guiding and/or providing air traffic control services to the subject aircraft within the applicable airspace;

6

b. violated numerous sections of the applicable Air Traffic Control Procedures Manual, which, upon information and belief, was Order 7110.65W, Change 3, in effect on April 27, 2017 (the "ATC Manual"), specifically including, but not limited to, Section 1-1-1; Section 1-1-2; Section 2-1-1; Section 2-1-2; Section 2-1-4; Section 2-1-6; Section 2-1-7; Section 2-1-18; Section 2-1-25; Section 2-10-3; Section 3-1-1; Section 10-1-1; Section 10-1-2; Section 10-1-3; Section 10-1-4; Section 10-2-1; Section 10-2-3; Section 10-2-5; Section 10-2-15; Section 10-2-16; and Section 10-2-17, as well as other sections and paragraphs of the ATC Manual;

c. violated other policies and procedures that were applicable;

d. failed to provide appropriate, timely and required air traffic control services to the Pilot of the subject aircraft as was required;

e. failed to properly comply with air traffic controller duties and responsibilities in that the air traffic controller who was in communication with the Pilot of the subject aircraft provided inaccurate, misleading and/or untimely information to the Pilot at the time he declared an emergency, upon which the Pilot specifically relied, which caused and resulted in unnecessary turns and a significant and deadly loss of energy and altitude which improperly limited the disabled aircraft's glide range;

f. failed to timely and properly advise the Pilot of appropriate landing fields when the Pilot initially declared an emergency;

g. improperly directed the disabled aircraft to an airport that was significantly further away (and unreachable), than other airports at which the Pilot could have (and would have) safely landed the disabled aircraft;

h. improperly directed the subject aircraft to engage in unnecessary turns during the course of the known emergency which caused a deadly loss of energy and

altitude thereby making it impossible for the Pilot to safely land the aircraft at an appropriate airport;

i.  failed to comply with air traffic controller duties and responsibilities in that the air traffic controller in communication with the Pilot failed to consult with other air traffic controllers and/or utilize the tools at his disposal, including, but not limited to, the RVM and/or [Emergency Obstruction Video Map, "EOVM"], in response to the Pilot's declaration of an emergency and failed to timely provide the Pilot with the closest airports at which he could (and would have) safely landed the crippled and disabled aircraft;

j.  was specifically aware that the Pilot was flying a disabled aircraft that had lost engine power and provided him with inaccurate and misleading information concerning available airports at which to land the subject aircraft;

k.  provided inaccurate heading and distance information to the Pilot despite knowing that the subject aircraft was in distress and without power;

l.  failed to timely advise the Pilot of an appropriate airfield on which the Pilot could have (and would have) safely landed the disabled aircraft;

m. failed to provide appropriate, safe, and proper traffic advisories and alerts to aircraft within the applicable airspace including, but not limited to, the subject aircraft;

n.  the air traffic controller in communication with the Pilot failed to be familiar with the airspace in which he was working and was responsible for, including appropriate air fields at which an aircraft may land, and directed the disabled aircraft to an airport that was significantly further away from the disabled aircraft's position despite that two other airports were much closer at which the Pilot would have safely landed the aircraft, notwithstanding that the aircraft had lost all engine power;

o. created a dangerous condition by inadequately, inappropriately, untimely and/or unsafely performing air traffic control duties and responsibilities by, amongst other things, directing the subject aircraft to engage in turns that caused a significant and deadly loss of energy and altitude thereby improperly reducing the aircraft's glide range;

p. in that air traffic control breached the duty of care owed to the occupants of the aircraft, specifically including the passengers of the subject aircraft, by, amongst other things, providing inaccurate, misleading, missing, untimely and/or deficient instructions upon which the Pilot relied;

q. in that the occupants of the aircraft, specifically including the passengers were entitled and expected to rely upon air traffic control's instructions given the circumstances that existed, including, but not limited to, the fact that the subject aircraft had suffered an in-flight engine failure and air traffic control provided inaccurate, misleading, missing, untimely and/or deficient instructions;

r. in that, upon information and belief, Savannah Tower violated air traffic control policies, procedures, rules and/or regulations by providing, *inter alia,* controllers with an RVM and/or EOVM that was inaccurate, not up-to-date, and directed its controllers to utilize said inaccurate information;

s. in that the RVM and/or EOVM that the subject air traffic controller was relying upon failed to list certain airports that were safe and appropriate for the subject aircraft to land;

t. failed to properly train and/or supervise its controllers concerning emergency landing fields in their area of responsibility;

u. failed to provide air traffic controllers, specifically including the air traffic controller in communication with

9

the subject aircraft, with accurate, up-to-date, and correct information regarding suitable airfields and/or landing areas for the airspace within the subject facility's area of responsibility;

v. the air traffic controller in communication with the subject aircraft failed to timely ask for assistance from other air traffic controllers despite the fact that he knew or should have known that the subject aircraft was in distress having suffered an engine failure;

w. air traffic control violated its own internal policies, procedures, regulations, guidelines and/or orders, including, but not limited to, FAA Order 1100.161; and

x. air traffic control was otherwise negligent, reckless and/or careless.

Doc. 387 at 17-20.

Plaintiffs also allege claims for negligence and vicarious liability against Defendants ADG and Thomas Huff. *See* doc. 387 at 23-29. They allege ADG and Huff were "experienced and knowledgeable in the field of on-demand for hire private aviation travel," and held themselves out to William and Catherine Cocke as experts in the field. *Id.* at 23. They further allege that William and Catherine Cocke relied exclusively on ADG and Huff's expertise, and "hired, retained and/or contracted with [ADG and Huff] to provide them with all of their on-demand, for hire, private aviation travel." *Id.* at 24. They allege that ADG and Huff arranged, scheduled, provided, hired retained, and/or selected the flight,

10

pilot, and aircraft for the Cockes, and that ADG and Huff are vicariously liable for the negligence of Pilot Hunter. *Id.* at 25-29. Plaintiffs also bring a claim for "negligent selection and/or retention" against Defendants ADG and Huff, based on ADG and Huff's "renting of the subject aircraft and the hiring and/or utilization of the Pilot." *Id.* at 29-34.

Defendants all contest liability, and after a lengthy discovery period, the parties have all named numerous experts to support their positions. For purposes of this Order, opinions from the following experts are at issue: ADG and Huff's aircraft accident investigator and pilot expert William Jeffrey Edwards, Ph.D., *see* doc. 408-1 (Edwards' Expert Report); ADG and Huff's aircraft accident investigator Douglas E. Stimpson, *see* doc. 408-7 (Stimpson Expert Report), doc. 408-8 (Stimpson Rebuttal Report); ADG and Huff's air traffic control expert Kevin S. Karpe, *see* doc. 408-13 (Karpe Expert Report); Plaintiffs' aerodynamicist Mark N. Callender, Ph.D., *see* doc. 470-1 (Callender Expert Report); doc. 470-2 (Callender Rebuttal Report); doc. 470-3 (Callender Supplemental Report); doc. 470-4 (Callender Supplemental Report Addendum); doc. 470-5 (Callender Second Supplemental Report); Plaintiffs' air traffic

control expert John D. Canoles, *see* doc. 487-8 (Canoles Report); Plaintiffs' piloting expert Col. Jameel "J.F." Joseph, U.S.M.C. (Ret.), *see* doc. 457-7 (Joseph Expert Report); doc. 457-8 (Joseph Rebuttal Report); Plaintiffs' flight path reconstruction, simulation, and animation expert Charles M. Pereira, *see* doc. 475-1 (Pereira Expert Report); Plaintiffs' accident reconstruction expert Colin Sommer, P.E., *see* doc. 460-1 (Sommer Expert Report); doc. 460-2 (Sommer Rebuttal Report); Plaintiffs' aviation industry expert Marc Fruchter, *see* doc. 454-1 (Fruchter Expert Report); and the United States' air traffic control expert Darren Gaines, *see* doc. 464-3 (Gaines Expert Report).   This Order addresses various *Daubert* challenges made by the parties to the opinions offered by these experts.

## II.   GOVERNING LEGAL STANDARD

In *Daubert*, 509 U.S. 579, the United States Supreme Court interpreted Federal Rule of Evidence 702 which governs expert testimony.  The Supreme Court "made abundantly clear" that Rule 702 "compels the district courts to perform the critical 'gatekeeping' function concerning the admissibility of expert scientific evidence." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing *Daubert*, 509 U.S.

at 589 n. 7, 597) (emphasis omitted). The Supreme Court later held that "Daubert's general holding–setting forth the trial judge's general 'gatekeeping' obligation–applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (citing Fed. R. Evid. 702). Having incorporated these decisions, Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and
>
> (d)    the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Eleventh Circuit has established a three-pronged inquiry encompassing the requirements of *Daubert*, its progeny, and Rule 702.

13

Under this inquiry, a court determining the admissibility of expert testimony must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Frazier*, 387 F.3d at 1260 (citations omitted); *see also Prosper v. Martin*, 989 F.3d 1242, 1249 (11th Cir. 2021).  The proponent of the expert bears the burden of establishing qualification, reliability, and helpfulness by a preponderance of the evidence.  *Daubert*, 509 U.S. at 592, n. 10.

For the first prong, "experts may be qualified in various ways. While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status." *Frazier*, 387 F.3d at 1260-61; *see also* Fed. R. Evid. 702 ("A witness may be qualified as an expert by "knowledge, skill, experience, training, or education.").  In determining qualification, courts generally look to a proposed expert's education and experience and ask whether the witness's intended testimony is sufficiently within his or her area of expertise.  *See Maiz v. Virani,* 253 F.3d 641, 665 (11th Cir. 2001).

14

However, "the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express." *Frazier*, 387 F.3d at 1261 (emphasis in original).

Consequently, reliability, the second prong, "remains a discrete, independent, and important requirement for admissibility." *Frazier*, 387 F.3d at 1261. The Supreme Court in *Daubert* "set out a list of 'general observations' for determining whether expert testimony is sufficiently reliable to be admitted under Rule 702." *United States v. Brown*, 415 F.3d 1257, 1267 (11th Cir. 2005) (citation omitted). These factors or observations inquire into the expert's "theory or technique" and are: "(1) whether it can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) what its known or potential rate of error is, and whether standards controlling its operation exist; and (4) whether it is generally accepted in the field." *Id.* (citation omitted). "Sometimes the specific *Daubert* factors will aid in determining reliability; sometimes other questions may be more useful. As a result, 'the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is

15

reliable.'" *Frazier*, 387 F.3d at 1262 (quoting *Kumho Tire*, 526 U.S. at 152). "Indeed, the Committee Note to the 2000 Amendments of Rule 702 expressly says that, '[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *Id.* at 1261 (emphasis in original).

Finally, expert opinion testimony must also assist the trier of fact. Fed. R. Evid. 702(a). "By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262 (citation omitted). Proffered expert testimony generally will not help the trier of fact, and is inadmissible, "when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Cook v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1111 (11th Cir. 2005) (citation omitted). Stated differently, expert testimony that offers something "beyond the understanding and experience of the average citizen" helps the trier of fact and can be admitted. *Id.* (parenthetically quoting *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985)). Additionally, to be helpful,

16

the expert's testimony must be relevant. *Daubert*, 509 U.S. at 591-92. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* at 591 (internal citation and quotations omitted).

## III. ANALYSIS

As discussed above, to most efficiently resolve the various disputes before the Court, this Order addresses only some of the *Daubert* motions currently pending. *See* docs. 408, 409, 410, 411, 412, 416, 439, 441, 442, 443, 446, & 448. The Court addresses each relevant expert in turn.

### John D. Canoles

Plaintiffs designated John D. Canoles as an air traffic control expert in this case. *See* doc. 487-8 (Canoles Expert Report). In his own words, he was retained "to evaluate the actions of the air traffic controllers involved in the control of a Beech Bonanza, tail number N87RY, on August 28, 2017." *Id.* at 2. He opines, for the reasons articulated in his report, that "the acts or omissions of Savannah Air Traffic Control (ATC) personnel breached, deviated from and/or fell below the standard of care required of FAA air traffic control personnel and that

17

these breaches and deviations caused or contributed to cause this fatal accident." *Id*. at 4.

The United States moves to exclude Canoles' testimony that "the belated and untimely offering of Cypress Lakes to the pilot of N87RY . . . caused or contributed to cause this crash," doc. 410 at 8-10 (quoting doc. 487-8 at 46), Canoles' opinion "that the airplane could have 'easily' reached Briggs Field," *id*. at 11-14, Canoles' testimony about "what the pilot would have seen while gliding along his proposed hypothetical path 'towards the town of Guyton,'" *id*. at 14-16, Canoles' testimony about "the 'conspicuity' of Briggs Field, *id*. at 16-20, Canoles' opinions concerning the FAA's Post-Accident Event Reporting and Review, *id*. at 20-21, and Canoles' opinion about issuing a "low altitude alert," *id*. at 21-22.

Defendants ADG and Huff also challenge some of Canoles' opinions, but on different grounds. They seek to exclude his "piloting-related opinions," that Pilot Hunter failed to follow ATC instructions and failed to fly at the proper glide speed, based on his lack of qualifications to render them, and his lack of a reliable methodology in formulating them. Doc. 439 at 2, 5. They argue he "has no qualifications whatsoever that would allow him to testify as to Hunter's piloting," *id*. at 5, and is

unqualified to opine as to "what Hunter did or failed to do (and why)," *id.* at 6, or opine about the glide speed, *id.* at 7. They further argue that this anticipated testimony impermissibly opines as to Pilot Hunter's intent, and his piloting opinions are otherwise based on speculation and unreliable. *Id.* at 8. The Court addresses each argument, and Plaintiffs' response, in turn.

1.   **Canoles' opinion that "the belated and untimely offering of Cypress Lakes to the pilot of N87RY . . . caused or contributed to cause this crash."**

In his Report, Canoles opined that, had Pilot Hunter "been given, and then chosen either [Cypress Lakes or Briggs Field], N87RY would have been able to reach either of those two airfield(s)." Doc. 487-8 at 43-44. He also opined that "the belated and untimely offering of Cypress Lakes to the pilot of N87RY was a breach of the required standard of care and caused or contributed to cause this crash." *Id.* at 46. During his deposition, he testified that he "still believed" that had Pilot Hunter been given and then chosen Cypress Lakes, that the airplane would have been able to reach the airfield. Doc. 410-3 at 43. He based this opinion on his "experience as a controller" and testified that, "looking at flight paths,

19

knowing the altitude that the airplane was at, [he] think[s] it was doable." *Id.*

The United States argues that Canoles should be excluded from opining that "the belated and untimely offering of Cypress Lakes to the pilot of N87RY caused or contributed to cause this crash." Doc. 410 at 8 (quoting doc. 487-8 at 46) (internal quotations and alteration omitted). It first suggests that Canoles may have abandoned this opinion during his deposition, *id.*, but Plaintiffs point out that this opinion is contained within Canoles' report and argue that his deposition testimony is consistent with his report, doc. 487 at 7-8. There is nothing to suggest either Plaintiffs or Canoles have "abandoned" Cypress Lakes "as a viable option in this case." Doc. 410 at 8-9; *see* doc. 487 at 7-8. Any attempt to exclude Canoles' opinion on this ground is **DENIED**. Doc. 410, in part.

Next, the United States challenges Canoles' opinion regarding whether the airplane landing at Cypress Lakes was "doable," *i.e.*, whether the "belated and untimely offering of Cypress Lakes . . . caused or contributed to cause" the airplane to crash, because he is not a pilot or an accident reconstructionist, and bases his opinion "solely on his purported 'experience as a controller' and 'eyeballing' a radar replay of

20

the accident." Doc. 410 at 8 (quoting doc. 410-3 at 42-43). The United States' Motion makes clear that the portion of this opinion they challenge is Canoles' testimony that the aircraft reaching Cypress Lakes was "doable," in other words, that the aircraft "would have been able to reach" Cypress Lakes had that landing option been offered sooner. *Id.* at 8-10. It argues his "eyeballing" the radar replay is not a reliable methodology to determine the glide range of an airplane, and that Canoles is not qualified in accident reconstruction. *Id.* at 8, 10.

In response, Plaintiff provides a list of Canoles' qualifications to testify as an expert in air traffic control. Doc. 487 at 9-10. Plaintiffs have borne their burden of demonstrating that Canoles is qualified to offer opinions *about air traffic control*. However, the United States' challenge goes beyond Canoles' testimony related to air traffic control. Instead, the United States disputes Canoles' qualifications to render an opinion on a hypothetical glide path of the airplane. Doc. 410 at 9. Canoles testified that, if the air traffic controller had offered Cypress Lakes earlier, the aircraft could have reached the airfield. Doc. 410 at 8-9. There is nothing in his substantial and undisputed air-traffic-control education and experience that indicates he is qualified to offer such an opinion. He is,

21

however, qualified to opine about the course of action an air traffic controller would or should take when faced with a similar emergency situation. Therefore, while he is qualified to testify about the actions of the air traffic controller, and whether and when he should have offered Cypress Lakes as an option to the pilot, he is not qualified to offer any expert testimony about whether, had the air traffic controller offered Cypress Lakes earlier in the emergency, the airplane could have reached the airfield. That is outside the scope of his expertise.

Even if Canoles were qualified to opine on the hypothetical glide path of the aircraft, his methodology here is not reliable. As the United States' Motion points out, during his deposition, Canoles agreed with the United States' lawyer that "all [he's] doing" to determine whether the aircraft could "make it" to Cypress Lakes is "eyeballing" the radar replay to determine the distance. Doc. 410 at 9-10. While, as Plaintiffs urge, this is sufficient for Canoles to offer opinions about "airport distances based on an aircraft's position on a radar screen," doc. 487 at 10, it is not sufficient for Canoles to opine that, in this case, if the air traffic controller had offered Cypress Lakes as the closer airfield, the airplane making it to Cypress Lakes was "doable." As the United States points out in its

22

Reply, Canoles offers no measurements, math, or any other methodology to support his opinion that the aircraft would have reached Cypress Lakes if the option were offered sooner. *See* doc. 509 at 2.

If Plaintiffs are relying on Canoles' experience as an air traffic controller, and his review of the radar screen and reports, transcripts, and documents produced in this case, *see* doc. 487 at 12, they have not carried their burden of demonstrating the reliability of his opinion that the aircraft landing at Cypress Lake was "doable." Plaintiffs must "explain how [Canoles'] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Frazier*, 387 F.3d at 1261 (internal quotation marks, citation, and emphasis omitted). While Canoles undeniably has significant experience as an air traffic controller, Plaintiffs fail to connect this experience with the specific opinion Canoles offers regarding the ability of the aircraft to safely reach Cypress Lakes. "[T]he unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express." *Id.* "If admissibility could be established merely by the *ipse*

*dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong." *Id.*; *see also Jones v. Anderson*, 2018 WL 2717221, at *7 (S.D. Ga. June 6, 2018).

The United States' request to exclude this line of testimony is, therefore, **GRANTED**, in part, and **DENIED**, in part. Doc. 410, in part. Canoles may offer opinion testimony about the distance between Cypress Lakes and the aircraft at the point the pilot informed the air traffic controller of the emergency, and about whether or when the air traffic controller should have offered Cypress Lakes as a landing option, but Canoles may not opine that, had the air traffic controller offered Cypress Lakes at a particular time, the aircraft could have safely reached that landing site.

### 2. Canoles' opinion that the aircraft could have "easily" reached Briggs Field.

In his Report, Canoles opined that "Briggs Field was the closest airport and could easily have been reached by the pilot." Doc. 410-2 at 43. During his deposition, he testified that "at the time of occurrence," the pilot was "at 3900 feet," and "was three miles from Briggs airport," so "just looking at it geometrically, I think he could have gone up there and circled the field a couple times before he landed." Doc. 410 at 13 (quoting

doc. 410-3 at 7). The United States moves to exclude this opinion, arguing it does not meet the standard for expert testimony. *Id.* (citing *McDowell v. Brown*, 392 F.3d 1283, 1301 (11th Cir. 2004)).

In response, Plaintiffs argue Canoles' experience led him to "know that controllers are trained to send an aircraft with the predicament faced by N87RY to the nearest airport or suitable off airport landing site." Doc. 487 at 23. Canoles is certainly qualified to offer this opinion. *See, e.g.*, doc. 487 at 9. He is also qualified to opine that "Briggs Field was the closest airport," doc. 410-2 at 43, and even that Briggs Field was the "better" option, doc. 487 at 22. However, Plaintiffs do not sufficiently demonstrate how Canoles' experience is sufficient to support his opinion "that N87RY would have reached" Briggs Field. *Id.* More importantly, Plaintiffs do not meet their burden of showing that Canoles' methodology in reaching this opinion is reliable.

Plaintiffs argue it is "a matter of common sense" that it would have been "better" had the controller offered the pilot an airport he "could have reached," and that Canoles "did not need to conduct an accident reconstruction (or rely on one), nor did he need to determine the actual glide ratio or glide performance of the aircraft during the accident

sequence to know that controllers are trained to send an aircraft with the predicament faced by N87RY to the nearest airport or suitable off airport landing site." Doc. 487 at 22-23. As discussed above, Canoles' experience is sufficient for him to testify about what controllers are trained to do, and what the controller here should have done in advising the pilot. However, Canoles then takes an unsupported leap in opining that "that N87RY *would have reached*" Briggs Field. *Id.* at 23 (emphasis added). As they concede, this opinion is based on Canoles' review of the data from the accident, through the lens of his experience as an air traffic controller. *Id.*; *see also* doc. 487-32 at 3-5. He did not consult any models or perform any calculations. *See generally id.* As with the Cypress Lakes opinion above, that methodology, or lack thereof, does not meet the Rule 702 standard for reliability. *Frazier*, 387 F.3d at 1261. Canoles' (belatedly revealed) reliance on the NTSB Data Summary to "bolster or support" his opinion does not render his methodology reliable. Doc. 487 at 24-25. To reiterate: Canoles may opine that "N87RY should have been sent to Briggs Field," doc. 487-32, but he may not offer expert opinion testimony that, if the airplane had been sent to Briggs Field, it could have reached it to safely land. The United States' request to exclude this specific line

26

of testimony, that the aircraft could have easily reached Briggs Field, is, therefore, **GRANTED**.  Doc. 410, in part.

3. **Canoles' testimony about what the pilot would have seen while gliding along his proposed flight path towards Guyton, and the "conspicuity" of Briggs Field.**

In his Report, Canoles explains that the City of Guyton, Georgia, which was depicted on the Controller's radar at the time of the crash, is "very close to Briggs Field."  Doc. 410-2 at 26.  He opines that, had the Controller "vectored N87RY towards the City of Guyton," the city, including a "notable water tower," "could be easily seen from the air by N87RY."  *Id.* at 26 n. 12; *see also* doc. 410-7 at 10 ("Here, SAV ATC personnel could have provided pilotage or guidance to N87RY . . . by advising pilot Hunter that Briggs Field was 2 miles west of the City of Guyton, which would have been clearly visible to pilot Hunter.").  He further opines that "Briggs [Field] is very, very conspicuous from the air and could be as easy to detect as a public-use airport."  Doc. 410-3 at 49

The United States seeks to exclude Canoles' testimony about what the pilot could have, or would have, seen if he had been directed towards Briggs Field via Guyton, arguing it is based on speculation.  Doc. 410 at 14-20; *see id.* at 14 ("Canoles has no basis for these statements."), 20

("Canoles' speculation about the 'conspicuity' of Briggs Field fails to satisfy Rule 702's requirements for admissibility."). During his deposition, Canoles testified that, to his knowledge, he has never flown over Guyton, and he based his opinion on "aerial photos" of Briggs Field and "ground level" photos of Guyton. Doc. 410-3 at 44. As for the photos of Guyton, he testified that he did not take the photos, did not know who took the photos or when, and did not know whether the photographs accurately depicted "Guyton as it existed in 2017," at the time of the accident. *Id.* at 45. When asked about a photograph of the water tower referenced in his Report, Canoles testified that he did not know "if that water tower existed in 2017." *Id.* He further testified that he based his opinion regarding the water tower's usefulness as a landmark for pilots on "an assumption" he would make as an air traffic controller but conceded he does not know how tall the water tower is. *Id.*

The United States argues that Canoles' testimony on this topic, made without "specific information concerning the geography of Guyton," is only supported by Canoles' experience as a controller, including information—in general, not specific to Guyton or the area at issue— reported by pilots when they are flying over "whatever is prominent that

28

appears easy to spot from the sky." Doc. 410 at 15 (quoting doc. 410-3 at 47). Related to Canoles' testimony about the "conspicuity" of Briggs Field, the United States argues it was solely based on Canoles' review, shortly before his deposition, of two-dimensional "Google Earth images" shown to him by Plaintiffs' counsel, his "experience that the airports are . . . fairly obvious" and "pretty easily detected from airplanes," and his belief that "that's true of Briggs Field." *Id.* at 17-18.

As above, Plaintiffs must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Frazier*, 387 F.3d at 1261 (emphasis omitted). They fail to do so here. While they have met their burden to show that Canoles is qualified to testify reliably about "how pilotage can be used to guide an aircraft to an airport," doc. 487 at 29, and may testify about the types of landmarks a controller could expect a pilot to be able to see, they do not meet their burden of showing how Canoles' experience is a sufficiently reliable basis to opine as to what this particular pilot could see from an aerial view of the relevant landscape. The United States' request to exclude Canoles' opinions that

Pilot Hunter could have or would have seen the City of Guyton or Briggs Field from the air is, therefore, **GRANTED**. Doc. 410, in part.

### 4. Canoles' opinions concerning the FAA's Post-Accident Event Reporting and Review.

Canoles' Report discusses, in depth, the Mandatory Occurrence Report ("MOR") completed by the Savannah Air Traffic Control facility after the crash. Doc. 410-2 at 27-39. The United States moves to exclude any testimony about the MOR, or any other FAA post-accident activities, as irrelevant and unhelpful. Doc. 410 at 20-21. In response, Plaintiffs argue that while this "stinging rebuke" of the post-accident investigation is "admittedly, not relevant to what caused or contributed to cause the crash," striking Canoles' opinions on this ground "would be premature." Doc. 487 at 34. Plaintiffs also concede they do not anticipate having Canoles testify as to these opinions, "unless circumstances at trial warrant seeking relief from the Court to elicit this testimony from Canoles." *Id.* at 35 n. 37. Plaintiffs' tenuous theory of potential relevancy is not sufficient to bear their burden of demonstrating the helpfulness of this anticipated testimony. The United States' request to exclude Canoles' opinions about the FAA's post-accident review, including the MOR, is **GRANTED**. Doc. 410, in part.

### 5.   Canoles' opinion about issuing a low altitude alert.

During his deposition, Canoles adjusted his opinion related to the air traffic controller not issuing a "low altitude alert to the accident aircraft." Doc. 410-3 at 4.  He explained he originally "sympathized with the controller for not issuing that information because it might have distracted the pilot," but "in reviewing it again" he "think[s] it might have given the pilot an awareness that he was getting closer to the ground than perhaps he knew." *Id.*  His ultimate opinion is "that the controller should have issued the low altitude alert to the . . . accident aircraft when it was received on his computer or on his STARS display," to "alert the pilot . . . of his proximity to the ground; that he was getting too close to the ground." *Id.*

The United States moves to exclude this opinion as "sheer speculation," arguing "[t]here is no evidence that the pilot was unaware of his altitude or that giving such an alert would have prevented the accident." Doc. 410 at 21.  However, Plaintiffs convincingly argue that Canoles' opinion about the issuance of the low altitude alert is relevant, reliable, and helpful.  Doc. 487 at 32-33.  The United States' request to exclude it is, therefore, **DENIED**.  Doc. 410, in part.

**6.     Canoles' piloting-related opinions.**

ADG and Huff also challenge some of Canoles' anticipated testimony, seeking to exclude his "opinions related to the piloting of the aircraft." Doc. 439 at 2. They argue his opinions criticizing the pilot for not complying with ATC instructions and not flying the proper glide speed are outside the scope of his qualifications as an air traffic control expert and not based on reliable methodology. *Id.* Plaintiffs concede Canoles is not a piloting expert but argue he is qualified to testify about what controllers expect pilots to do, and about the relationship between pilots and air traffic controllers. *See generally* doc. 455. A review of the challenged testimony, which was elicited during Canoles' deposition and not contained in his report, *see* doc. 439 at 3, shows that it is consistent with Plaintiffs' categorization, and revolves around Canoles' opinions about the interplay between the pilot and the air traffic controller, and what the controller can expect from a pilot. *See* doc. 455 at 6-7, 8, 9-10, 11-12 (quoting doc. 455-18). Plaintiffs have also demonstrated that Canoles' testimony is reliable. *Id.* at 14-15. ADG and Huff's Motion is, therefore, **DENIED**. Doc. 439. If Canoles attempts to offer any

testimony that exceeds the scope of his expertise at trial, ADG and Huff remain free to challenge any specific testimony at that time.

## Mark N. Callender, Ph.D.

Plaintiffs identified Mark N. Callender, Ph.D., as an expert aerodynamicist. Doc. 470 at 1; *see also* doc. 470-1 (Callender Expert Report); doc. 470-2 (Callender Rebuttal Report); doc. 470-3 (Callender Supplemental Report); doc. 470-4 (Callender Supplemental Report Addendum); doc. 470-5 (Callender Second Supplemental Report).[2] The United States moves to exclude his testimony. Doc. 409. Before turning to the United States' substantive challenges to Callender's opinions, the Court must first address its suggestion, made in a footnote, that Callender's first supplemental report, doc. 409-13; *see also* doc. 470-3, should be excluded as improperly "designed to cure a significant omission in Callender's original report." Doc. 409 at 6 n. 5 (citing *Green v. COSCO Shipping Lines Co. Ltd.*, 2023 WL 2137117, at *2 (S.D. Ga. Feb. 21, 2023)).

---

[2] In the discussion below, the Court cites to the copies of Callender's various reports attached to Plaintiff's brief. For simplicity, the Court has not included parallel citations where those reports are filed elsewhere in the record.

The Federal Rules of Civil Procedure require a party seeking to introduce expert testimony at trial to disclose the identity of the expert along with an expert report containing:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications . . . ; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(A)-(B). These disclosures must be made "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). A party has a continuing obligation to supplement its expert's report. Fed. R. Civ. P. 26(a)(2)(E). However, the duty to "supplement" a report does not render the initial duty of complete and timely disclosure toothless. *Hamlett v. Carroll Fulmer Logistics Corp.*, 176 F. Supp. 3d 1360, 1363 n.5 (S.D. Ga. 2016) ("[T]he rules and case law require timely disclosure and timely supplementation; trial by ambush is not permitted. Nor are reports that are blatantly untimely or rely on supplementation to dodge a deadline.").

34

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). " 'The party failing to comply with Rule 26(a) bears the burden of establishing that its non-disclosure was either substantially justified or harmless.'" *Caviness v. Holland*, 2011 WL 13160390, at \*2 (S.D. Ga. Mar. 17, 2011) (quoting *Hewitt v. Liberty Mut. Grp., Inc.*, 268 F.R.D. 681, 683 (M.D. Fla. 2010)). "A failure to timely make the required disclosures is harmless when there is no prejudice to the party entitled to the disclosure." *Hewitt*, 268 F.R.D. at 683.

Here, the Court need not determine whether Plaintiffs improperly supplemented Callender's original expert report, because even if they did, any untimeliness was harmless. The United States concedes that Callendar was offered for a second deposition after he produced the supplemental report. Doc. 409 at 7. As Plaintiffs compellingly argue, "all spreadsheets and supplements were supplied long before the close of expert discovery, and the United States suffered no prejudice since Callender gave a second deposition at which the United States had an

unlimited opportunity to question Callender on all of his spreadsheets." Doc. 470 at 8. Since, even if the Court were to find Plaintiffs untimely produced any of Callender's opinions, that untimely production was harmless, the United States' request to exclude any opinion on this ground is **DENIED**. Doc. 409, in part.

Having resolved the parties' procedural dispute, the Court turns to the United States' substantive challenges to Callender's opinions. As the United States observes in its Motion, "[a] key question posed by Plaintiffs' Complaint is whether the airplane would have had the glide range to safely land at Cypress Lakes or Briggs Field but for the air traffic controller's alleged negligence." Doc. 409 at 3. In aid of their position on this question, Plaintiffs explain that Callender determined "the best glide range and speed for the A36 Bonanza," which he then used to determine "how far the aircraft can glide." Doc. 470 at 4 (citing doc. 470-1 at 7-12). Then, "[a]rmed with this information, Callender answered hypotheticals to demonstrate what was possible for N87RY had ATC and Hunter performed properly their respective roles during this emergency." *Id.*

Callendar's initial Report explains that he conducted flight tests in an A36 Beech Bonanza equipped with the same engine and propeller as

N87RY. Doc. 470-1 at 7. He utilized a method called the "Sawtooth Climb and Descent (SCD)," and explained how the SCD runs were carried out. *Id.* at 7-9. Using the data collected during the flight tests, he calculated the airplane's "sink rate (SR)" (Equation 1), corrected the SR for nonstandard temperature ($SR_{corr}$) (Equation 2), calculated the airplane's required horsepower ($HP_R$) (Equation 3), calculated the airplane's corrected power (PIW) (Equation 4), calculated the calibrated airspeeds (CAS) (Equation 5), corrected the CAS values to calculate the corrected airspeeds (VIW) (Equation 6), then created a "plot of PIW vs VIW" to identify "the airplane's best glide airspeed ($V_G$)." *Id.* at 9-11. The CAS values were then corrected for density, to arrive at the true airspeed (TAS) (Equation 7). *Id.* at 11. "Using TAS and the corrected SR, the airplane's glide angle ($y$) and L/D[3] were calculated (Equations 8 & 9)." *Id.* Callendar then plotted L/D vs indicated airspeed (IAS), applied a curve fit, and determined the airplane's $(L/D)_{max}$, or glide ratio, to be 11.92. *Id.* at 12. The "POH," or "airplane operating handbooks," *id.* at 5, identifies the airplane's "Glide Ratio" as "1.7 nautical miles . . . per 1000

---

[3] Elsewhere, Callender explains that L/D is the ratio of lift over drag. Doc. 470-1 at 5. The $(L/D)_{max}$ for an airplane is equivalent to the airplane's best glide ratio, or GR. *Id.* at 6. "An airplane's GR is used by a pilot to determine how far an airplane can glide in the event of an engine failure." *Id.*

feet of altitude," doc. 470-16 at 4, which Callender calculates as a value of 10.33, doc. 470-1 at 12.

The United States summarizes that "Dr. Callender has produced 16 tables with 64 separate glide predictions, each of which is based on one of five different glide ratios . . . ." Doc. 409 at 8. Plaintiffs argue these "tables and hypotheticals" are not separate opinions, but instead Callender "produced one opinion regarding the maximum glide ratio of an A36 Bonanza" and this opinion, along with "the separate conservative glide ratio from the [N87RY's Pilot Operating Handbook ("POH")] are the bases of the spreadsheets." Doc. 470 at 7. Callender's initial Report explains that, based on his calculation of the airplane's glide ratio, he could then determine the aircraft's glide range. Doc. 470-1 at 12-13. He calculated the glide range "beginning five seconds prior to the point that an emergency was declared to the two closest airports: GA35 and GA43." *Id.* at 13. He relied on admitted assumptions to complete these calculations: "1) the airplane is flown at the published $V_G$ [best glide airspeed, *see id.* at 9,] of 110 [knots indicated airspeed, "KIAS"], 2) a constant ground track is held until 13 seconds after the emergency was declared, 3) turns are at constant bank angles, and 4) the airplane's

38

propeller is windmilling." *Id.* at 14.  Additionally, "[t]he glide calculations were performed using the meteorological conditions reported at the time of the accident." *Id.*

Callender's initial Report includes the calculated glide paths to Cypress Lakes (identified as GA35), using his calculated GR of 11.9, and four different bank angles, 15°, 30°, 45°, and 60° for the turns.  Doc. 470-1 at 17.  The Report includes the same calculations for Briggs Field (identified as GA43).  *Id.* at 18.  It also includes the glide range calculations for both Cypress Lakes and Briggs Field using the POH GR of 10.33, with the same four bank angles.  *Id.* at 20-21.  His Supplemental Report includes "additional glide ratio tables to GA35 and GA43."  Doc. 470-3 at 2.  These tables, which, like those in the original report, include glide paths to both GA35 and GA43 using a GR of 11.9 and a GR of 10.33 with bank angles of 15°, 30°, 45°, and 60°, include updated calculations based on different wind data.  *Id.* at 6-8.  The supplement also includes two tables that contain glide path calculations to GA43, using two sets of wind data, with an air speed of 80 KIAS, "an approximated average airspeed recorded for N87RY after the emergency was declared and during the accident sequence." *Id.* at 9.  His final supplement includes a

table showing "glide prediction data for an A36 Bonanza to GA35 at 80 KIAS" with a GR of 10.22. Doc. 470-5 at 2. The 10.22 GR was calculated "based upon an approximated average airspeed recorded for N87RY after the emergency was declared and during the accident sequence." *Id.*

The United States challenges Callender's "hypothetical glide predictions to Cypress Lakes and Briggs Field." Doc. 409 at 4 (emphasis and quotations omitted). It seeks to exclude these "hypothetical glide predictions" as unhelpful, *id.* at 12-13, not properly tested, *id.* at 13-17, based on speculation, *id.* at 18-29, based on improper reliance on modeled winds, *id.* at 30-31, based on unvalidated geographic data, *id.* at 32-33, based on an unverified predicate, *id.* at 33-34, and inconsistent with Plaintiffs' expert Canoles' opinions, *id.* at 34. Plaintiffs oppose these arguments. *See* doc. 470 at 15-33.[4]

### 1.   Callender's hypothetical glide predictions to Cypress Lakes.

The United States argues Callender's "32 hypothetical glide predictions to Cypress Lake" are not helpful, because Plaintiffs' air traffic

---

[4] In opposing these substantive challenges, Plaintiffs observe that the United States did not dispute Callender's qualifications as an aerodynamicist. Doc. 470 at 13. Plaintiffs then go on to discuss his qualifications, both educational and experiential. *Id.* at 14. Plaintiffs have borne their burden, unchallenged by the United Sates, that Callender is qualified as an aerodynamicist.

control expert, Canoles, testified that he "simply would have issued Briggs" if he were assisting the pilot. Doc. 409 at 12. However, as the Court already determined above, there is nothing to suggest the Plaintiffs have abandoned their arguments related to Cypress Lakes, and it remains a disputed issue in this case. *See, e.g.*, doc. 470 at 17 ("Since Plaintiffs have not abandoned Cypress Lakes, Callender's opinions related to that airport remain helpful."). Therefore, the United States' request to exclude Callender's "hypothetical glide predictions to Cypress Lakes" is **DENIED**. Doc. 409, in part.

### 2. Callender's rebuttal of Stimpson's opinion.

The United States criticizes what it characterizes as Callender's "attempt[ ] to validate the exemplar glide ratio of 11.9 to 1 for use in his hypothetical glide predictions." Doc. 409 at 13. Relying on a portion of Callender's rebuttal report where Callender responds to opinions from ADG and Huff's expert Douglas Stimpson, doc. 470-2 at 7, the United States argues Callender incorrectly applied his methodology in determining that the aircraft's actual glide performance "is well represented by the flight test data." Doc. 409 at 13-14. In considering Stimpson's opinion that "Pilot Hunter was able to achieve near-textbook

41

maximum glide distance (6.4 v. 6.63 n.m.) even with a 180-degree turn," Callender opined that "[t]he distance covered by N87RY, given the turn that it performed and the suboptimal airspeed it had throughout the glide, is only possible if its glide ratio was significantly higher than the handbook value." Doc. 470-2 at 7. Callender then applied the "suboptimal airspeed of 85 KIAS" to reveal a glide ratio "of approximately 10.6." *Id.* He then opined that, "[c]alculating the altitude lost in a low bank angle 180° turn along with the altitude lost in a straight and level glide with a glide ratio of 10.6 results in a total glide distance of approximately 6.3 NM," which "is consistent with the distance covered by N87RY, which verifies that its glide performance is well represented by the flight test data obtained using [the exemplar A36 Bonanza]." *Id.*

The United States argues this "attempt to validate the airplane's actual glide ratio" is unreliable because it fails to account for wind, Callender did not know whether he was calculating a glide along the actual flight path of the accident airplane, and Callender did not verify that 85 knots was the proper airspeed to use for this analysis. Doc. 409 at 14-17. Plaintiffs observe, in response, that Callender was not attempting to validate his calculated glide ratio, but providing his own

explanation of Stimpson's opinion. Doc. 470 at 18. They further argue that Callender's analysis was not designed to "test" any of his "hypothetical paths against what N87RY did the day of the crash." *Id.* As for the specific challenges to the opinion, Plaintiffs argue that these challenges go to the weight of Callender's opinion, and not its admissibility. Plaintiffs are correct.

The United States' motion concedes that "[t]here is nothing inherently improper about [Callender's] methodology." Doc. 409 at 14. Instead, it argues "several critical factors" in its application "were either overlooked or simply ignored." *Id.* These are the types of criticisms that "impugn the accuracy of his results, not the general scientific validity of his methods." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003). The identification of these types of flaws "is precisely the role of cross-examination." *Id.* As the Eleventh Circuit has observed, based on the Supreme Court's decision in *Bazemore v. Friday*, 478 U.S. 385 (1986), "normally, failure to include variables will affect the analysis' probativeness, not its admissibility." *Quiet Tech. DC-8*, 326 F.3d at 1346 (internal quotations and alteration omitted). Any reliance on assumptions, or even questionable data, in performing otherwise

reliable and acceptable calculations does not render the ultimate opinion inadmissible; those are matters for cross-examination. *See id.*; *see also, e.g. United States v. Markovich*, 95 F.4th 1367, 1377-78 (11th Cir. 2024) (vigorous cross-examination and jury instructions "are the appropriate means of attacking shaky but admissible evidence." (internal citations and quotations omitted). The United States' request to exclude Callender's opinions on this ground is, therefore, **DENIED**. Doc. 409, in part.

### 3. Callender's assumptions underlying his glide predictions.

The United States next argues that Callender's hypothetical glide predictions should all be excluded because they are calculated using "five different assumed glide ratios," and those glide ratios each "requires its own set of assumed conditions which either knowingly did not exist during the accident flight or remain unknown by Callender." Doc. 409 at 18. Specifically, the United States challenges the assumptions made about the airplane's speed, *id.* at 18-20, the rotation and position of the propeller, *id.* at 21-24, the airplane's bank angle, *id.* at 24-25, the airplane's weight, *id.* at 25-28, and the timing of a turn to the selected airport, *id.* at 28-29.

The United States argues that the airplane's speed was "less than 110 knots after the reported engine failure." Doc. 409 at 18. Therefore, it challenges Callender's original glide predictions, which assume an air speed of 110 knots, and further challenge his reliance on a constant speed, even though "the undisputed evidence shows it was not." *Id.* It argues the glide predictions are inadmissible because, while they "may be academically interesting, . . . they do not answer the question posed by Plaintiff's Complaint, *i.e.*, whether the accident airplane would have safely landed at Cypress Lakes or Briggs Field but for the controller's alleged negligence." *Id.* at 19. The predictions are, in the United States' view, unhelpful. *Id.* The United States' helpfulness argument is unavailing. "To be admissible, an expert's testimony need not independently satisfy Plaintiff's burdens as to breach or causation. The standard for 'assisting the trier of fact' is gentler than that." *Hudgens v. Durrence*, 2008 WL 6839019, at *3 (S.D. Ga. Dec. 30, 2008) (quoting *Daubert*, 509 U.S. at 591-92) (alterations omitted)). Plaintiffs explain that the 110 knots speed was taken from the airplane's POH, and therefore tied to the facts of the case. Doc. 470 at 21. Callender's

45

calculations based on an assumed airplane speed of 110 are, therefore, helpful.

Additionally, Callender is permitted to base his calculations on assumptions, and that reliance does not render his methodology unreliable. As the United States concedes, "experts are permitted to offer opinions that rely on assumptions . . . [that] have some basis in the record." Doc. 409 at 18 (citing *AZZ, Inc. v. S. Nuclear Op. Co., Inc.*, 2023 WL 2746033, at \*10 (S.D. Ga. Mar. 31, 2023)). Plaintiffs' response identifies where in the record Callender obtained his assumed airplane glide speeds. *See* doc. 470 at 21-22. The United States does not challenge Callender's calculations, but the data he input into those calculations. Because Plaintiffs are correct, and he is permitted to base his opinions on these express assumptions, the United States' arguments about the validity of his data are for cross-examination. "The information experts rely on generally goes to weight not admissibility. [Cit.] The identification of flawed data or facts relied upon by an expert is precisely the role of cross-examination." *Griffin v. Coffee Cnty.*, 623 F. Supp. 3d 1365, 1378 (S.D. Ga. 2022) (internal citation, alteration, and quotations omitted).

The United States' arguments about the propeller are twofold. First, it asks the Court to exclude any opinion from Callender "concerning the airplane's glide ratio with a stopped propeller," since other experts in the case opine that the propeller was rotating, or "windmilling," up until the crash. Doc. 409 at 21. Second, they ask the Court to exclude Callender's glide predictions based on the propeller being in the "full aft position," since Callender does not know the propeller's position, and bases it on the maximum glide configuration in the POH. *Id.* at 22-23. As with the assumed airplane speed, this is the type of potentially "flawed data" that the United States can explore on cross-examination. So too his reliance on assumed, or hypothetical, bank angles, weight, and turns. *See* doc. 409 at 24-28. The formulas used for the calculations themselves remain reliable.

Overall, Callender may testify about the results of his test flight and his calculations of various glide ranges based on those results, even if they contain assumptions, or are based on hypothetical scenarios. He is clear about the assumptions made, the assumptions were based on scenarios "within the capabilities of the aircraft," doc. 470 at 25, and the hypotheticals are closely tied to a main issue in this case. Therefore, the

47

opinions are within the realm of admissible expert testimony.  *See Griffin*, 623 F. Supp. 3d at 1376.  The critiques of his opinions all go to the weight, and not admissibility, of his testimony.  *Quiet Tech. DC-8*, 326 F.3d at 1346.  The United States' request to exclude his opinions as speculative is, therefore, **DENIED**.  Doc. 409, in part.

> ### 4.   Callender's reliance on modeled winds.

The United States next argues that Callender improperly relied on "modeled winds" in conducting his calculations of the various glide ranges.  Doc. 409 at 30-31.  Unlike the case cited by the United States in its Motion, *see id.* at 31 (citing *Grayson v. No Labels, Inc.*, 599 F. Supp. 3d 1184, 1193 (M.D. Fla. 2022)), Callender does not improperly bolster another expert's opinion by blindly relying on it; instead, Callender used data points from multiple experts as input into his own detailed calculations.  *See* doc. 470 at 28-29.  If the United States wishes to challenge Callender's testimony as based on incorrect assumptions, or imprecise data, they may do so on cross-examination.  *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1194 (11th Cir. 2011).  The request to exclude on this ground is **DENIED**.  Doc. 409, in part.

### 5. Callender's reliance on provided geographic data and assumption about the location of Briggs Field.

For the same reasons as those discussed above concerning Callender's glide predictions, exclusion is not the appropriate remedy for the United States' challenges to Callender's reliance on data provided by Plaintiffs' counsel as to "the direction and the distance" of the start position for his calculations, and the exact location of Briggs Field. *See* doc. 409 at 32-34. The methodology, *i.e.*, the formulas used for his calculations, is indisputably reliable. The data or information used to complete those calculations can be challenged on cross examination. *See Rosenfeld*, 654 F.3d at 1194 (rejecting reliability challenge based on alleged "incorrect assumptions"). The request to exclude on this ground is, therefore, **DENIED**. Doc. 409, in part.

### 6. Callender's opinions compared to those of Plaintiffs' expert Canoles.

Finally, the United States argues that Callender's glide predictions do not follow a route to Briggs Field provided by Plaintiffs' air traffic control expert Canoles. Doc. 409 at 34. Plaintiff has demonstrated that, generally, Callender is qualified to offer his opinions, and they are sufficiently reliable and helpful to meet the requirements of *Daubert* and Rule 702. That another expert may offer testimony that could conflict

49

with Callender's testimony is not reason, under *Daubert*, to exclude.  *See, e.g., Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 n. 7 (11th Cir. 2005) ("[A] district court may not exclude an expert because it believes one expert is more persuasive than another expert.").  The request to exclude on this ground is, therefore, **DENIED**.  Doc. 409, in part.

### William Jeffrey Edwards, Ph.D.

Defendants ADG and Huff identified Dr. William Jeffrey Edwards as a "piloting expert and accident investigator."  Doc. 469 at 21; doc. 408-1 (Edwards' Expert Report); doc. 469-12 (Edwards' CV).  The United States seeks to exclude his opinion that "the accident airplane would have been able to glide to and/or safely land at Briggs Field," since it lacks a reliable basis, and to exclude any opinions about air traffic control, since he is not qualified to offer those opinions.  Doc. 408 at 2.[5]  ADG and Huff oppose the exclusion of these opinions.  Doc. 469 at 16-21.

In his initial report, Dr. Edwards opined:

> The actual glide distance achieved by the pilot confirms that he would have been able to easily reach Briggs Field had the aircraft diverted to this airport.  Dr. Callender computed that the aircraft would have arrived over Briggs Field at approximately 1,600 feet AGL[, *i.e.*, above ground level].  This

---

[5]  Plaintiffs also challenge Dr. Edwards' opinions, *see* doc. 414, but those challenges will be resolved by subsequent Order.

altitude is sufficient for a pilot to execute an engine out landing to either runway and the altitude is also sufficient to account for deviations noted elsewhere.

Doc. 408-1 at 49. The United States argues that the above opinion should be excluded because Dr. Edwards did not personally determine the glide ratio of the airplane during the accident flight and did not perform an analysis of his own to determine whether the airplane would have been able to glide to Briggs Field, and if so, what the altitude would have been upon arrival. Doc. 408 at 7. The Motion argues Dr. Edwards should not be allowed to "parrot" the opinions of Dr. Callender. *Id.* at 8.

In response, Defendants ADG and Huff argue Dr. Edwards did not rely on Callender's work with respect to his opinion that the aircraft could reach Briggs Field, and that instead the opinion is "based on data which is not in dispute[ *i.e.,*[t]he distance to Briggs at the point of the declared emergency and the actual distance the aircraft was able to travel following the engine failure,"], and the result of his own calculations." Doc. 469 at 18, 18 n. 3. The United States clarifies that this is not the portion of Edwards' opinion they seek to exclude. Doc. 506 at 7. Instead, the United States attacks the second portion of Edwards' opinion, "that the accident airplane would have had sufficient altitude to land safely at

Briggs." *Id.* This opinion is based, in part, on one of Callender's hypothetical glide paths. *See* doc. 469 at 19.

To the extent the United States seeks to exclude this opinion based on its unsuccessful challenge to Dr. Callender's opinions, *see* doc. 506 at 7, that fails for the reasons articulated above in rejecting the United States' challenge to Callender's opinions. Additionally, ADG and Huff have sufficiently articulated why Edwards' reliance on Callender's opinion is sufficient to meet the *Daubert* standard. *See* doc. 469 at 19; *see also, e.g.*, *In Wright Med. Tech. Inc., Conserve Hip Implant Prods. Liab. Litig.*, 127 F. Supp. 3d 1306, 1320 (N.D. Ga. 2015). Edwards did not merely "parrot" Callender's opinion; instead, he considered Callender's opinion that, based on one of his glide path calculations, the airplane could have arrived at Briggs Field "at approximately 1,600 feet," and then applied his own experience as a pilot to determine that was sufficient altitude "for a pilot to execute an engine out landing." Doc. 408-1 at 49; *see also* doc. 469 at 19-20. The United States' request to exclude this opinion is **DENIED**. Doc. 408, in part.

The United States also seeks to exclude Edwards' testimony related to air traffic control. Doc. 408 at 13. In his Report, Edwards opines that

52

"[p]ilots who declare an emergency are entitled to rely on ATC to provide them with 'maximum assistance,'" and that it is "reasonable" for a pilot to rely on ATC to provide him with timely and accurate information as to available airports or off-airport landing opportunities in the event of an engine out emergency. Doc. 408-1 at 53. During his deposition he offered testimony on his understanding, as a pilot, about what a pilot may reasonably expect from an air traffic controller in an emergency situation. Doc. 408-2 at 7-9; 11; 13-14. However, some of his testimony veered into improper testimony about the standard owed by air traffic controllers, which he is not qualified to offer. For example, he testified that he agreed that the air traffic controller, in "not giving [the pilot] the distance to Statesboro or Savannah when the controller first communicated with him," was "not providing maximum assistance." Doc. 408-2 at 13. ADG and Huff agree that Dr. Edwards is not offering opinions on what the controller should or should not have done, *see* doc. 469 at 21. Edwards may not testify about whether the air traffic controller met the standard of care, or, in other words, did what he "should or should not have done," *id*. Therefore, the United States' request to exclude his testimony is **GRANTED**, in part, and **DENIED**,

53

in part.  Doc. 408, in part.  Edwards may testify about what a pilot can expect from an air traffic controller, but may not testify about whether the air traffic controller in this case did what he should have done.

### Douglas E. Stimpson

Defendants ADG and Huff identified Douglas E. Stimpson as an aircraft accident investigator.  *See, e.g.,* doc. 408-7 (Stimpson Expert Report); doc. 408-8 (Stimpson Rebuttal Report).  As with Edwards, discussed above, the United States moves to exclude any testimony from Stimpson about whether the aircraft could have safely landed at Briggs Field, doc. 408 at 9-12, and any testimony or opinions about air traffic control, *id.* at 13-15.

As the United States summarizes in its Reply, it "seeks to exclude Mr. Stimpson's opinion that the accident airplane could have 'made it' to Briggs Field because Mr. Stimpson failed to consider the winds aloft." Doc. 506 at 3; *see also* doc. 408 at 11 (Mr. Stimpson's use of the 'book' glide distance without accounting for the winds aloft renders his opinions meaningless.").  Stimpson does not have any calculations "on paper anywhere," doc. 408-6 at 105, and explains that he uses the data from the POH to "reconstruct what would have happened in this case."  *Id.*  ADG

and Huff focus their response on why the failure to include "winds aloft" in the calculation is not fatal to the opinion's admissibility, but what ADG and Huff never explain is what the methodology is in the first instance. *See* doc. 469 at 8-11. They admit this opinion was not in Stimpson's initial or rebuttal report, and it was developed during questioning by Plaintiff's counsel during Stimpson's deposition. *Id.* at 8. There is no indication in the Response as to how exactly Stimpson reached his conclusion that the airplane could have made it to Briggs Field, under any set of circumstances. *See generally id.* As the Eleventh Circuit has explained, in quoting the advisory committee's comment to Rule 702, "[t]he trial court's gatekeeping function requires more than simply taking the expert's word for it." *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1331 (11th Cir. 2014) (internal citation and quotations omitted). Here, as in *Hughes*, the "vague manner in which [Stimpson] described his methodology" is fatal to its reliability. *Id.* ADG and Huff have not met their burden of demonstrating the opinion's reliability and it must be excluded. The United State's request is, therefore, **GRANTED**, as to Stimpson's opinion that the airplane could have made it to Briggs Field. Doc. 408, in part.

55

The United States also seeks to exclude Stimpson's testimony related to air traffic control. Doc. 408 at 13-15. Like Edwards, Stimpson offers opinions related to air traffic control based on his piloting experience. *See, e.g.*, doc. 408-6 at 49. However, also like Edwards, his testimony and opinions veer outside of the scope of what a pilot might expect from an air traffic controller. In his Report, Stimpson opines that "[t]he ATC controller did not provide 'maximum assistance' to pilot Hunter." Doc. 408-7 at 15. This is beyond his experience, which is as a pilot, flight instructor, mechanic, and accident reconstructionist. Doc. 469 at 13. Stimpson may offer testimony on what he, as a pilot, would expect from the air traffic controller, but may not offer an opinion as to whether what the air traffic controller did in this situation meets the applicable standard of care. The United States' request to exclude this line of testimony is, therefore, **GRANTED**, in part, and **DENIED**, in part. Doc. 408, in part.

## Kevin S. Karpe

Defendants ADG and Huff identified Kevin S. Karpe as an air traffic control expert. *See* doc. 408-13 (Karpe Expert Report). The United States moves to exclude his opinion that the airplane "could have easily

56

made" it to Briggs Field.  Doc. 408 at 12-13.  The contested portion of his expert report is the opinion: "The failure to include Briggs Field on the RVM was a direct contributing cause to the crash because had it been on the RVM then the NR controller would have been able to provide N87RY an airport that he could have easily made under the emergency scenario he was facing."  Doc. 408-13 at 15.  The United States does not challenge Karpe's experience or expertise as an air traffic controller, or challenge any of his other opinions.  *See generally* doc. 408.  But, on the narrow issue of Karpe's opinion that Briggs Field is "an airport that [the pilot] could have easily made," their challenge is well-taken.  ADG and Huff do not offer any argument to rebut the United States' observation that this portion of the opinion is beyond the scope of Karpe's experience and devoid of any reliable methodology.  *See* doc. 408 at 12-13; doc. 469 at 15-16.  It is, therefore, excluded.  The United States' request is **GRANTED**. Doc. 408, in part.

### Col. Jameel "J.F." Joseph, U.S.M.C. (Ret.)

Plaintiffs designated Col. Jameel "J.F." Joseph, U.S.M.C. (Ret.), as their piloting expert in this case.  *See* doc. 457-7 (Joseph Expert Report); doc. 457-8 (Joseph Rebuttal Report).  Joseph's Expert Report explains

that he was retained to opine on "piloting; the pilot/air traffic control nexus and the role that relationship played in contributing to cause this fatal crash; aircraft and pilot performance during the subject flight; and aircraft selection for the mission involved in the accident flight." Doc. 457-7 at 3.

The United States moves to exclude his opinions related to "the pilot/air traffic control nexus" and the role it played in the accident, and his opinions related to aircraft and pilot performance during the accident flight. Doc. 411 at 2. Defendants ADG and Huff also move to exclude some of Joseph's opinions: "opinions regarding FAR Part 135 in relation to the accident Aircraft and flight," "opinions that ADG and Huff chose the Aircraft and arranged the accident flight," "opinions regarding the suitability and reliability of the accident aircraft," "testimony and opinions related to his reenactment flights," "opinion that the Aircraft stalled 80 yards from a certain field," "opinions regarding a lack of oil on the Aircraft's windscreen," and his "opinion that reference to the word 'team' in an FAA Order includes ATC controllers and the pilot." Doc. 443 at 2.

### 1. Joseph's qualifications to offer opinions on air traffic control.

The United States argues Joseph is not qualified to provide expert opinions about air traffic control. Doc. 411 at 6. Joseph testified that he considers himself an expert "in terms of the nexus, the relationship, between a pilot and air traffic control." Doc. 411-3 at 19. The United States argues his experience as a pilot is insufficient to render "air traffic control opinions under the guise of a so-called 'pilot/air traffic control nexus.'" Doc. 411 at 2. Plaintiffs respond that Joseph is qualified to testify as a piloting expert, and may permissibly testify as to "pilot expectations regarding the information and assistance that ATC is to provide when advised by a pilot of an in-flight emergency that he has an 'engine failure, need to land.'" Doc. 457 at 4. Plaintiffs have demonstrated that Joseph is qualified to opine about what the pilot can expect from an air traffic controller, and how the two interact. *Id.* at 4, 11-21. However, no matter how Plaintiffs package the testimony, Joseph is not qualified to opine about what an air traffic controller "should" have done. *See, e.g.*, doc. 457-7 at 54 (opining the controller "should have noted the large heading deviation"), 57 (opining the "ATC should have known that the MA never could have reached Cypress Lakes Airport at the time

it was offered"); *see also id.* at 58 (discussing the ATC's "failures").  In sum, the United States is correct that "testifying about what a pilot *may expect* from air traffic control is not the same as testifying about what air traffic control *should have done or failed to do.*"  Doc. 511 at 3.  Therefore, the United States' request to exclude this testimony is **GRANTED** in part, and **DENIED**, in part.  Doc. 411, in part.  Joseph may testify about what a pilot expects from an air traffic controller, but any testimony about what an air traffic controller should do, whether the air traffic controller's actions in this case rose to what Joseph opines is the correct standard, or testimony about perceived failures of the controller in this case is **EXCLUDED**.

### 2.   Joseph's Cypress Lakes opinion.

In his initial Report, Joseph opined that "Cypress Lakes Airport is suitable in length and an A-36 could have likely reached this airport had it been timely provided at the time of the emergency given the MA's altitude at the time of the emergency declaration, the distance and winds."  Doc. 457-7 at 49.  The United States first argues this opinion should be excluded because it is no longer relevant, based on Canoles' testimony that he "simply would have issued Briggs."  Doc. 411 at 11.  As

the Court already determined above, there is nothing to suggest Plaintiffs have abandoned Cypress Lakes as an issue in this case. Any attempt to exclude Joseph's opinion on this ground is **DENIED**. Doc. 411, in part.

The United States also argues that Joseph's Cypress Lakes' opinion is not the product of a reliable methodology. Doc. 411 at 11. It argues Joseph, in rendering his opinion, that an "A-36 could have likely reached" Cypress Lakes "had it been timely provided at the time of the emergency," doc. 457-7 at 49, "did not reconstruct the accident and has no idea what the airplane's actual glide ratio was during the emergency." Doc. 411 at 11. It points to deposition testimony where Joseph explains his opinion that, at the time the controller gave Pilot Hunter the two choices of Savannah or Statesboro, the airplane "would have been able to" make it to Cypress Lakes. Doc. 411-3 at 49. He first states that his opinion is based on "Dr. Callender's data," though he does not explain which of Dr. Callender's many calculations he considered in forming his own opinion. *Id.* He then explains his "independent pilot analysis," which he describes as "math for Marines," which is "a value that a pilot may have in terms of, How far can I go? And it's just a gouge [sic]

reference for very quick, because it's not precise, but it'll get me in the ballpark." *Id.* He then used the "book values" of "1.7 nautical miles per thousand feet" to explain his calculation that, if flying at an altitude of 4,000 feet, the result is "8 miles – something less than 8 miles for planning purposes." *Id.* When asked about the turn the airplane would have had to make to reach Cypress Lakes from the point of the emergency, he testified, "[w]ell, it all depends on how quick, what kind of rate of turn was employed. There are many number of variables that would expedite that turn, shorten that turn and therefore the distance that the airplane's going to cover." *Id.*

Joesph, as a pilot expert, is qualified to opine as to how a pilot facing an emergency might calculate how far he can go, and what that calculation might have looked like for Pilot Hunter during the accident at issue. His experience provides the necessary basis for him to offer that testimony. However, Plaintiffs have not borne their burden of showing that he may reliably opine that the airplane "could have likely reached this airport had it been timely provided at the time of the emergency." Doc. 457-7 at 49. He does not offer any real methodology to reach that conclusion, and his reliance on some unspecified portion of Callender's

62

result does not save the opinion. *See Schoen v. State Farm Cas. Co.*, 638 F. Supp. 3d 1323, 1335-37 (S.D. Ala. 2022) (discussing exclusion of expert opinion where expert simply repeated opinion from separate expert). The United States' request to exclude Joseph's opinion that the airplane could have made it to Cypress Lakes is, therefore, **GRANTED**. Doc. 411, in part.

### 3.    Joseph's "Crash Profile Flight Observations."

Joseph reported that he conducted "eight flights along and adjacent to the actual mishap flight route based on radar data." Doc. 457-7 at 48. He clarified during his deposition that he was a passenger on the flights, and it was during "a single flight where eight 'profiles' were flown." Doc. 411 at 14. He then observed that, "[w]hile not readily visible from the [mishap pilot's] route of flight during the emergency, once turned towards Briggs the airfield is ***extremely prominent*** and can easily be 'talked on to' with reference to Guyton (town) and the large water tower in Guyton." Doc. 457-7 at 49 (emphasis in original). The United States argues these observations are not the product of a reliable methodology, since Joseph was not the pilot in command, did not sit in the pilot's seat, and relied on statements from the pilot during the flight as to what he could see. Doc.

411 at 15. The United States also critiques Joseph's ability to recall details from the flights during his deposition, and the apparent inconsistencies between his memory of the flight and the GPS track data for the flight. *Id.* at 15-19.

Plaintiffs explain that Joseph's methodology in observing and relaying the information about Briggs Field was "his ability to see, perceive and observe the flight profiles flown and report on his findings and observations." Doc. 457 at 29. They urge the Court to accept a "fly over" of the particular area as "appropriate methodology to orient Joseph and to provide context for his opinions and testimony." *Id.* Plaintiffs sufficiently bear their burden of demonstrating the reliability of Joseph's fly-over method, especially when coupled with his extensive piloting experience. *Id.* at 29-34. As they correctly point out, the United States can explore all of their criticisms of Joseph's fly-over and subsequent memory of the flight on cross-examination. *Quiet Tech. DC-8*, 326 F.3d at 1346. The United States' request to exclude Joseph's observations is **DENIED**. Doc. 411, in part.

64

### 4.    Joseph's opinions regarding FAR Part 135.

Next, the Court turns to ADG and Huff's challenges to Joesph's testimony, starting with their challenges to his "opinions regarding FAR Part 135." *See generally* doc. 443. They argue Joseph admitted the following two opinions were wrong, and therefore they should be excluded as unreliable:

- [D]espite a prior and safer practice of assigning a multi-engine airplane with two pilots to transport the Cocke family, the operator (ADG/Huff) elected to use a single-engine airplane with one pilot certified in only 14 CFR Part 91 operations, and the [Pilot] accepted this assignment on behalf of ADG. Doc. 457-7 at 61.

- While single-engine/single-pilot operations are both legal and routinely conducted under 14 CFR Part 91, there is simply no substitute for the safety by virtue of redundancy afforded by using multi-engine and multi-piloted aircraft. *Id.* at 48

*See also* doc. 443 at 6. They also argue that Joseph's opinion about maintenance requirements under Part 135 "disregards the uncontroverted evidence." Doc. 443 at 6; *see also* doc. 457-8 at 7.

However, Plaintiffs argue that ADG and Huff mischaracterize Joseph's opinions, and that he never admitted error or reversed himself on these opinions. Doc. 458 at 13-14. Plaintiffs' explanation of Joseph's opinions, why he is qualified to offer them, and why they are reliable

carries the day. *See id.* at 11-17. They have borne their burden of demonstrating that Joseph is qualified to offer these challenged opinions, and that his experience has been reliably applied to the facts of this case to render the above opinions. Therefore, ADG and Huff's request to exclude these opinions is **DENIED**. Doc. 443, in part.

### 5. Joseph's opinions about ADG and Huff arranging the accident flight.

ADG and Huff next seek exclusion of Joseph's opinion "that ADG and Huff chose the Aircraft and arranged the subject flight." Doc. 443 at 7. They argue this opinion is not proper expert testimony under Rule 702, since it does not require scientific, technical, or other specialized knowledge. *Id.* They also argue it is unreliable. *Id.* Plaintiffs respond that Joseph's opinion is reliable, because he reviewed the available documentary evidence and extrapolated his opinion from that existing data. *See* doc. 458 at 19-22. They also argue the opinion is a proper subject for expert testimony because it is beyond the understanding of the average layperson, and Joseph "opined regarding aircraft selection." *Id.* at 23.

To be admissible under Rule 702, expert testimony must assist the trier of fact, meaning it must "concern matters that are beyond the

66

understanding of the average lay person." *Frazier*, 387 F.3d at 1262. "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* at 1262-63.  Joseph's opinion that ADG and/or Huff arranged the accident flight, which is based on his review of communications produced in this case and testimony from Pilot Hunter's wife, does not offer anything outside of what the lawyers can argue during their closing arguments.  Plaintiffs do not point to any technical, scientific, or other special knowledge that would be necessary for the jury to be able to consider this factual dispute.  ADG and Huff's request to exclude Joseph's opinion that ADG and Huff chose the aircraft and arranged the accident flight is **GRANTED**.  Doc. 443, in part.

### 6. Joseph's opinions about the suitability and reliability of the accident aircraft.

In his Report, Joseph opined that:

> . . . ADG/Huff should have placed the Cockes in a multi-engine/multi-crew aircraft which would have provided enhanced safety.  Flight operations in a single-engine airplane with a single pilot offers little redundancy in terms of powerplant or systems and components in the event of failure. Redundancy in engines, systems and components and flight crew afford tremendous safety advantages over or [sic] single-engine/pilot operations.  As someone who has operated in the general aviation, airline, and military fields of aviation

as both a pilot and operational authority, one must always consider when calculating their risk equation for any operation the passengers and their personal and professional situations.  To place a mother and father of five children ranging in age from infant to adolescent, on a single engine, piston engine driven aircraft, is not a best practice.  This is why many FAR 135 operators who provide air transportation for hire, elect to use larger multi-engine and crewed aircraft. The lack of redundancy in systems was an additional factor in this crash.   Based upon my background, training and experience, I can state for certain that, here, redundancy in both the "machine and man" would have provided an added layer of safety which likely would have prevented the crash.

Doc. 457-7 at 58-59 (footnote omitted).  ADG and Huff seek to exclude this opinion based on their challenges, above, related to Joseph's Part 135 opinions and opinion that ADG and/or Huff selected the accident airplane and scheduled the accident flight.  Doc. 443 at 10.  As discussed above, Joseph is excluded from opining that ADG and/or Huff selected the accident airplane or scheduled the accident flight, and therefore he is not permitted to couch this opinion in terms of what ADG/Huff should have done relative to the selection of the aircraft for the accident flight. However, the remainder of this opinion is not excluded.  Therefore, Joseph is permitted to opine about the safety benefits of multi-engine/multi-crew aircraft, and why such an aircraft would have been preferable for the Cockes.  ADG and Huff can explore their remaining

challenges to this testimony on cross-examination.  ADG and Huff's request is, therefore, **GRANTED**, in part, and **DENIED**, in part.  Doc. 443, in part.

### 7.    Joseph's opinions related to his reenactment flights.

ADG and Huff challenge Joseph's opinions related to his "reenactment flights" on similar grounds as the United States, discussed above.  For the same reasons, their request to exclude his testimony about his flights is **DENIED**.  Doc. 443, in part.  Any criticisms of his observations from the flights, or his opinions related to those observations, can be explored on cross-examination.

### 8.    Joseph's opinion that the accident airplane stalled at a certain point.

During his deposition, Joseph opined that the accident aircraft stalled "[a]bout 80 yards from [a] large cotton field.  Doc. 443-6 at 22. Plaintiffs do not explain any methodology that Joseph actually employed in forming this opinion; instead, they point to other evidence that presumably supports the opinion.  Doc. 458 at 23-24.  Without any explanation of how Joseph reached his conclusion that the aircraft stalled, the opinion is unreliable and must be excluded.  ADG and Huff's

request is, therefore, **GRANTED**. Doc. 443, in part. Joseph may not opine that the aircraft stalled near a large cotton field.

### 9. Joseph's opinion that the pilot thought a field was Cypress Lakes.

ADG and Huff seek exclusion of Joseph's testimony that Pilot Hunter mistook a cotton field for Cypress Lakes, and that the misidentification was reinforced by the Pilot's confirmation bias that he would make it to Cypress Lakes. Doc. 443 at 13-14. They argue this testimony is improper, because an expert may not "testify as to the knowledge, motivation, intent, state of mind, or purpose of others." *Id.* at 14. (citing *Giusto v. Int'l Paper Co.*, 2021 WL 3603374, at *6 (N.D. Ga. Aug. 13, 2021); *Omar v. Babcock*, 177 F. App'x 59, 63 n. 6 (11th Cir. 2006)). Defendants are correct.

In *Giusto*, the Northern District of Georgia explained that:

"[R]elevant testimony from a qualified expert is admissible only if the expert knows of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation." *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988). Accordingly, an expert cannot speculate as to an individual's state of mind. *See Omar v. Babcock*, 177 F. App'x 59, 63 n. 5 (11th Cir. 2006) (affirming district court's decision to strike expert testimony that "contain[ed] legal conclusions as to another person's state of mind"); *United States ex rel. Raven v. Ga. Cancer Specialists I, P.C.*, No. 1:11-cv-00994-CAP, 2018 WL 11220441, at *4 (N.D. Ga. July 3,

2018) (excluding parties from "offering any state of mind testimony via either expert at trial"); *Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1326 (M.D. Fla. 2015) (excluding expert testimony that offered opinions on party's "intent, state of mind, or motivations").

*Giusto*, 2021 WL 3603374, at *6. Joseph's testimony about what Pilot Hunter may have believed with respect to a nearby cotton field is the type of speculative "state of mind" testimony that is inadmissible. ADG and Huff's request to exclude it is, therefore, **GRANTED**. Doc. 443, in part.

**10. Joseph's opinions regarding the lack of oil on the airplane's windscreen.**

Joseph, in his rebuttal report, explained that when he inspected the wreckage he "saw no oil on the windscreen, or pieces of the windscreen, and [he] saw no oil on the top of the fuselage." Doc. 457-8 at 3. He also noted that, at no time during the emergency did Pilot Hunter "state or mention that he could not see as a result of oil on the windscreen." *Id.* He therefore concludes that oil did not obstruct Pilot Hunter's view out of the cockpit. *Id.* ADG and Huff seek to exclude any testimony from Joseph on this point, arguing he did not perform any swabbing analysis on any samples taken from the windscreen, but merely "wiped the windscreen with a paper towel and looked at it." Doc. 443 at 15. Joseph inspected the wreckage, reviewed the transcript of Pilot Hunter's

71

communications with ATC, and formed his opinion about the lack of oil obstructing the pilot's view. This is reliable, for *Daubert*'s purposes. ADG and Huff may expose any flaws in the opinion on cross-examination. Their request to exclude the opinion is **DENIED**. Doc. 443, in part.

### 11. Josephs's opinion about the meaning of the word "team" in an FAA Order.

ADG and Huff's final challenge to Joseph's opinions relates to FAA Order JO 7110.65W, which "describes a concept of a terminal radar 'team' whereby the air traffic controllers within an air traffic control facility are to act together as a team to help resolve an emergency." Doc. 443 at 15. ADG and Huff argue that Joseph claims that the word "team" includes the pilot, and that this opinion is a legal conclusion and not supported by the language of the order. *Id.* at 15-16. As a pilot, Joseph is qualified to opine about the relationship between pilots and air traffic control, and may offer his opinion that the two are to work together as a "team." Any inconsistencies between this opinion and FAA or ATC publications can be explored on cross-examination. The request to exclude this testimony is **DENIED**. Doc. 443, in part.

## Charles M. Pereira

Charles M. Pereira is Plaintiffs' expert "in the area of flight path reconstruction, simulations, and animations." Doc. 475 at 1; doc. 471 at 1; *see also* doc. 412-1 (Pereira Expert Report). The United States moves to exclude Pereira's "flight path reconstruction and animation" and "hypothetical paths to Cypress Lakes and Briggs Field," since his work was created using software created by a third-party named Dennis Crider. Doc. 412 at 9;[6] *see also id.* at 3-4. Plaintiffs responded in opposition, doc. 475, and the United States replied, doc. 512. Defendants ADG and Huff similarly seek exclusion of Pereira's animations, and any testimony or opinions regarding the animations, arguing that Pereira used a proprietary software to generate the animations, and that "the underlying . . . project file which contains the data inputs and values derived from the data has not been produced . . . ." Doc. 446 at 3.[7]

---

[6] The United States also challenges Pereira's hypothetical flight paths as unhelpful, doc. 412 at 9-10, and based on speculation, *id.* at 11-29.

[7] ADG and Huff also argue the animations "portray conditions that are not substantially similar to the conditions that existed at the time of the accident," "depict ground features that are not substantially similar to the day of the accident," would "give the jury the misimpression that the pilot had a wide-field, unobstructed view from within the cockpit," and the animations which include text messages sent from the Cockes during the flight would be unfairly prejudicial. Doc. 446 at 3-4.

Plaintiffs responded in opposition to ADG and Huff's Motion, doc. 471, and ADG and Huff replied, doc. 523.

According to his Expert Report, Pereira used data identified in the Report[8] "to develop a ground and flight path for the accident airplane" and "to develop ground and flight paths for hypothetical post-engine failure scenarios." Doc. 412-1 at 5. He then "created animations during this process to visually depict, correlate, and confirm these data which reflect the actual flight path of the accident airplane as well as timing aspects of the hypothetical scenarios." *Id.* at 6. Therefore, Pereira's work can be divided into three broad categories: (1) "[f]light path and event reconstruction for the accident flight," doc. 412-1 at 5; (2) "[f]light path and event analysis for hypothetical post-engine failure scenarios involving various ATC and pilot actions for the windmilling prop and stopped prop conditions with glide ratios from the A36 AFM/POH (GR=10.33) and the Texas flight tests (GR=11.90)," *id.*; and (3) "create[ing] animations . . . to visually depict, correlate, and confirm these data which reflect the actual flight path of the accident airplane as well as timing aspects of the hypothetical scenarios," *id.* at 6.

---

[8] The data he reviewed is listed in his Report at doc. 412-1 at 4-5.

Before discussing the disputed issues, the Court will clarify some terminology. First, as to the "hypothetical post-engine failure scenarios" described in his report, *see* doc. 412-1 at 5, Pereira testified that he considers those to be "simulations." *See* doc. 412-2 at 20-29; *see also id.* at 7 ("Simulation is using mathematical formulas along with input data to produce output behavior, in this case, of a vehicle, an airplane."). His Report, in Attachment III, includes six pages of "Hypothetical Paths to Airports," doc. 412-1 at 37-43, which Pereira testified correspond to his simulations, doc. 412-2 at 34 (confirming that his file contains "simulations" which "correspond to those hypothetical paths"). Additionally, Plaintiffs explain that Pereira "created four recreations related to the August 28, 2017 flight and crash of N87RY." Doc. 475 at 1. The "recreations" are referred to by the parties and Pereira as "animations," *see, e.g.*, doc. 412-1 at 6; doc. 412-2 at 7 ("Animation is a visual and sometimes oral, as in this case, depiction of the data and events that occurred up to and including a crash . . . ."), and were produced in four separate MP-4 files, doc. 412-2 at 7. These files were submitted to the Court by Plaintiffs. *See* doc. 471-3. For clarity, the

Court will refer to the hypothetical post-engine failure scenarios as "simulations," and the MP-4 recreations of the flight as "animations."[9]

During his deposition, Pereira testified that, to create his flight simulations, he input data, like "the position of the aircraft latitude, longitude and altitude, and the atmospheric data and the lift curve slope of the wing of the airplane," to "derive via a simulation of sorts, pitch, roll, heading, Gs, those sorts of things." Doc. 412-2 at 11. These simulations are created through a program called "Glide," which is a "Java program that was written for this case to analyze the effects of glide ratio and speed and bank angle, various other hypothetical parameters on the glide performance and flight path of the airplane." *Id.* The "output data" from the Glide software is contained in Excel spreadsheets, which are the simulations described above. *Id.*; *see also id.* at 20. The "formulas" used to calculate the simulations are "[e]mbedded" in the Glide software. *Id.* at 11. These formulas, or equations, were not produced as part of Pereira's Report in this case. *Id.* at 20. The Glide program was not discussed, or even mentioned, in his Report. *Id.* at 29.

---

[9] Pereira's animations also include some "simulated" data, including "pitch, bank, track, calibrated airspeed, true airspeed and ground speed." Doc. 412-2 at 109.

His Report contains "output from the Glide program . . . in graphical format." *Id.* at 29-30; *see also* doc. 412-1 at 37-43.

Pereira explained that he and a third-party, Dennis Crider,[10] worked together to create Glide specifically for this case: Pereira "put together a plan and a design scheme for a new piece of software for this accident," and Crider "wrote the code." Doc. 412-2 at 11-12; *see also id.* at 29 ("Glide didn't exist prior to this accident . . ."). According to Pereira's testimony, Glide "uses equations to output theoretical results based off of long-established aerodynamic equations." *Id.* at 20. When asked about those "equations," he described them as "*related to* glide ratio, lift over drag, flight path angle, coefficient lift, angle to tack, pitch attitude." *Id.* (emphasis added). He was not able to identify any of the actual equations contained within the Glide software, explaining they are "numerous and lengthy." *Id.* He also testified that he had "some" involvement with "determining the data input, the data output and the equations that were used" in the Glide software, but "not completely." *Id.* at 18. When asked if he could point to a document that contained the

---

[10] Crider is not an expert in this case and has not provided a report. *See, e.g.*, doc. 412-2 at 29.

equations contained within the Glide software, he referred generally to textbooks he used during his college classes. *Id.* at 21. While Pereira did provide the files containing the "parameters that [he] utilized in the Glide software simulations that [he] performed in this case," which included the data, or values, run through the Glide program, *see id.* at 21-23, the actual equations run by the program using those values remain, at least for the Court, unknown. *See, e.g., id.* at 28 (discussing "long equations that have aerospeed and bank angles, variables" that were prepared by Plaintiff's expert Dr. Callender and then "embedded into the Glide software," but testifying that those formulas are not included in his file). The Glide software itself has not been peer-reviewed. *Id.* at 136. Pereira testified that the software is "essentially self-validating," and that the "equations that go into it have been validated by every aircraft manufacturer in the world for over a hundred years," *id.*, but again confirmed that he could not provide the equations that are embedded in the software, *id.*

Pereira relied on another program created by Crider to create the animations that he produced in this case. *See* doc. 412-2 at 74. Crider "wrote" a program called "LATS_anim." *Id.*; *see also id.* at 77 ("I would

78

have to refer to Dennis for exactly how he coded certain things."). According to Pereira, "all of the different datasets[11] were combined into one continuous . . . file, which, along with the latitude and longitude, gets fed into LATS_anim and outputs the . . . sim file, in this case, and then that sim file is used to drive the animation for pitch, roll, bank, altitude." *Id.* at 75. He testified that the LATS_anim software "does a bunch of calculations." *Id.* at 77. He explained his methodology: Pereira provided files to Crider, and then Crider ran those files through the LATS_anim software, and then "provided the output of that" to Pereira, which Pereira then used for another program, Insight, to create the animation. *Id.* at 77-78. The data file from the LATS_anim software was not produced. *Id.* at 75 (confirming the LATS_anim file is not in Pereira's materials); *see also* doc. 412 at 9.

The United States moves to exclude Pereira's testimony that relies on Crider's work—both LATS_anim and Glide—that generated the data file for his flight path reconstruction and animation. Doc. 412 at 9. It argues that Pereira could not be properly questioned about Crider's work,

---

[11] The "datasets" include data from a Garmin GPS, ADS-B, and Savannah radar. *See* doc. 412-2 at 9; 15; 74-75.

since the software was not produced and Pereira lacked familiarity with the embedded equations to respond to the United States' questioning. *Id.* The Motion points to persuasive authority interpreting Rule 703, *id.*, which explains that an expert "may not simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon." *In re Polypropylene Carpet Antitrust Litigation*, 93 F. Supp. 2d 1348, 1357 (N.D. Ga. 2000). As the Northern District of Georgia explained, "courts must ensure that an expert witness is sufficiently familiar with the reasoning or methodology behind the information to permit cross-examination." *Id.*

In responding to the United States' Motion, Plaintiffs explain more about Pereira's use of Insight, Glide, and LATS_anim. *See* doc. 475 at 6-7.

> *Insight* is generally accepted in the scientific community for the development of flight recreations as was done here and was used and applied to the specific facts of this case. Lats_anim is an additional piece of proprietary Java software that was utilized to perform mathematical calculations on various data points relative to the actual performance of N87RY, such as speed, altitude, latitude, longitude, etc., for input into *Insight*. Lats-anim [sic] is identical to the proprietary software used by the NTSB for this exact purpose and utilizes the same widely accepted mathematical formulas that have been in use in aviation for a century. It is used in simulation and/or recreation involving aircraft that do not

80

have a flight data recorder, such as N87RY. Glide is also a proprietary Java software that was used to calculate data pertaining only to the specific set of glide hypotheticals which was also input into *Insight*.

Doc. 475 at 6-7. Plaintiffs argue that Pereira co-developed Glide with Crider and assisted Crider in developing Lats_anim, based on using "identical programs at the NTSB for decades." *Id.* at 7. Thus, they argue, "Pereira has extraordinary knowledge of both programs' function and purpose." *Id.* Plaintiffs also argue that Pereira "provided all parties with the raw data that was entered into the [*Insight*], as well as the data contained in [*Insight*]." *Id.* at 18. He also provided the *Insight* data in "plotted format." *Id.* Therefore, Plaintiffs argue, "[a]ny challenges to the correctness of the data input into *Insight* goes to the weight and not the admissibility of the evidence." *Id.*

Pereira's testimony, even as summarized by Plaintiffs' response, reveals methodological gaps between the data—both factual and assumed—and the final simulations and animations. It is unquestionable, based on Pereira's own testimony, that the simulations are based entirely on the calculations run by the Glide software. Doc. 412-2 at 11, 20. And, as Plaintiffs appear to concede, the "proprietary software . . . provided mathematical calculations for a portion of the data

that was input into *Insight*." Doc. 475 at 2. Because the calculations that created both the simulations and the data input into *Insight* remain unknown, despite Plaintiffs' arguments that *Insight* "provide[s] a reliable methodology based on computer software that has been tested, peer reviewed, has a known error rate, and is wide accepted in the community it serves," doc. 475 at 6, Plaintiffs have not borne their burden of demonstrating the reliability of Pereira's testimony based on his simulations or animations.

As to the output from the Glide software, there are two gaps that render it unreliable for purposes of the *Daubert* analysis. First, although Pereira explained that he "put together a plan and a design scheme" for the software, doc. 412-2 at 11, he was consistently unable to identify the equations underpinning that plan, *see id.* at 20, 28. Second, even if Pereira had been able to clearly identify the mathematical equations underpinning Glide's calculations, the Court would have to rely entirely on his assertion that Crider, a third-party who has not been identified as an expert in this case, took Pereira's "plan" and correctly coded it into the software. The Court does not have anything on which to base its review of Crider's software coding work, which is necessary in this case because,

82

as Pereira readily admits, Glide was created specifically for use in this case. There is nothing to suggest it has been reviewed by anyone other than Crider, who is not here, and Pereira. The Court cannot simply take Pereira's word for its reliability, since, for the following reasons, that does not meet the *Daubert* standard.

The *Daubert* Court described several factors trial judges may use to assess the reliability of proffered scientific testimony, including: (1) whether the theory or technique "can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) "in the case of a particular scientific technique, . . . the known or potential rate of error," and (4) whether the theory or technique is generally accepted by the relevant scientific community. *Daubert*, 509 U.S. at 592-94; *see also Rink*, 400 F.3d at 1292 (discussing these factors in the context of assessing an expert's particular scientific technique). In addition, the Supreme Court has noted that, in the context of this analysis, "conclusions and methodology are not entirely distinct from one another." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Viewing Pereira's testimony about the Glide software through the lens of these *Daubert* factors, it does not meet the reliability standard.

The calculations embedded in the Glide program underpinning Pereira's simulations have not been tested. Though Pereira implied that the equations are well-known in the industry, referring to "textbooks" as the source for those equations, the equations embedded in Glide remain unknown. The program has not been peer-reviewed or otherwise tested, as far as the record in this case demonstrates. Pereira's assurances that the software is "self-validating" are not enough. The Court cannot simply take his word for the software's reliability, and, even more apparent, the Court cannot take *his* word that Crider's word is enough. "Although experts 'commonly extrapolate from existing data . . . nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.' [Cit.] Rather, the trial court is free to 'conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194 (11th Cir. 2010) (quoting *Joiner*, 522 U.S. at 146).

The methodology underpinning the LATS_anim software fails the reliability test for similar reasons. Pereira explained that Crider developed LATS_anim, and although Plaintiffs urge the Cout to accept

84

that it is a program "identical to the proprietary software used by the NTSB for this exact purpose and utilizes the same widely accepted mathematical formulas that have been used in aviation for a century," doc. 475 at 7, they do not cite to any record evidence or testimony to support this assertion, *id.*, and there is nothing in Pereira's deposition testimony that would satisfy the Court that Crider, who again has not been proffered to speak for himself, developed and coded LATS_anim identically to some other well-known software. Pereira himself was not confident about what LATS_anim could do, testifying that he would "have to refer to Dennis for exactly how he coded certain things." Doc. 412-2 at 77. Crider created and wrote the LATS_anim software, *id.*, received files from Pereira that he then input into his LATS_anim software, *id.* and then provided the output from LATS_anim to Pereira for him to use in the *Insight* software, *id.* at 77-78. There is no way for the Court to assess the reliability of the calculations run by the LATS_anim software, except to take *both* Pereira *and* Crider's word for it. For the same reasons the Court could not conclude the Glide software was reliable, discussed above, that is not sufficient. *See Frazier*, 387 F.3d at 1261.

Plaintiffs have not borne their burden of demonstrating that Pereira's testimony about his simulations and animations is reliable. They urge the Court to permit Pereira's testimony based on Crider's work because experts may rely upon other experts. Doc. 475 at 8 (citing *DL v. District of Columbia*, 730 F. Supp. 2d 78, 82 (D.D.C. 2010)), 19 (citing *McReynolds v. Sodexho*, 349 F. Supp. 2d 30, 36-37 (D.D.C. 2004)). The court finds these cases distinguishable, since they both relate to the field of statistics, and permit the testifying expert to rely on an assistant to carry out analyses that the expert designed. *See McReynolds*, 349 F. Supp. 2d at 36-37. The Court explained that experts may rely upon facts or data "of a type reasonably relied upon by experts in the particular field," and relying "on . . . assistants to carry out analyses that *the expert designed.*" *Id.* at 36 (emphasis added). Here, Pereira relied on a third-party purported coding expert, Crider, to develop proprietary computer programs to run aerodynamic equations on data inputs to calculate simulations of what a hypothetical aircraft could do. There is no suggestion that Crider's programming is "of a type reasonably relied upon" by other experts or that Pereira giving Crider a "plan and design *scheme,*" for the software, doc. 412-2 at 11 (emphasis added), amounts to

86

Crider's simply "carrying out" analyses that Pereira "designed." The cases are too dissimilar for the Court to find the cited cases persuasive.

Here, the unknown equations and unknown computer coding underlying Glide and LATS_anim create too significant a methodological gap for the final simulations and animations to meet the reliability required by *Daubert* and Rule 703. Therefore, the United States of America's Motion to Exclude the Testimony of Plaintiffs' Expert Charles Pereira is **GRANTED**. Doc. 412. Additionally, because Pereira is excluded from testifying about both his simulations and his animations, ADG and Huff's Corrected Motion to Exclude in part Expert Testimony of Charles Pereira is **DISMISSED AS MOOT**. Doc. 446.

## Colin Sommer, P.E.

Plaintiffs identified Colin Sommer, P.E., as an accident reconstruction expert. *See* doc. 460-1 (Sommer Expert Report); doc. 460-2 (Sommer Rebuttal Report). The United States seeks to exclude his testimony about hypothetical or projected glide paths prepared by Plaintiffs' other experts, doc. 416 at 7-16, his opinions or testimony regarding the duties and responsibilities of an air traffic controller, *id.* at 16-20, and his opinions "about the accident airplane's propeller and its

87

Garmin 796 GPS navigation system," *id.* at 20-30.  Defendants ADG and Huff also challenge Sommer.  They move to exclude any of his testimony or opinions "relating to what the pilot 'should have done.'"  Doc. 448 at 2; *see also id.* at 5-10.

### 1.  Sommer's reliance on other experts' glide path opinions.

Sommer opines, in his report, that "at the point in time when the pilot communicated the emergency to Air Traffic Control and received a response, there were 2 airports within glide distance that were likely obtainable."  Doc. 460-1 at 17.  The United States argues this opinion must be excluded because it is impermissibly based on other experts' calculations without independently verifying those calculations.  Doc. 416 at 7-16.  Its Motion argues that "Sommer should not be permitted to offer testimony about hypothetical glide scenarios prepared by other experts when he has never attempted to validate their data, their methodology, or their results."  *Id.* at 16.

Plaintiffs argue that Sommer "conducted his own, independent analysis . . . of the available data and known facts regarding the fatal flight," including "the fact that N87RY actually glided 6.3 nm after the emergency was declared and that N87RY remained in the air for over 4

½ minutes before radar contact was lost." Doc. 460 at 13-14. He also reviewed the Bonanza POH and the weather and visibility conditions existing at the time of the crash. *Id.* He "did basic glide calculations himself," and then reviewed the glide range capabilities and hypothetical glide scenarios from Plaintiffs other experts. *Id.* at 14-15. Sommer testified that he "didn't do any formal calculations," doc. 416-1 at 12, to determine the glide ability of the aircraft in this case, but he did consider the published glide ratio in the POH, and the same values based on the tested glide ratio during the test flights discussed by Callender. *See, e.g.,* *id.* at 12-13.

While Plaintiffs may be correct that Sommer employed his own, albeit rudimentary, methodology, in developing some of his opinions, they do not meet their burden with respect to the reliability of Sommer's opinion testimony about the glide capabilities of the aircraft. Sommer's report and testimony reveal that he relied on information and conclusions from Pereira to opine that "the accident aircraft would have easily been able to make Briggs Field Airport from the first indication of the emergency." Doc. 448-2 at 16; *see also* doc. 416-1 at 12, 13, 18-19. He testified that he did not "do calculations on Mr. Pereira's hypothetical

89

glide paths," or "do anything to validate the accuracy of what he had done in those hypothetical glide paths." Doc. 416-1 at 18. Because the Court finds, above, that Pereira's hypothetical glide paths, or "simulations," are unreliable, Sommer may not offer any testimony or opinions based on those unreliable hypothetical glide paths.

Where an expert's opinion is excluded, other experts "obviously cannot rely on it." *Hanson v. Colgate-Palmolive Co.*, 353 F. Supp. 3d 1273, 1291-92 (S.D. Ga. 2018) (citations omitted); *see also Chandler Gas & Store, Inc. v. Treasure Franchise Co. LLC*, 2025 WL 3018829, at \*4 (D. Ariz. Oct. 29, 2025) ("Although inadmissible evidence may be considered in formulating expert opinions, [cit], [an expert] may not rely on evidence that itself is unreliable."(citation omitted)). Other courts are more categorical. *See, e.g., PRCM Advisers LLC v. Two Harbors Inv. Corp.*, 2025 WL 1276513, at \*19 (S.D.N.Y. May 2, 2025) ("[I]f one expert's opinion is excluded by the court (for example, because that expert was inadequately qualified, or her methodology was unreliable), *any* calculations, analyses, or conclusions reached by other experts in reliance on the excluded opinion must themselves be excluded." (emphasis added) (citation omitted)); *In re Pandora Media, LLC*, 2025 WL 1090408, at \*12

90

(C.D. Cal. Jan. 21, 2025) ("[N]o expert may rely on excluded opinions."). Although the Court in *Hanson* noted that the derivative opinions "have no basis" without the excluded opinion, *id.* at 1291, and though Plaintiffs argue Sommer did not rely exclusively on Pereira's opinions in forming his own opinions, because of Plaintiffs' emphatic—and, as the United States points out, doc. 510 at 2-3, incorrect—argument that Sommer's opinion is based entirely on his own calculations, they have not attempted to parse out which portions of his opinion about the "obtainable" airports "within glide distance" were derived independently of Pereira's excluded simulations. *See* doc. 460 at 12, 15-16. The Court, therefore, cannot find that Plaintiffs have borne their burden to establish the admissibility of any portion of his opinion about whether Briggs Field or Cypress Lakes were "obtainable" or "within glide distance" of the aircraft. The United States' Motion is, therefore, **GRANTED**, in part. Doc. 416, in part.

### 2.    Air traffic controller responsibilities.

The United States argues that Sommer is not qualified to offer opinions about air traffic control. Doc. 416 at 16-20. Plaintiffs do not argue that he is, *see* doc. 460 at 11 ("Plaintiffs agree that Sommer is not

proffered as an ATC expert."), but instead argue that he did not offer any air traffic control opinions. *See id.* at 19-25. As with Joseph, above, they argue Sommer should be permitted to "discuss the interaction and expectations between a pilot and ATC." *Id.* at 25. Therefore, for the same reasons explaining the permissible scope of Joseph's testimony above, the United States' request to exclude Sommer's testimony is **GRANTED, in part**, and **DENIED, in part**. Doc. 412, in part. Sommer may testify about what a pilot expects from an air traffic controller, but any testimony about what an air traffic controller should do, whether the air traffic controller's actions in this case rose to what Sommer opines is the correct standard, or testimony about perceived failures of the controller in this case is **EXCLUDED**.

3.   **Sommer's opinions about the accident airplane's propeller and Garmin 796 GPS navigation system.**

The United States moves to exclude Sommer's testimony and opinions about the accident airplane's propeller and GPS navigation system as untimely, relying on Federal Rule of Civil Procedure 37. Doc. 416 at 20-30. The Motion explains that, in his original Rule 26 Report, Sommer stated that the glide ratio of an aircraft is dependent on many factors, including the propeller condition. *Id.* at 20 (citing doc. 460-1 at

9). But, the Report concluded that "it cannot be determined if the engine and propeller continued to rotate or ceased rotation all together due to the internal mechanical failure." Doc. 460-1 at 11; *see also* doc. 416 at 20. Both his initial report and rebuttal report were silent as to "the position of the propeller lever in the cockpit" and "the propeller blades, post-accident." Doc. 416 at 21; *see also* doc. 416-1 at 21 (deposition testimony confirming neither report references the propeller position). According to the United States, this is "significant," because the POH requires that the propeller lever in the cockpit "be in the 'Full Aft' position to achieve maximum glide performance." Doc. 416 at 21 (quoting doc. 416-11 at 2). The United States notes that this is one of the assumptions relied on by Plaintiffs' experts in calculating their hypothetical glide scenarios. *Id.* at 21-23.

Prior to Sommer's deposition, Plaintiffs produced notes from Sommer that discuss the propeller, noting that there were "no signs of rotation" and that the blades were in the "fine pitch" position. Doc. 416 at 24. During his deposition, Sommer testified that these notes were incorrect, and that the notes should have reflected that the propeller blades were in "coarse pitch." *Id.* (citing doc. 416-1 at 51). The United

States argues this is a new opinion, untimely produced, and that it should be excluded under Rule 37 as untimely, and "far from harmless." *Id.* at 25.

In response, Plaintiffs spend significant time and effort arguing why the testimony is consistent or inconsistent with other expert's testimony and irrelevant to the issues. Doc. 460 at 25-30. They also argue that the testimony is not a new opinion. *Id.* at 31. But, as the United States observes, this opinion was not included in Sommer's original or rebuttal report, a *different* opinion was included in the notes produced prior to the deposition, and Sommer's testimony about the status of the propeller blades was revealed *during* his deposition. *See* doc. 510 at 6. The United States compellingly argues that this revelation of his opinion during his deposition is prejudicial, and Plaintiffs do not explain why the failure to disclose it prior to the deposition was substantially justified. Sommer's testimony about the position of the propeller blades is, therefore, **EXCLUDED** as untimely under Rule 37.

Also during Sommer's deposition he first testified about his use of an exemplar GPS, like the one located on the accident airplane, the day before his deposition. Doc. 416 at 29. This opinion was not included in

94

his original report, and was first disclosed during his deposition. It is, for the same reason as the propeller testimony, **EXCLUDED**.

The United States Motion is, on these points, **GRANTED**. Doc. 416, in part.

### 4.    Pilot opinions.

ADG and Huff's request to exclude a portion of Sommer's testimony focuses only on his "piloting-related opinions." Doc. 448 at 6. Sommer is a licensed professional mechanical engineer and accident reconstructionist and was retained by Plaintiffs as an accident reconstructionist. Doc. 448-2 at 2-3; doc. 448-3 at 9. ADG and Huff argue he is not qualified to opine on issues related to piloting. Doc. 448 at 3. In particular, Defendants point to his testimony that, "had Air Traffic Control and the Pilot performed their duties properly, this accident, as it occurred, would have been avoided." *Id.* (quoting doc. 448-2 at 17). They also attack his opinion, contained in his Rebuttal Report, about Pilot Hunter's failure to establish the POH's best glide speed. *Id.* (citing doc. 448-4 at 3). They argue he is not qualified as a pilot expert in this case. *Id.* at 5-6.

In response, Plaintiffs argue that Sommer is a qualified accident reconstructionist and point out that ADG and Huff do not challenge those qualifications. Doc. 459 at 10. He is a licensed professional engineer, a licensed pilot, had investigated over 700 aviation accidents, and has testified as an accident reconstructionist. *Id.* Plaintiffs concede he offers some opinions that touch on piloting, but argue he is qualified to offer those limited opinions in support of his reconstruction analysis. *Id.* Based on the Plaintiffs' compelling arguments about Sommer's qualifications and his ability to opine on piloting issues as they relate to his accident reconstruction, *id.* at 10, 13-16, the Court agrees that Sommer is qualified to offer the limited piloting-related opinions included in his report and rebuttal.

ADG and Huff also argue that Sommer's piloting-related opinions are unreliable, since he relied on other experts' opinion related to how Hunter should have performed based on the airplane's capabilities. Doc. 448 at 6-9. In particular, ADG and Huff challenge Sommer's "flight path analysis," on roughly the same basis as the United States, arguing Sommer based his opinion that the aircraft could have made it to either Brigg Field or Cypress Lakes on "data and analysis . . . compiled and

96

conducted by other experts," including Pereira. *Id.* at 7. For the reasons explained above in considering the United States' challenge to this same opinion, ADG and Huff are correct, and any testimony from Sommer about the glide capabilities of the aircraft, and its ability to reach either Briggs Field or Cypress Lakes, is **EXCLUDED**.

However, as to Sommer's other challenged "piloting-related" opinions, from his rebuttal report, they are not tied to Sommer's reliance on Pereira. *See* doc. 448 at 9-10. Plaintiffs have sufficiently explained how Sommer reached those opinions, based on his experience. Doc. 459 at 24-28. Any critiques of his opinions can be attacked on cross-examination.

For the forgoing reasons, ADG and Huff's request to exclude a portion of Sommer's opinions is **GRANTED**, in part, and **DENIED in part**. Doc. 448.

### Marc Fruchter

Plaintiffs retained Marc Fruchter as an expert in the aviation industry to opine on "aviation industry standards, the [Federal Aviation Regulations ("FARs")], aircraft management and charter/pilot operations and services." Doc. 454 at 2; *see also* doc. 454-1 (Fruchter Expert Report).

Defendants ADG and Huff challenge his opinions "regarding whether [Pilot] Hunter was acting as agent of ADG and Huff," doc. 441 at 5-8, his opinions "regarding whether Defendants complied with FAA regulations," *id.* at 8-10, his opinion "that the Cockes relied on ADG's and Huff's endorsement of Hunter," *id.* at 10-13, his opinions "regarding whether Huff had operational control of the accident flight," *id.* at 13-15, and "opinions related to piloting," *id.* at 15-16.  Plaintiffs responded in opposition, *see generally* doc. 454, and Defendants ADG and Huff replied, *see generally* doc. 521.  The Court addresses each challenge in turn.

1.   **Fruchter's opinions regarding whether Hunter was acting as an agent of ADG and Huff.**

ADG and Huff first challenge Fruchter's opinion regarding their relationship with Hunter.  Doc. 441 at 5-8.  Plaintiffs have claims against ADG and Huff for, among other things, vicarious liability for the actions of Pilot Hunter.  Doc. 387 at 23-28 (Count III), 28-29 (Count IV).  Therefore, an issue in this case is whether Pilot Hunter "was an agent, servant, representative and/or employee of the defendants ADG and/or Huff."  *Id.* at 25.  In his Report, Fruchter opined that:

> Based upon the totality of the evidence, specifically including the evidence concerning ADG/Huff's coordination, scheduling and involvement of flights on the accident aircraft, it is

98

evident that (1) ADG/Huff held out Hunter as acting on their behalf with respect to his dealings with the Cockes specifically including flights on the accident aircraft, (2) there is no documentary evidence in which ADG/Huff disavow their representations to the Cockes that Hunter was acting on their behalf; (3) ADG/Huff held out Hunter as qualified and competent to conduct flights on the accident aircraft on their behalf, including the accident flight, (4) ADG/Huff held out the accident aircraft as safe for flight, including the accident flight, (5) it was reasonable for the Cockes to rely on ADG/Huff's representations by agreeing to travel on aircraft where Hunter was the pilot, specifically including on the accident aircraft and other aircraft as evidence by amongst other things, Hunter acting as a pilot including on flights where Huff and Hunter acted as the flight crew when the Cockes were passengers and Mr. Huff advised Mr. Cocke that he essentially told Mr. Hunter to make sure a particular flight on the Bonanza was safe, and (6) the Cocke's reliance and trust in ADG/Huff led to their deaths as they were killed during a flight on the accident aircraft where Hunter was the pilot.

Doc. 454-1 at 23-24.

ADG and Huff, summarizing Fruchter's opinion as "Hunter was acting as an agent of ADG and Huff," move to exclude it as an inappropriate subject for expert testimony, since an expert may not provide testimony as to whether conduct satisfies a legal standard. Doc. 441 at 5-6. They concede Fruchter "may offer his opinion on facts that would support the ultimate legal conclusion that Hunter acted as an agent," but argue "he may not testify as to whether that legal standard

has been satisfied." *Id.* at 6. In response, Plaintiffs argue Fruchter's testimony is permissible under Rule 704 and does not embrace an ultimate issue. Doc. 454 at 10-16.

Experts "may not testify to the legal implications of conduct" or "tell the jury what result to reach." *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990). Such testimony is considered unhelpful because it "in no way assists the trier of fact." *Cooper v. Pacific Life Ins. Co.*, 2007 WL 430730, at *1 (S.D. Ga. Feb. 6, 2007). Therefore, ADG and Huff are correct that Fruchter may not offer legal conclusions. *See Montgomery*, 898 F.2d at 1541. But "[t]he line between proper expert testimony (facts, inferences to draw therefrom, and the expert's opinion) and improper expert testimony (the actual requirements of the law) is often difficult to draw." *Cooper*, 2007 WL 430730, at *1; *see also Hanson v. Waller*, 888 F.2d 806, 811 (11th Cir. 1989) ("[T]he distinction between whether challenged testimony is either an admissible factual opinion or an inadmissible legal conclusion is not always easy to perceive.").

ADG and Huff are correct that Fruchter may not offer any testimony or opinion that Hunter was acting as ADG or Huff's agent. That would be impermissible, as it necessarily requires an opinion on the

100

legal implications of certain conduct.  Similarly, Fruchter may not opine that ADG or Huff "held out Hunter as acting on their behalf," or whether the Cockes reasonably relied on ADG or Huff's representations.  These all cross the line, telling the jury what conclusion to reach as it relates to the legal implications of the parties' conduct.  ADG and Huff's request to exclude these opinions is, therefore, **GRANTED**.  Doc. 441, in part.

### 2. Fruchter's testimony regarding whether ADG and Huff complied with FAA regulations.

ADG and Huff next argue that Fruchter should be prohibited from testifying about whether their "aviation activities" complied with the Federal Aviation regulations.  Doc. 441 at 9.  They contend he is unqualified to opine on either application of or compliance with FAA regulations.  *Id.*  In response, Plaintiffs sufficiently explain Fruchter's qualifications and experience related to the FAA and its regulations.  *See* doc. 454 at 4-9.  He has "the highest level of pilot certification issued by the FAA, *id.* at 4, is a Certified Flight Instructor and FAA Designated Part 135 Check Airman and an FAA Pilot Proficiency Examiner, *id.*, has a "vast, extensive and relevant" history of work experience in the aviation industry, *id.*, operated an FAA-certified aviation business, *id.* at 5-6, and was a member of an FAA committee established to propose revisions to

the Federal Aviation Regulations related to fractional ownership programs, *id.* at 6. ADG and Huff's attempt to exclude his testimony based on a lack of qualifications, is, therefore, **DENIED**. Doc. 441, in part.

### 3. Fruchter's opinion that the Cocke's relied on ADG and Huff's endorsement of Hunter.

In his report, Fruchter opined that "[t]he Cockes relied on ADG/Huff for their guidance, advice, coordination and scheduling their private aviation charter flights including flights on the accident aircraft," and that they "trusted and relied upon Mr. Huff's judgment by placing them on the accident aircraft with Mr. Hunter acting as pilot." Doc. 454-1 at 23. ADG and Huff move to exclude this opinion as improperly commenting on the state of mind of the Cockes and as unreliable and speculative. Doc. 441 at 11. Their challenge is well-taken. While Plaintiffs claim this opinion is proper and reliable, because Fruchter developed it after reviewing the documents and communications in this case, any opinion as to the Cockes' trust or reliance on Huff that Fruchter formed from reviewing their communications is necessarily speculative and improper. *See Giusto*, 2021 WL 3603374, at *6. ADG and Huff's request to exclude this opinion is **GRANTED**. Doc. 441, in part.

102

4.    **Fruchter's opinions regarding whether Huff had operational control of the accident flight.**

ADG and Huff seek exclusion of Fruchter's opinion that Huff had "operational control of the accident flight" as unreliable. Doc. 441 at 13. Plaintiff's response sufficiently explains how Fruchter considered the evidence in this case and applied his experience to reach his conclusion. Doc. 454 at 22-26. He relied on his significant experience in the aviation industry, discussed above, particularly his experience dealing with the "operational control" issue when sitting on an FAA committee, and viewed the documents, text messages, emails, voicemails, phone records, calendars, billing records, and invoices in this case through that lens. *Id.* at 22-23. While ADG and Huff may explore any weaknesses in his conclusion on cross-examination, the opinion survives their challenge under Rule 702 and *Daubert*. The request for exclusion is **DENIED**. Doc. 441, in part.

5.    **Fruchter's opinions related to piloting.**

Fruchter is not offered as a piloting expert. Doc. 441 at 15; *see also* doc. 454 at 26. However, during his deposition, he offered testimony about Pilot Hunter and his abilities as a pilot, his training, and his operation of the aircraft. *See* doc. 441 at 15 (citing deposition testimony).

Plaintiffs argue he is qualified to offer these opinions, but Frutcher himself testified that he was not offering pilot opinions. *See, e.g.,* doc. 441-2 at 3. Therefore, his opinions on Pilot Hunter's actions as a pilot, or his training as a pilot, are appropriately excluded. The Motion is **GRANTED**. Doc. 441, in part.

### Darren Gaines

The United States designated Darren Gaines as an expert in the field of air traffic control "to provide expert analysis and testimony involving air traffic controller duties and responsibilities in connection with the crash of Bonanza N87RY near Ellabell, Georgia on August 28, 2017." Doc. 464-3 at 3 (Gaines Expert Report). Defendants ADG and Huff first argue that since Gaines was disclosed as an ATC expert, his testimony related to piloting is outside of his designated area of expertise and should be excluded. Doc. 442 at 6. ADG and Huff highlight Gaines' testimony that Hunter should have known about his distance to Statesboro at the time of his engine failure because "he has a GPS" and "should have been approximately aware" because of his flight planning. Doc. 442 at 7 (citing doc. 442-5 at 8). They also identify Gaines' testimony about piloting "procedures" in the Aeronautical Information Manual

("AIM") and the Code of Federal Regulations as outside the scope of his expertise. *Id.* Finally, they dispute his qualifications to offer opinions on whether certain pilot actions are "advisable," "expected," or other similar descriptors. *Id.* at 8.

The United States has borne its burden of explaining how this challenged testimony is within the scope of Gaines' experience and knowledge. *See* doc. 464 at 5-11. To begin, ADG and Huff do not challenge his qualifications as an air traffic controller, and even if they had, the United States has sufficiently explained how he is qualified. *See id.* at 4. His opinions and testimony are properly offered through the lens of what an air traffic controller would expect from a pilot, based on his extensive experience in the field. *Id.* at 5-14. If, during trial, Gaines deviates outside the scope of his expertise, ADG and Huff may object to specific testimony at that time. Their Motion to exclude on this ground is **DENIED**. Doc. 442.

ADG and Huff also challenge some of Gaines' opinions as unreliable. Doc. 442 at 8-12. They seek to exclude his opinions that "ATC controllers would have expected the pilot to be aware of geographical conditions and alternative landing destinations along his route," "ATC

controllers expected the pilot to know of airports along his intended route of travel," "[t]he ATC controller recommended alternate airports based upon a distinction he made between public and private use," "ATC controllers failed to offer Briggs Airfield based upon a discretionary decision they made not to depict Briggs on the radar video map," "ATC controllers failed to offer Briggs Airfield based upon alleged obstructions around Briggs," and "[t]he pilot should identify 'alternatives available' if the planned flight could not be completed," as speculative and based on an unreliable methodology. *Id.* at 2-3; *see also id.* at 8-12. The United States sufficiently explains Gaines' bases for these challenged opinions and meets its burden of demonstrating their admissibility under *Daubert*. *See* doc. 464 at 16-26. As the response explains, Gaines relied on his experience as an air traffic controller to opine that, generally, controllers assume that pilots are geographically aware. *Id.* at 17-18. Additionally, the criticisms of the distinction between "public and private use" airports relies on alleged discrepancies in testimony, which are issues to be explored on cross-examination, and not at the *Daubert* stage. *Id.* at 19. The challenges to Gaines' testimony about Briggs Field also fail, since Gaines relied on his own experience as an FAA TRACON

controller to discuss, generally, the appearance (or non-appearance) of private use airports on the RVM. *Id.* at 20. ADG and Huff's disputes and criticisms about Gaines' testimony can be explored on cross-examination, exclusion is not warranted. Their Motion is, therefore, **DENIED**. Doc. 442.

## IV. CONCLUSION

Therefore, for the foregoing reasons, the first group of *Daubert* Motions are resolved as follows:

- United States' Motion to Exclude Certain Testimony from ADG/Huff's Experts is **GRANTED**, in part, and **DENIED**, in part. Doc. 408.

- United States of America's Motion to Exclude the Testimony of Plaintiffs' Expert Mark N. Callender, Ph.D., is **DENIED**. Doc. 409.

- United States of America's Motion to Exclude the Testimony of Plaintiffs' ATC Expert John D. Canoles is **DENIED**. Doc. 410.

- Defendants Aviation Development Group, LLC and Thomas Huff's Corrected Motion to Exclude in part Expert Testimony of John D. Canoles is **DENIED**. Doc. 439.

- United States of America's Motion to Exclude the Testimony of Plaintiffs' Expert Jameel F. "J.F." Joseph is **GRANTED**, in part, and **DENIED**, in part. Doc. 411.

- Defendants Aviation Development Group, LLC and Thomas Huff's Corrected Motion to Exclude the Testimony of J.F. Joseph is **GRANTED**, in part, and **DENIED**, in part. Doc. 443.

- United States of America's Motion to Exclude the Testimony of Plaintiffs' Expert Charles Pereira is **GRANTED**. Doc. 412.

- Defendants Aviation Development Group, LLC and Thomas Huff's Corrected Motion to Exclude in part Expert Testimony of Charles Pereira is **DISMISSED AS MOOT**. Doc. 446.

- United States of America's Motion to Exclude the Testimony of Plaintiffs' Expert Colin Sommer is **GRANTED**, in part, and **DENIED**, in part. Doc. 416.

- Defendants Aviation Development Group, LLC and Thomas Huff's Corrected Motion to Exclude in part the Testimony of Colin Sommer is **GRANTED**, in part, and **DENIED**, in part. Doc. 448.

- Defendants Aviation Development Group, LLC and Thomas Huff's Corrected Motion to Exclude in part Expert Testimony of Marc Fruchter is **GRANTED**, in part, and **DENIED**, in part. Doc. 441.

- Defendants Aviation Development Group, LLC and Thomas Huff's Corrected Motion to Exclude in part Expert Testimony of Darren Gaines is **DENIED**. Doc. 442.

**SO ORDERED**, this 9th day of March, 2026.

_____
CHRISTOPHER L. RAY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA