**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

JOHN HARTWELL COCKE, as Executor of the Estate of WILLIAM BYRON COCKE, Deceased, and as Executor of the Estate of CATHERINE CRICHTON COCKE, Deceased; WILLIAM RUFFIN COLEMAN COCKE; WILLIAM MARSTON BECKER, as Conservator of W.R.C., a minor, as Conservator of E.C.C., a minor, as Conservator of J.S.C., a minor, as Conservator of C.E.C., a minor, as Conservator of P.S.G.C., a minor; and JOHN HARTWELL COCKE and VIRGINIA FRANCES COCKE, as Guardians of W.R.C., a minor, as Guardians of E.C.C., a minor, as Guardians of J.S.C., a minor, as Guardians of C.E.C., a minor, and Guardians of P.S.G.C., a minor;,

Plaintiff,

v.

THE UNITED STATES OF AMERICA; AVIATION DEVELOPMENT GROUP, LLC; and THOMAS HUFF,

Defendants.

CIVIL ACTION NO.: 4:19-cv-169

**O R D E R**

This case emerges out of a fatal airplane crash which took the lives of pilot Randall Don Hunter ("Pilot Hunter") and his two passengers, William "Byron" Cocke and Catherine Crichton Cocke ("Decedents"). (See generally doc. 387.) Plaintiffs consist of the following individuals: John Hartwell Cocke, as Executor of Decedents' estates; William Ruffin Coleman Cocke in his individual capacity; William Marston Becker, as Conservator of Decedents' minor children; and John Hartwell Cocke and Viginia Frances Cocke as Guardians of Decedents' minor children. (Id.

at pp. 3–4.) Defendants are comprised of the following entities and individuals: the United States (the "Government"), being sued under the Federal Tort Claims Act ("FTCA"); Aviation Development Group, LLC ("ADG"), a Georgia LLC; and Thomas Huff, the sole member of ADG (together "ADG/Huff"). (Id. at pp. 4–7.) The Government has also filed a crossclaim against Defendants ADG/Huff. (Doc. 92.) Before the Court is the Government's Motion for Summary Judgment. (Doc. 417). Plaintiffs and ADG/Huff have each filed a Response opposing the Government's Motion. (Docs. 479 & 480.) The Government has filed a Reply both to Plaintiffs, (doc. 514), and ADG/Huff, (doc. 507). For the reasons below, the Court **GRANTS** the Government's Motion. (Doc. 417.)

## BACKGROUND

### I. Factual Background

The Court derives the facts below from the parties' submissions and the summary judgment record. Under Local Rule 56.1, a motion for summary judgment must include a separate, short, and concise statement of the material facts as to which it is contended there exists no genuine dispute to be tried as well as any conclusions of law thereof. All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by a statement served by the opposing party. S.D. Ga. L.R. 56.1. Under Local Rule 56.1, when a fact is undisputed, the Court includes the fact. For disputed facts, the Court reviews the record to determine if a material dispute exists. When the other party's response reflects the cited record more accurately, the Court modifies the proposed fact and cites the record. The Court also excludes immaterial facts, those stated as an issue or legal conclusion, those not supported by a citation to evidence, or those that the record citation fails to support. And, where appropriate, the Court includes facts drawn from its review of the record. See Williams v. Wal-Mart Stores E.,

LP, 661 F. Supp. 3d 1264, 1266 (N.D. Ga. 2023). These facts are undisputed unless otherwise stated.

On August 28, 2017, a single-engine Beechcraft A36 Bonanza airplane owned and operated by Pilot Hunter (the "Aircraft") departed from the Savannah/Hilton Head International Airport ("SAV") on a flight to the Cobb County International Airport in Kennesaw, Georgia. (Doc. 479-45, pp. 1–2.) Decedents were passengers on the Aircraft. (Id. at p. 2.) The weather was clear on the day of the flight, with Visual Meteorological Conditions prevailing at the time of the accident.[1] (Id.) At 12:30:02 UTC, Pilot Hunter contacted an air traffic controller ("Controller Thomas") working at the North Radar Position in the Savannah Air Traffic Control Tower ("SAV ATCT"). (Id. at p. 2.) At 12:30:08, Controller Thomas instructed Pilot Hunter to "climb and maintain [an altitude of] eight thousand [feet]." (Id.)

At 12:35:46, Pilot Hunter contacted Controller Thomas and declared an emergency, stating that "yeah have an engine failure need to land." (Id. at p. 3.) At 12:35:55, Controller Thomas presented Pilot Hunter with two options for landing: turning back to SAV or flying to an airport in Statesboro, Georgia. (Id.) At 12:35:58, Pilot Hunter responded that he was "gonna have [to] go to Statesboro" as he was "not gonna make it" to SAV. (Id.) At 12:36:09, Pilot Hunter stated that he was headed to Statesboro. (Id. at p. 4.) At 12:36:23, Pilot Hunter asked for the distance to Statesboro, repeating this inquiry at 12:36:29. (Id.) At 12:36:31, Controller Thomas stated that it was twelve miles to Statesboro before correcting himself at 12:36:34 that the distance was twenty miles. (Id.) Pilot Hunter responded that he was not sure that he could make the twenty miles to Statesboro but added that he "might" be able to. (Id.)

[1] Under Visual Meteorological Conditions, pilots may safely operate their aircraft through their own vision and are not reliant on the use of instruments for navigation. *Visual Meteorological Conditions (VMC): Comprehensive Guide*, TARMACVIEW, https://www.tarmacview.com/glossary/vmc/ [https://perma.cc/GW9M-3BJC] (last visited Sep. 10, 2026).

At 12:36:39, Controller Thomas presented Pilot Hunter with a third option for landing—Cypress Lakes, a private use airport with a turf runway. (Id. at pp. 4–6.) Controller Thomas informed Pilot Hunter that Cypress Lakes was approximately seven miles away from the aircraft at the time and would require Hunter to execute a left turn to reach. (Id. at pp. 4–5.) At 12:36:49, Pilot Hunter stated that he was going to attempt to reach Cypress Lakes. (Id. at p. 5.) Pilot Hunter then informed Controller Thomas that he had three hours of fuel as well as two passengers onboard the Aircraft. (Id.)

At 12:38:48, Controller Thomas told Pilot Hunter that "it looks like you're not gonna make it to Cypress Lakes" and asked him if he saw "a road or something" that he could land on. (Id. at p. 6.) Pilot Hunter replied that he would "probably" make it to Cypress Lakes. (Id.) At 12:39:04, Controller Thomas informed the Aircraft that it was roughly five and a half miles to Cypress Lakes. (Id.) At 12:40:22, Controller Thomas stated that he lost contact with the Aircraft. (Id.) The Aircraft crashed in a wooded area approximately five miles from Cypress Lakes. (Id. at p. 7.) Decedents and Pilot Hunter perished in the crash. (Id. at p. 1.)

During the emergency, a fourth airport was nearby—Briggs Field, a private use airport with a turf runway. (Id. at p. 10.) Briggs Field was approximately 3.4 miles away from the Aircraft at the time the emergency was declared. (Doc. 479-13, p. 4.) Nevertheless, Controller Thomas did not offer Briggs Field as an option for landing and the airport was not depicted on the radar video map ("RVM") utilized by Controller Thomas. (Id.)

In their Fourth Amended Complaint, Plaintiffs allege that Controller Thomas failed to timely offer either Cypress Lakes or Briggs Field as options for landing despite the fact that these airports were "well within the glide range" of the Aircraft at the time of the emergency. (Doc. 387, p. 14.) Plaintiffs also contend that Controller Thomas's initial recommendation of SAV and

later recommendation of Cypress Lakes caused Pilot Hunter to execute multiple mid-air turns which substantially reduced the Aircraft's glide range. (Id. at pp. 13–15, 18–19.) Because of these allegations, the Aircraft's glide range is a central question in this case. "Glide range" refers to how far an aircraft can travel absent the engine thrust necessary for normal flight, with the aircraft being propelled downward by its weight. (See doc. 417-7, p. 4; doc. 479-41, p. 6.) An aircraft's glide range is a function of several factors, including its "glide ratio." (Doc. 417-7, p. 4; doc. 479-41, p. 6.) An aircraft's glide ratio is defined as "the distance the airplane travels in relation to the altitude it loses," or, alternatively, "how much ground the airplane can cover when descending from a given altitude." (Doc. 417-7, p. 4; doc. 479-41, p. 6.) The higher the glide ratio, the further an aircraft can glide. (Doc. 479-41, p. 6.) To maximize the distance flown during a glide, an aircraft must be flown at the best glide speed. (Doc. 417-7, p. 4.) The best glide airspeed occurs at the highest "lift-to-drag ratio (L/D)." (Id.) The "Maximum Range Glide Airspeed" for the Beechcraft A36 Bonanza is 110 knots indicated airspeed ("KIAS"). (Doc. 479-45, p. 7.) Additionally, to achieve the "Maximum Glide Configuration" for the Beechcraft A36 Bonanza airplane, the propeller lever must be pulled to the "Full Aft (low rpm)" position" and the plane's cowl flaps must be closed. (Id.; doc. 417-8, p. 9.)

## II. Procedural Background

Plaintiffs brought this action against the Government and ADG/Huff, suing the Government under the FTCA, 28 U.S.C. § 1346(b) and 28 U.S.C. § 2671, *et seq*. (Doc. 387, p. 4.) Plaintiffs bring two counts of negligence against the Government. (Id. at pp. 17–23.) Pertinent allegations include that the Government—by and through the Federal Aviation Administration—negligently caused the fatal crash by failing to timely advise Pilot Hunter of appropriate landing fields, improperly directed the Aircraft to airports that were "significantly further away (and

unreachable), than other airports at which [Pilot Hunter] could have (and would have) safely landed," and improperly directed the Aircraft to engage in unnecessary turns. (Id. at pp. 17–19.) Plaintiffs also allege that Pilot Hunter negligently operated the Aircraft and bring claims against ADG/Huff for vicarious liability and negligent selection and/or retention of Pilot Hunter, whom Plaintiffs allege was ADG/Huff's agent, employee or representative. (Id. at pp. 23–34.) In their Amended Answer and Affirmative Defenses to Plaintiffs' Fourth Amended Complaint, ADG/Huff assert that any damages awarded to Plaintiffs should be apportioned to and among the other parties and other nonparties and third parties. (Doc. 396, p. 3.)

Previously, the Government filed a partial Motion to Dismiss, contending that all claims relating to the design and content of the RVM fall within the discretionary function exception to the FTCA. (See generally doc. 428.) The Court granted this Motion, dismissing all claims in the Fourth Amended Complaint related to the design and content of the RVM. (See doc. 529.) As such, Plaintiffs cannot establish the Government's negligence through the omission of Briggs Field from the RVM.

Given the technical nature of the factual issues underlying Plaintiffs' claims, the parties have retained numerous expert witnesses. For purposes of the present Motion, Plaintiffs' relevant witnesses include David Canoles, Jameel Joseph, Charles Pereira, Colin Sommer, and Mark Callender. Canoles is Plaintiffs' air traffic control expert. (Doc. 417, p. 8; 417-9; doc. 479-33.) Joseph is Plaintiffs' pilot expert. (Doc. 417, p. 9; doc. 417-10.) Sommer and Pereira were retained as Plaintiffs' accident reconstruction experts. (Doc. 417-11; doc. 417-14; doc. 417-15.) Callender was retained to design and conduct a flight test and generate "glide predictions" for the Aircraft to determine whether it could have safely landed at either Cypress Lakes or Briggs Field. (Doc. 417-12, p. 5; doc. 479-41.) ADG/Huff have retained Kevin Karpe as an air traffic control expert, (doc.

417-20), William Jeffrey Edwards as a pilot and accident reconstruction expert, (docs. 417-16 & 417-17), and Douglas Stimpson as an accident investigation expert, (doc. 417-18). Also relevant is the Government's piloting expert, Kenneth Orloff, who analyzed the flight path of the Aircraft and compared it with hypothetical flight paths that the Aircraft could have taken had Cypress Lakes been suggested to Pilot Hunter at the outset of the emergency. (Docs. 514-1 & 514-2.)

The Government filed a series of motions seeking to exclude Plaintiffs' and ADG/Huff's experts. (Docs. 408, 409, 410, 411 & 412.) Among other things, the Government sought to prevent the experts from offering testimony on whether the Aircraft could have safely reached either Cypress Lakes or Briggs Field had they been promptly suggested by Controller Thomas. (See generally doc. 526.) The Magistrate Judge granted the Government's motion to exclude the expert testimony of Pereira. (Id. at pp.73–87.) The Magistrate Judge further granted the Government's motions to exclude Stimpson's and Karpe's opinions that the Aircraft could have reached Briggs Field, Joseph's and Canoles's opinions that the Aircraft could have reached Cypress Lakes, and Sommer's opinion that the Aircraft was able to reach either Briggs Field or Cypress Lakes. (Id. at pp. 20–24, 54–57, 60–63, 91, 97.) However, the Government's motions to exclude Callender and Edwards from opining that the Aircraft could have safely landed at Briggs Field were denied. (Id. at pp. 33–52.)

The Government now moves for summary judgment, contending that Plaintiffs have failed to present reliable evidence that Controller Thomas's actions were the cause in fact of the fatal crash. (Doc. 417.) The Government further argues that "[b]ecause ADG/Huff has failed to present any additional evidence to establish that the [Aircraft] would have safely landed at Cypress Lakes or Briggs Field but for [Controller Thomas's] alleged negligence," it is also entitled to summary judgment on ADG/Huff's apportionment defense. (Id. at p. 5.) Plaintiffs and ADG/Huff have

both filed Responses opposing the Government's Motion. (Docs. 479 & 480.) The Government has filed Replies to both Plaintiffs, (doc. 514), and ADG/Huff, (doc. 507).

**STANDARD OF REVIEW**

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing there is no genuine dispute as to any material fact. See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party has the burden of proof at trial, the moving party may discharge his burden by showing the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). If the moving party discharges this burden, the burden shifts to the nonmovant to present affirmative evidence to show a genuine issue of fact. Anderson, 477 U.S. at 257. When the moving party has the burden of proof at trial, the moving party "must show affirmatively the absence of a genuine issue of material fact," supporting its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial." United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in State of Ala., 941 F.2d 1428, 1438 (11th Cir. 1991) (internal citations omitted).

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in the light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., Fla., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)). However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (emphasis and citations omitted). Mere speculation does not create a genuine issue of material fact. Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005) (internal quotations omitted).

**DISCUSSION**

Under the FTCA, the liability of the United States is determined "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The FTCA requires courts to apply the "whole law" of the relevant state, including its choice of law rules. Richards v. United States, 369 U.S. 1, 11–12 (1962). Here, the relevant conduct occurred in Georgia. (Doc. 479-45, p. 1.) Georgia follows the doctrine of *lex loci delicti* in tort cases, applying the substantive law of the state where the tort was committed. Bullard v. MRA Holding, LLC, 740 S.E.2d 622, 625 (Ga. 2013). As the alleged tort here occurred in Georgia, Georgia law thus governs.

Negligence under Georgia law is not to be presumed but is instead "a matter for affirmative proof." Purvis v. Steve, 643 S.E.2d 380, 383 (Ga. Ct. App. 2007) (internal quotation omitted). To recover for negligence in Georgia, a plaintiff must show four elements: a duty, breach of that duty, causation, and damages. Yearty v. Scott Holder Enters., Inc., 824 S.E.2d 817, 820 (Ga. Ct. App. 2019) (internal citation omitted). Causation is further divided into two elements: cause in fact and

proximate causation. Id. The Government's Motion focuses on the element of cause in fact, or factual causation. (Doc. 417, pp. 8–17.) To establish factual causation, "the plaintiff ordinarily must prove that, but for [the defendant's] conduct, he would not have sustained the injury." Yearty, 824 S.E.2d at 820–21 (internal quotation omitted) (alterations adopted). "A mere possibility of such causation is not enough." Purvis, 643 S.E.2d at 383–84 (internal quotation omitted); see also Tuggle v. Helms, 499 S.E.2d 365, 368 (Ga. Ct. App. 1998) ("Guesses or speculation which raise merely a conjecture or possibility [of factual causation] are not sufficient to create even an inference of fact for consideration on summary judgment."). To satisfy their burden, plaintiffs "must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result." Purvis, 643 S.E.2d at 383 (internal quotation omitted); see also Redmon v. Daniel, 779 S.E.2d 778, 781–82 (Ga. Ct. App. 2015) (plaintiff bears burden of proving causation by a preponderance of evidence).

Generally, questions of causation are "for the [finder of fact] to resolve and should not be determined by a trial court as a matter of law except in plain and undisputed cases." Ogletree v. Navistar Int'l Transp. Corp., 535 S.E.2d 545, 548 (Ga. Ct. App. 2000) (internal citation omitted). However, as Plaintiffs brought this case pursuant to Section 1346(b) of the FTCA, (doc. 387, p. 4), the Court is the finder of fact here. 28 U.S.C. § 2402 ("[A]ny action against the United States under section 1346 [of the FTCA] shall be tried by the court without a jury."). As the Government notes, (doc. 514, p. 2), a court serving as the factfinder in a nonjury case may make factual determinations and draw inferences at the summary judgment stage where there are no issues of witness credibility. Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc., 830 F.3d 1242, 1251 (11th Cir. 2016) (internal quotations and citations omitted); see also Useden v. Acker, 947 F.2d 1563,

1572 (11th Cir. 1991) (quoting Nunez v. Superior Oil Co., 572 F.2d 1119, 1123–24 (5th Cir. 1978)).

Here, the Government contends that cause in fact has not been established as "Plaintiffs have failed to present reliable evidence that [Pilot Hunter] would have safely landed at Cypress Lakes or Briggs Field but for [Controller Thomas's] alleged negligence." (Doc. 417, p. 8.) The Government urges that Plaintiffs cannot meet their burden of proving factual causation through "conclusory allegations and speculation," arguing that "[w]hile all reasonable inferences must be drawn in favor of the nonmoving party, an inference based on speculation and conjecture is not reasonable." (Id. at p. 6 (first quoting Glasscox v. City of Argo, 903 F.3d 1207, 1213 (11th Cir. 2018); then quoting Hinson v. Bias, 927 F.3d 1103, 1115 (11th Cir. 2019)).)

The bulk of the Government's Motion focuses on the alleged insufficiency of the expert witnesses proffered by Plaintiffs and ADG/Huff. (Id. at pp. 8–17.) The Government contends that these experts have failed to present reliable evidence to support the claim that the Aircraft would have safely reached either Cypress Lakes or Briggs Field, relying instead on "hypothetical scenarios" and speculation. (Id.) According to the Government, it is "entitled to judgment at this point because Plaintiffs' experts' reliance upon hypotheticals, not the real facts of this accident flight, means Plaintiffs have failed to meet their burden of proof on factual causation." (Id. at pp. 12–13.) The Government further argues that ADG/Huff's experts "have likewise failed to present any reliable evidence establishing that [Controller Thomas's] alleged negligence was a factual cause of the accident." (Id. at p. 16.) Plaintiffs respond that the factfinder could use "logic" and "common sense" to conclude that the Aircraft could have safely reached Briggs Field but for the alleged negligence, arguing that expert witness testimony is thus not necessary. (Doc. 479, p. 26; see id. at p. 22 (quoting Zwiren v. Thompson, 578 S.E.2d 862, 865 (Ga. 2003)).) This argument

is echoed by ADG/Huff, who aver that the undisputed facts in this case are enough for a reasonable jury to conclude that the crash was caused by Controller Thomas's actions. (Doc. 480, p. 12.) The Government disputes these arguments and urges that expert testimony is required here as the factfinder is tasked with assessing complex matters beyond the scope of lay knowledge. (Doc. 514, pp. 11–13.)

The Supreme Court of Georgia has explained that while "expert evidence is not required in the mine run of simple negligence cases," such evidence is necessary where the factfinder would need to know the answers to questions that "can be answered accurately only by witnesses with specialized expert knowledge." Cowart v. Widener, 697 S.E.2d 779, 786 (Ga. 2010). In other words, expert evidence may be required whenever there is "a situation where the plaintiff need[s] to go beyond common knowledge and experience to meet her initial burden of showing causation." Id. at 784.

Here, whether the Aircraft could have safely reached a given airport is a complex question which requires determining the Aircraft's glide capabilities. While they differ in how they frame the relevant considerations, the parties all agree that the Aircraft's glide ratio and airspeed are important factors in determining its glide range. (See doc. 417-1, p. 4; doc. 479-45, pp. 7–8; doc. 480-1, p. 2.) Callender's report makes clear that determining an aircraft's glide ratio is a complex endeavor and requires accounting for the speed and direction of winds (headwind, tailwind, and crosswind) during the flight. (See doc. 479-41, pp. 12–13.) Additionally, an aircraft's bank angle when making a given turn must be considered when evaluating its ability to reach a given airport. (Id. at pp. 16–18.) Orloff's report shows that the Aircraft's altitude is another salient factor in determining whether it could have safely reached either Cypress Lakes or Briggs Field. (See doc. 514-2, pp. 12–13, 31.) Evaluating these factors and applying them to the Aircraft's flight

capabilities goes well beyond the knowledge and experience of the typical layperson.[2] Here, causation hinges not on logical deductions, but rather on complex questions of physics. As such, Plaintiffs must provide competent expert testimony to carry their burden on the issue of factual causation.

**I. The Sufficiency of Plaintiffs' and ADG/Huff's Evidence**

The Court now turns to the evidence produced by the parties. Plaintiffs and ADG/Huff both argue that the Government's Motion fails in light of the expert evidence they have produced. Plaintiffs aver that the Government's Motion is "fragilely premised upon it prevailing on every Daubert motion it filed against Plaintiffs' expert witnesses seeking to preclude their opinions" on whether the Aircraft "could, and would, have reached either Briggs Field or Cypress Lakes had one or both of these airports been timely offered by [SAV] ATC." (Doc. 479, p. 23.) In their Response, Plaintiffs argue that the Government's failure to prevail on even one of its then-pending Daubert motions would completely undermine its Motion for Summary Judgment. (Id.) ADG/Huff similarly contend that "no less than *seven* [expert] witnesses have opined that the Aircraft would have been able to safely land at Briggs Field had [Controller Thomas] provided" it as an option and that "evidence from any one" of these experts is sufficient to establish a genuine issue of material fact. (Doc. 480, pp. 8–10.)

While both Plaintiffs and ADG/Huff stress the sheer number of expert witnesses who have opined on the Aircraft's ability to reach either Cypress Lakes or Briggs Field, most of these expert opinions are inadmissible and may not be considered. As noted above, the Magistrate Judge granted the Government's motions to exclude the testimony of Pereira entirely. (Doc. 526, pp.

[2] Indeed, other courts have recognized that determining the cause of airplane crashes requires expert testimony. See Michaels v. Avitech, Inc., 202 F.3d 746, 753 (5th Cir. 2000) ("In this case, expert testimony was necessary to establish the likely cause of an aircraft disaster.").

56–57, 73–87.) Other experts offered by Plaintiffs and ADG/Huff may opine on other relevant questions in the case but are barred from offering opinions on the Aircraft's ability to reach specific airports. Stimpson's opinion that the Aircraft could have reached Briggs Field was found to be unreliable and therefore inadmissible, as was Joseph's opinion on the Aircraft's ability to reach Cypress Lakes. (Id. at pp. 55, 61–63.) While Canoles may testify as to whether Controller Thomas should have offered Cypress Lakes as an option, he is barred from opining that the Aircraft "could have reached the airfield" as such testimony "is outside the scope of his expertise." (Id. at pp. 21–24.) Canoles is likewise barred from opining on the Aircraft's ability to reach Briggs Field. (Id. at pp. 24–27.) Karpe's opinion that the Aircraft "could have easily made" it to Briggs Field was also found to be outside the scope of his expertise. (Id. at pp. 56–57.) Additionally, the Magistrate Judge found that Plaintiffs failed to establish the admissibility of Sommer's opinion that Briggs Field and Cypress Lakes were "obtainable" or "within glide distance" of the Aircraft and consequently granted the motion to exclude Sommer from offering such testimony. (Id. at p. 91.)

However, the Magistrate Judge also denied some of the Government's Daubert motions, finding the testimony of Callender and Edwards to be admissible. (Id. at pp. 33–52.) Thus, while Plaintiffs and ADG/Huff may not invoke any of the excluded opinions, they may rely on the findings of Callender and Edwards in establishing causation. Contrary to Plaintiffs' and ADG/Huff's contentions however, this does not dispositively defeat the Government's Motion. The mere existence of an alleged factual dispute will not defeat a motion for summary judgment where the record taken as a whole could not lead a rational trier of fact to find for the nonmovant. Scott, 550 U.S. at 380. The Court must therefore determine whether the opinions of Callender and Edwards, viewed within the record as a whole, would permit the factfinder to reasonably conclude that Controller Thomas's alleged negligence was the factual cause of the accident.

As an initial matter, it is not enough to show that Pilot Hunter would have diverted to Briggs Field or Cypress Lakes had they been offered at the outset. For factual causation, the relevant inquiry is whether the injury (here the fatal crash) would have occurred absent the alleged negligence. See Yearty, 824 S.E.2d at 820–21 (factual causation requires showing that, absent the defendant's conduct, the plaintiff would not have sustained the injury); see also Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1304 (11th Cir. 2009) ("Georgia law is well-settled that the defendant's conduct is not a cause of the event, if the event would have occurred without it." (internal quotation and citation omitted)). In other words, establishing factual causation requires showing that had Controller Thomas suggested either Cypress Lakes or Briggs Field to Pilot Hunter, Pilot Hunter would have not only diverted to either of these airports but would have safely landed there. The Court will thus examine the record as to both Cypress Lakes and Briggs Field to determine whether a rational factfinder could conclude that either airport was a viable option for landing.

**A. Cypress Lakes**

Beginning with Cypress Lakes, Plaintiffs largely rely on the calculations and opinions of Callender to establish that the Aircraft could have safely landed there. The Government challenges Callender's testimony as unreliable and speculative, resting on hypothetical scenarios. The Government is heavily critical of Callender's "glide predictions" for the Aircraft, noting that Callender has testified that he was "not asked" to determine the actual glide ratio of the Aircraft. (Doc. 417, p. 9 (quoting doc. 417-12, p. 12).) The Government further claims that each of Callender's "glide predictions" "is instead based on assumptions that are contrary to the factual record and/or cannot be proved." (Id.) Callender has testified that he

> *assumed* that the airplane was flown at 110 knots; *assumed* that the ground track was held constant for 13 seconds after the emergency was declared; *assumed* that the turns were at a constant bank angle as opposed to a varying bank angle

> throughout any turn; and *assumed* that the propeller was windmilling, as the flight test airplane continuously did throughout flight testing.

(Doc. 417-13, p. 46 (emphasis added).) Callender has further testified that, in making his glide predictions, he assumed that the propeller would have been in the full-aft lever position and that the cowl flaps of the Aircraft were closed. (Id.)

The Government avers that Plaintiffs have presented no factual evidence to support Callender's assumptions, noting that "there is undisputed evidence that contradicts virtually all of Dr. Callender's predicate assumptions." (Doc. 417, p. 10.) Callender himself has acknowledged that the Aircraft's speed was not 110 KIAS as he originally assumed, later testifying that he believes the average airspeed of the Aircraft during the flight was 80 KIAS. (Doc. 417-13, p. 18.) The bank angles Callender used—which the Government characterizes as being "randomly selected"—were likewise higher than the actual bank angle throughout the majority of the flight. (Doc. 417, p. 10 (citing doc. 417-13, p. 43).) Given that Callender did not know the Aircraft's actual glide ratio during the emergency and instead prepared a hypothetical glide ratio predicated upon questionable factual assumptions, the Government urges that he "has no basis to say that the [Aircraft] would have safely landed at Cypress Lakes or Briggs Field but for [Controller Thomas's] alleged negligence." (Id. at p. 11.)

The Government analogizes the present case to Anthony v. Chambless, 500 S.E.2d 402 (Ga. Ct. App. 1998). (Doc. 417, pp. 14–15.) In Anthony, the plaintiffs presented expert testimony opining that "the decedent would have had an 80 percent chance of survival *under certain circumstances*," basing that determination on an idealized scenario. 500 S.E.2d at 405. The Georgia Court of Appeals rejected this opinion as contradicted by the factual record, holding that contrary evidence in the record rendered the opinion "so attenuated to be speculative." Id. The

Government argues that, as in Anthony, "Plaintiffs cannot substitute assumptions to establish factual causation." (Doc. 417, p. 15.)

Following his deposition, Callender submitted a Report Supplement addressing the concerns raised by the Government and elaborating on the methodology underlying his glide predictions. (See doc. 479-42.) In this Supplement, Callender provides glide predictions for an A36 Bonanza to Cypress Lakes using the airspeed of 80 KIAS, basing this off the "approximated average airspeed recorded for [the Aircraft] after the emergency was declared and during the accident sequence." (Id. at p. 2.) Callender claims that the Aircraft

> would have been capable of reaching [Cypress Lakes], given the wind conditions at the time of the accident, 1) when flown at the suboptimal airspeed of 80 KIAS, 2) with a turn initiated 13 [seconds] after the time that an emergency was declared (corresponding to the length of time taken by [SAV] ATC to provide guidance to Statesboro Airport[)], and 3) using any of the bank angles tested[.]

(Id.) Callender also states in an affidavit that, contrary to the Government's argument, it is "virtually impossible" to produce a single glide ratio for the Aircraft given that the airspeed, which alters the glide ratio, varied throughout the emergency. (Doc. 479-40, p. 4.) Plaintiffs thus dispute the cogency of the Government's arguments regarding Callender and contend that Callender's reports show that "even at the suboptimal airspeeds flown by Hunter during the emergency sequence . . . [the Aircraft] would have been able to glide to Cypress Lakes had Controller Thomas timely provided that airport . . . at the onset of the emergency." (Doc. 479, p. 32.)

After reviewing both Callender's Report and the Supplement, the Court is unpersuaded. As Callender acknowledges, the alteration of the bank angle used resulted in the alteration of the estimated altitude that the Aircraft would have had on arrival. (Doc. 479-42, p. 2.) Callender has testified that the bank angle appears to have been less than 10 degrees—lower than the four bank angles Callender used in his calculations. (Doc. 417-13, p. 43.) This is significant given that a

difference in mere feet of altitude can mean the difference in whether an aircraft safely lands. (Doc. 480-13, pp. 4–5.) Moreover, while Callender has arguably shown that the Aircraft could have reached Cypress Lakes under a variety of conditions, his calculations are removed from the actual facts of the case and reflect only how the Aircraft *may* have performed under certain conditions. As Callender states, he "calculated what the [A]ircraft *can* do"—not what the Aircraft actually did. (Doc. 417-13, p. 43 (emphasis added).) As such, Callender's calculations support only the possibility that Controller Thomas's acts could have caused the accident and are thus insufficient to establish factual causation. See Purvis, 643 S.E.2d at 383–84; see also Anthony, 500 S.E.2d at 405 (finding expert opinion "irrelevant" and insufficient to support a finding of causation where it relied on assumptions contradicted by the record).

Further, there is considerable evidence that the Aircraft was incapable of reaching Cypress Lakes under the actual conditions of the accident flight. Edwards, ADG/Huff's accident reconstruction expert, opines that Cypress Lakes was never a viable option for landing. Edwards states in his report that Briggs Field was "[t]he only airport within realistic glide range for an emergency landing" and "the only airport that Hunter could have safely made it to after losing his engine." (Doc. 417-16, pp. 52–53.) According to Edwards, Cypress Lakes was out of reach for Pilot Hunter from "the moment he lost his engine." (Id. at p. 53.) Similarly, the Government's expert Orloff concludes that the Aircraft would have failed to reach Cypress Lakes under a variety of conditions. (Doc. 514-2, p. 31.) Utilizing two different possible wind profiles, Orloff constructed hypothetical flight paths that would have resulted had Pilot Hunter attempted to turn towards Cypress Lakes less than seven seconds after declaring an emergency and concluded that each flight path fell short reaching Cypress Lakes. (Id.) Orloff ultimately found that the accident resulted from Pilot Hunter's alleged errors. (Id. at p. 32.) Plaintiffs' expert Canoles testified that

because of the turn that Pilot Hunter would have had to make to reach Cypress Lakes, he would have suggested Cypress Lakes only "[w]hen there were no other alternatives available." (Doc. 417-6, p. 29.)[3]

Neither Plaintiffs nor ADG/Huff have produced competent evidence that the Aircraft would have safely landed at Cypress Lakes had Controller Thomas promptly suggested it. At most, Plaintiffs have produced evidence that the Aircraft may have reached the airport under certain conditions. As this evidence is speculative and contradicted by the real facts of this case, it does not establish a genuine dispute of material fact. See Cordoba, 419 F.3d at 1181 ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.") (internal citation omitted).

**B. Briggs Field**

Turning to Briggs Field, the totality of the undisputed evidence, even when viewed in the light most favorable to Plaintiff, proves that it was not a viable option for landing. Whether the Aircraft could have safely reached Briggs Field must be considered in light of its omission from Controller Thomas's RVM at the time of the accident. In their Response, Plaintiffs argue at length that the Government breached a duty of care in failing to depict Briggs Field on the RVM. (Doc. 479, pp. 10–17.) However, whether Briggs Field should have been depicted on the RVM at the time of the accident is ultimately irrelevant as the content of the RVM was left to the discretion of SAV ATCT and thus falls within the discretionary function exception to the FTCA. (See generally doc. 529.) As such, the Government cannot be held liable for the omission of Briggs Field from the RVM. (See id.) Briggs Field's omission from the RVM must thus be taken as a given when

---

[3] Although Canoles is barred from opining on whether the Aircraft could have safely landed at Cypress Lakes, he is permitted to opine on whether Cypress Lakes should have been offered as a landing option. (Doc. 526, p. 24.)

determining whether the Aircraft could have safely landed there. This significantly impacts the analysis here as the record strongly indicates that Briggs Field was not a tenable option for landing due to its absence from the RVM.

Multiple experts have opined that attempting to vector an aircraft to an airport omitted from the controller's RVM is not advisable. Dennis Hartman, a former air traffic controller and instructor with decades of experience, testified that "[w]e are not going to vector an airplane to an airport that's not depicted on the radar map, no." (Doc. 515-4, p. 37.) The Government's air traffic control expert Darren Gaines similarly concluded that Briggs Field was not a safe option given its omission from the RVM and rejected the argument that Controller Thomas should have attempted to direct Pilot Hunter there by "superimpos[ing] the location of Briggs Field [from other documents] onto the RVM." (Doc. 442-3, p. 18.) Gaines opined that he does not believe that an air traffic controller should offer such an option and that it is "highly unlikely . . . that a pilot would accept" such a vector "if advised that it was based on mentally overlaying a Sectional Chart or other document onto his [RVM]." (Id.) While Plaintiffs have argued at length that Briggs Field *should* have been included on the RVM, they have not adequately addressed the fact that it wasn't. Plaintiffs have produced no evidence—expert or otherwise—indicating that Controller Thomas could have feasibly vectored the Aircraft to an airport omitted from his RVM.

Moreover, even if Briggs Field had been depicted on the RVM and Controller Thomas had offered it as an option, Plaintiffs have not produced competent evidence that the Aircraft would have safely landed there. Orloff has opined that the Aircraft would not have reached Briggs Field under the conditions prevailing on the day of the accident. (Doc. 514-1, p. 101.) Even if the Aircraft could have flown the distance to Briggs Field under the wind conditions at the time, it still cannot be assumed that the Aircraft would have safely landed there such that the ultimate injury

would have been avoided. As the Court's prior Order acknowledged, private-use airports such as Briggs Field present unique challenges related to safety and reliability. (Doc. 529, p. 15.) In his report, Gaines found that Briggs Field presented hazards—abandoned cars, heavy equipment, a sandpit, and two ponds adjacent to the runway—which are "not present at public airports" (such as SAV and Statesboro). (Doc. 442-3, p. 13.) Plaintiffs have produced nothing that would enable a factfinder to disregard this evidence and conclude that it is more likely than not that the Aircraft would have safely landed had Briggs Field been offered as an option.

While Edwards testifies that the Aircraft would have "[a]bsolutely" reached Briggs Field had it been offered by Controller Thomas, (doc. 417-17, p. 23), this does not change the analysis. Edwards largely bases this opinion on Callender's hypothetical glide predictions and did not reconstruct the accident flight himself. (Id. at p. 82.) Edwards also calculated a "direct-line" distance from the point where the emergency was declared to Briggs Field, but by his own admission did not account for the altitude of the Aircraft when it would have arrived at Briggs Field. (Id.) Like Callender's glide predictions, Edwards' calculations are speculative and divorced from the facts of the flight. Moreover, even accepting that the Aircraft was capable of reaching Briggs Field, there is still no evidence that it could have been safely vectored there given the omission of Briggs Field from the RVM. As such, Edwards' testimony is not enough to defeat the Government's Motion for Summary Judgment.

Plaintiffs also cite the National Transportation Safety Board ("NTSB")'s Data Summary following its investigation into the accident, arguing that this report provides direct support for a conclusion that the Aircraft could have safely reached Briggs Field had it been timely provided as an option for landing. (Doc. 479, p. 24 (quoting doc. 479-31, p. 2).) The Government responds that Plaintiffs may not rely on any analytical reports provided by the NTSB. (Doc. 514, pp. 13–

15.) The Government is correct. As stated in 49 U.S.C. § 1154(b), "[n]o part of a report of the [NTSB], related to an accident or an investigation of an accident, may be admitted into evidence or used in a civil action for damages resulting from a matter mentioned in the report." NTSB reports are distinguished between "Board accident reports" (which include the NTSB's determinations and probable cause analysis) and "factual accident reports" (which contain only the results of the NTSB investigator's factual investigation of an accident). 49 C.F.R. § 835.2. Factual accident reports are admissible as evidence, but "no part of a Board accident report may be admitted as evidence or used in any suit or action for damages growing out of any matter mentioned in such reports." Id. As such, NTSB investigatory reports are not considered as evidence by federal courts. Chiron Corp. & PerSeptive Biosystems v. Nat'l Transp. Safety Bd., 198 F.3d 935, 940 (D.C. Cir. 1999) ("The simple truth here is that NTSB investigatory procedures are not designed to facilitate litigation, and Congress has made it clear that the Board and its reports should not be used to the advantage or disadvantage of any party in a civil lawsuit."); Knous v. United States, 981 F. Supp. 2d 1365, 1367 (N.D. Ga. 2013) (NTSB reports which "merely recite the relevant facts" are admissible, but Board accident reports which "actually determine causation" are inadmissible).

Plaintiffs acknowledge the inadmissibility of NTSB determinations of proximate causation and redact the portion of the Data Summary expressly concerned with determining probable causation. (Doc. 479, p. 24 n.18; see also doc. 479-31, p. 3.) Plaintiffs' redaction does not render the Data Summary admissible, however. Rather than merely stating the relevant factual findings, the NTSB Data Summary Plaintiffs cite still involves a discussion of the accident's proximate cause and whether the Aircraft was capable of reaching certain airports, thus constituting an inadmissible Board accident report. (See doc. 479-31, p. 2.) Moreover, 49 C.F.R. § 835.2

expressly states that "no part" of any Board accident report is admissible. Other courts have recognized that such "Data Summaries" are inadmissible in their entirety. See Specter v. Texas Turbine Conversions, Inc., No. 3:17-CV-00194-TMB, 2020 WL 7701484, at *1, *4–5 (D. Alaska Dec. 28, 2020) (holding that because the NTSB Data Summary provided by plaintiffs contained probable cause analysis and findings, "all portions" of it were inadmissible); see also Benavides v. Tesla, Inc., No. 21-CV-21940, 2025 WL 2029739, at *6 (S.D. Fla. July 20, 2025) (rejecting the argument that "only the conclusions and opinion" of the NTSB are inadmissible and holding that plaintiffs may not "introduce or rely on any portion" of any Board report). As such, the Court will not consider any portion of the Data Summary that Plaintiffs cite.

Plaintiffs and ADG/Huff have thus failed to produce evidence sufficient to support a finding that it is more likely than not that the accident was caused by Controller Thomas's actions. Absent competent evidence that the Aircraft would have safely reached Cypress Lakes or Briggs Field—much less that the Aircraft would have safely landed at one of those locations—Plaintiffs fail to establish factual causation. See Anders v. United States, 307 F. Supp. 3d 1298, 1342 (M.D. Fla. 2018) (holding that, because plaintiffs "presented no credible evidence that [the pilot] would have been able to land sooner at any other airport or in any other fashion," their claims "fail[ed] on the element of causation"). The most that Plaintiffs offer are speculative possibilities about what could have occurred. But the "mere possibility" that a defendant's actions were the cause in fact of the accident "is not enough; and when the matter 'remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to grant summary judgment for the defendant.'" Purvis, 643 S.E.2d at 383; Giles v. Greenhouse Apartments, LLC, 926 S.E.2d 324, 328 (Ga. Ct. App. 2026) (quoting George v. Hercules Real Est.

Servs., Inc., 795 S.E.2d 81, 85 (Ga. Ct. App. 2016)); see also Hinson, 927 F.3d at 1115 (speculation and conjecture do not establish genuine dispute of material fact).

## CONCLUSION

The death of Decedents is an incredibly sad tragedy. But "the occurrence of an unfortunate event is not sufficient to authorize an inference of negligence." Giles, 926 S.E.2d at 328 (quoting Wilson v. Guy, 848 S.E.2d 138, 141 (Ga. Ct. App. 2020)). Because Plaintiffs have failed to establish a genuine dispute of material fact as to the essential element of factual causation, their negligence claims against the Government fail. Thus, the Court **GRANTS** the Government's Motion for Summary Judgment. (Doc. 417.) Accordingly, the Court **DIRECTS** the Clerk of Court to **TERMINATE** the Government.[4]

**SO ORDERED**, this 14th day of September, 2026.

R. STAN BAKER, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

[4] ADG and Huff are now the sole remaining Defendants in this case.