**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | |
|---|---|
| JOHN HARTWELL COCKE, as Executor of the Estate of WILLIAM BYRON COCKE, Deceased, and as Executor of the Estate of CATHERINE CRICHTON COCKE, Deceased; WILLIAM RUFFIN COLEMAN COCKE; WILLIAM MARSTON BECKER, as Conservator of W.R.C., a minor, as Conservator of E.C.C., a minor, as Conservator of J.S.C., a minor, as Conservator of C.E.C., a minor, as Conservator of P.S.G.C., a minor; and JOHN HARTWELL COCKE and VIRGINIA FRANCES COCKE, as Guardians of W.R.C., a minor, as Guardians of E.C.C., a minor, as Guardians of J.S.C., a minor, as Guardians of C.E.C., a minor, and Guardians of P.S.G.C., a minor;, | |
| Plaintiffs, | CIVIL ACTION NO.: 4:19-cv-169 |
| v. | |
| THE UNITED STATES OF AMERICA; AVIATION DEVELOPMENT GROUP, LLC; and THOMAS HUFF, | |
| Defendants. | |

**ORDER**

This case emerges out of a fatal airplane crash which took the lives of pilot Randall Don Hunter and his two passengers, William "Byron" Cocke and Catherine Crichton Cocke (the latter two individuals will hereinafter be referred to collectively as the "Decedents"). (See generally doc. 387.) Plaintiffs consist of these individuals: John Hartwell Cocke, as Executor of Decedents' estates; William Ruffin Coleman Cocke in his individual capacity; William Marston Becker, as Conservator of Decedents' minor children; and John Hartwell Cocke and Viginia Frances Cocke as Guardians of

Decedents' minor children. (Id. at pp. 3–4.) Defendants are Aviation Development Group, LLC ("ADG"), a Georgia LLC, and its sole member, Thomas Huff (collectively, "ADG/Huff"). (Id. at pp. 4–7.) Before the Court is ADG/Huff's Motion for Summary Judgment. (Doc. 438). Plaintiffs filed a Response, (doc. 478), and ADG/Huff filed a Reply, (doc. 525). For the reasons below, the Court **GRANTS in part** and **DENIES in part** ADG/Huff's Motion. (Doc. 438.)

## BACKGROUND

The Court derives the facts below from the parties' submissions and the summary judgment record. Under Local Rule 56.1, a motion for summary judgment must include a separate, short, and concise statement of the material facts as to which it is contended there is no genuine dispute to be tried as well as any conclusions of law thereof. All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by a statement served by the opposing party. S.D. Ga. L.R. 56.1. Under Local Rule 56.1, when a fact is undisputed, the Court includes the fact. For disputed facts, the Court reviews the record to determine whether a material dispute exists. When the other party's response reflects the record cited more accurately, the Court modifies the proposed fact and cites the record. The Court also excludes immaterial facts, those stated as an issue or legal conclusion, those not supported by a citation to evidence, or those that the record citation fails to support. And, where appropriate, the Court includes facts drawn from its review of the record. See Williams v. Wal-Mart Stores E., LP, 661 F. Supp. 3d 1264, 1266 (N.D. Ga. 2023). These facts are undisputed unless otherwise stated.

The factual background surrounding the accident flight is described in the Court's prior orders. (Docs. 529 & 557.) The Court incorporates those facts by reference here. For purposes of the present Motion, the Court focuses instead on the events preceding the fatal flight and the business relationships between Decedents, Hunter, and ADG/Huff.

ADG is a single-member limited liability company ("LLC") with Huff as its sole member. (Doc. 478-76, p. 2.) ADG provides various aviation-related services, primarily focusing on developing and building aircraft hangars while also providing aircraft purchase and management services. (Id.) While the parties dispute whether ADG was in the business of providing aircraft charter services during the events in question, the company aspired to offer such services in the future. (Doc. 525-1, pp. 2–3.)

Hunter was an FAA-certified commercial and private pilot, holding a Commercial Pilot Certificate for Multi-Engine Land Aircraft and instrument rating as well as a Private Pilot Certificate for Single-Engine Land Aircraft. (Doc. 478-76, p. 5.) Hunter owned and operated several aviation-related businesses, including Hunter Aviation & Consulting ("Hunter Aviation"). (Doc. 438-2, p. 2; doc. 438-7, p. 3.) Hunter also provided maintenance services for ADG. (Doc. 438-2, p. 2; doc. 438-5, p. 18.) In addition to his maintenance work for ADG, Hunter would sometimes pilot flights on aircraft owned or managed by ADG. (Doc. 438-2, p. 3; doc. 478-76, p. 5.) With respect to both maintenance and piloting services, Hunter was paid on a job-by-job basis. (Doc. 438-2, p. 3.) Hunter typically invoiced ADG through his company, Hunter Aviation. (Id.) However, Hunter would sometimes request that ADG pay him as an individual. (See doc. 478-27.) Hunter did not work exclusively for ADG, providing his services to other companies as well. (Doc. 438-2, p. 9; doc. 438-30.) Hunter did not list ADG as an employer on his tax returns for either of the two years preceding the accident flight. (See docs. 438-31 & 438-32.) Although Hunter had an ADG shirt that he would wear when flying for the company, he wore his own Hunter Aviation shirt on the day of the accident. (Doc. 438-2, p. 10.) Hunter's practice was to wear a shirt of the company he was flying for. (Id.; doc. 438-7, p. 7.)

In 2014, Decedents met Huff through mutual friends. (Doc. 438-2, p. 3.) Decedents were interested in purchasing an aircraft and began taking flights with ADG on various aircraft for potential purchase. (Id.) Defendants characterize these flights as "demonstration flights," although aviation

consultants state that ADG charged Decedents fees far above the rates Federal Aviation Regulations [FAR] permit for demonstration flights and that such flights are better classified as charter flights. (Doc. 478-55, pp. 14–15.) After these flights, Decedents purchased an aircraft from Huff. (Doc. 438-2, pp. 3–4; doc. 478-76, p. 8.)

In 2016, Hunter bought a 1994 Beech Bonanza A36 model aircraft (the "Aircraft") because he wanted to "go out on his own through Hunter Aviation." (Doc. 438-2, p. 4.) Hunter was the FAA-registered owner and operator of the Aircraft. (Id.) Under Hunter's Aircraft insurance policy, he was not permitted to "charge any person or organization" for using the Aircraft. (Id.; doc. 438-14, p. 2.) Hunter generally kept the Aircraft in a hangar that he owned but would also park the Aircraft at ADG's hangar when conducting contract maintenance on ADG aircraft. (Doc. 438-2, p. 4; doc. 438-12, p. 6; doc. 438-4, p. 18.) In 2017, Byron Cocke saw the Aircraft in the ADG hangar and spoke with Hunter about it. (Doc. 438-2, p. 4.) In April 2017, Decedents began flying with Hunter on the Aircraft. (Id.) These early flights were arranged, scheduled and coordinated by and between Decedents and Huff. (Doc. 478-17.) ADG invoiced Decedents for these flights. (Doc. 438-19; doc. 478-4; doc. 478-5.) Decedents were only responsible for paying their share of the flight expenses, which Hunter would send to ADG to include with other expenses Decedents owed to consolidate the amounts into a single monthly invoice. (Doc. 438-2, p. 5.) Prior to the accident flight, Decedents completed 20 flights with Hunter. (Id. at pp. 5–6.) Most flights were on the Aircraft, but some were on other airplanes owned or managed by ADG. (Id.)

Decedents grew closer with Hunter and began scheduling flights directly with him. (Id.; see generally doc. 438-22.) Eventually, Decedents decided to hire Hunter in the future as their full-time pilot for the aircraft they bought. (Doc. 438-2, p. 5.) Hunter started to assume some responsibilities of

managing Decedents' aircraft and began the process to obtain his pilot qualification to operate it. (Doc. 438-2, pp. 5–6; doc. 438-4, p. 8; doc. 438-7, p. 8; doc. 438-11, p. 6.)

On August 25, 2017, Catherine Cocke called Hunter to schedule a series of flights. (Doc. 438-2, p. 6.) Hunter subsequently added five flights to a flight calendar which he shared with ADG. (Id.) The first flight was to take place on August 28, 2017. (Id.) On that day, Hunter, piloting the Aircraft, departed from the Savannah/Hilton Head International Airport with Decedents on board, intending to fly to Cobb County International Airport. (Id.) Approximately eight minutes after takeoff, Hunter contacted air traffic control to declare an emergency. (Id. at pp. 6–7.) The Aircraft crashed shortly after, killing all on board. (Id. at p. 7.) A post-accident investigation revealed that the Aircraft's engine suffered a power loss caused by a failure to properly torque the hold-down bolts and through-studs at the time the engine's No. 1 cylinder was installed. (Id.) This work was done by Precision Aviation Services. (Id.) ADG was not responsible for the allegedly faulty maintenance of the Aircraft. (Id.)

Although Catherine Cocke scheduled and coordinated the accident flight directly with Hunter, she repeatedly attempted to contact Huff before calling Hunter and eventually reached Huff after speaking with Hunter. (Doc. 478-76, p. 16; doc. 478-42.) Huff also spoke with Hunter on the same day, after Hunter's call with Catherine Cocke. (Doc. 478-76, p. 16; doc. 478-49.) The evening before the accident, Hunter told his wife that he would fly Decedents the next day because Huff needed him to. (Doc. 478-51, pp. 3–4.) Following the accident, Hunter's widow filed a Proof of Loss to collect under the Aircraft's insurance policy, affirming that the Aircraft was being operated solely by Hunter and that Hunter was "operating the [A]ircraft for a purpose specifically agreed upon in the policy." (Doc. 438-2, p. 4; doc. 438-15, p. 2.)

In their Fourth Amended Complaint, Plaintiffs allege that ADG/Huff are vicariously and directly liable for Hunter's negligence (Counts III and IV). (Doc. 387, pp. 23–29.) Plaintiffs also bring direct

claims against ADG/Huff for the negligent selection and retention of Hunter (Counts V and VI), and they seek punitive damages (Count VII). (Id. at pp. 29–35.) Before the Court is ADG/Huff's Motion for Summary Judgment on all claims against them. (Doc. 438.) Plaintiffs filed a Response, (doc. 478), and ADG/Huff filed a Reply, (doc. 525).

**STANDARD OF REVIEW**

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing there is no genuine dispute as to any material fact. See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party has the burden of proof at trial, the moving party may discharge his burden by showing the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). If the moving party discharges this burden, the burden shifts to the nonmovant to present affirmative evidence to show a genuine issue of fact. Anderson, 477 U.S. at 257. When the moving party has the burden of proof at trial, the moving party "must show affirmatively the absence of a genuine issue of material fact," supporting its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial." United

States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in State of Ala., 941 F.2d 1428, 1438 (11th Cir. 1991) (internal citations omitted).

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in the light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., Fla., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)). However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (emphasis and citations omitted). Mere speculation does not create a genuine issue of material fact. Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005) (internal quotations omitted).

**DISCUSSION**

In their Fourth Amended Complaint, Plaintiffs seek to hold ADG/Huff both directly and vicariously liable for the accident flight. In Counts III and IV, Plaintiffs bring claims for negligence and vicarious liability against ADG/Huff. (Doc. 387, pp. 23–28.) Plaintiffs assert that ADG/Huff operated a federally regulated aircraft charter operation and held themselves out as experts in private aviation travel, with Decedents relying on their expertise and knowledge in pursuing private air travel. (Id. at pp. 23–24.) Count III alleges that Hunter committed several negligent acts and omissions. (Id. at pp. 26–27.) According to Plaintiffs, Hunter was ADG/Huff's "agent, servant, employee and/or representative" as shown by ADG/Huff's representations to Decedents. (Id. at p. 25.) As such, Plaintiffs contend that ADG/Huff are both directly and vicariously liable for Hunter's negligence. (Id.) In Counts V and VI, Plaintiffs bring claims for negligent selection and retention of Hunter. (Id. at pp. 29–34.) Plaintiffs also assert a claim for punitive damages against ADG/Huff in Count VII. (Id. at pp. 34–35.)

ADG/Huff move for summary judgment, arguing that they may not be held either directly or vicariously liable for Hunter's negligence as Hunter was at most an independent contractor. (See generally doc. 438-1.) ADG/Huff also contend that, as a matter of law, they cannot be held liable under an apparent agent theory. (Id. at pp. 24–27.) Huff further argues that he is entitled to summary judgment because, as a member of an LLC, he is protected from individual liability as there is no reason to disregard the corporate form here. (Id. at pp. 27–28.) ADG/Huff also move for summary judgment on Plaintiffs' claim for punitive damages. (Id. at pp. 28–30.)

## I. Negligence and Vicarious Liability (Counts III and IV)

ADG/Huff argue that, as a matter of law, Hunter was an independent contractor such that Plaintiffs' claims for vicarious liability and negligent selection and retention fail. (See generally id.) In their Response, Plaintiffs contend that whether Hunter was an independent contractor is not dispositive. Rather, Plaintiffs assert that Hunter was an apparent agent of ADG/Huff such that ADG/Huff may be held vicariously liable for Hunter's negligence under an apparent agency of liability. (Doc. 478, pp. 26–29, 40–42.) Plaintiffs also argue that ADG/Huff maintained operational control of the Aircraft during the accident flight such that they may be held directly liable for the crash. (Id. at pp. 30–31.) In analyzing ADG/Huff's Motion for Summary Judgment as to Counts III and IV, the Court must therefore analyze whether Hunter was an independent contractor as a matter of law as well as whether ADG/Huff may be held liable for the accident flight under Plaintiff's apparent agency or operational control theories.

### A. Whether Hunter was an Independent Contractor

Under Georgia law, an employer "generally is not responsible for torts committed by his employee when the employee exercises an independent business and in it is not subject to the immediate direction and control of the employer." O.C.G.A. § 51-2-4; see also Peachtree-Cain Co. v. McBee, 327 S.E.2d 188, 189 (Ga. 1985). In other words, an employer is generally not liable for the torts of an

independent contractor. Ga. Messenger Serv., Inc. v. Bradley, 715 S.E.2d 699, 702 (Ga. Ct. App. 2011). The historical reason for this rule is that where "the employer has no right of control over the manner in which the work is to be done, it is to be regarded as the contractor's own enterprise, and he, rather than the employer, is the proper party" to be charged. Id. (internal quotations omitted). However, an employer may be liable for the negligence of a contractor if "the employer retains the right to direct or control the time and manner of executing the work or interferes and assumes control so as to create the relation of master and servant or so that an injury results which is traceable to his interference." O.C.G.A. § 51-2-5(5). When an employer exercises this degree of control over the work of an independent contractor, the contractor is deemed to be their servant, and they may be held vicariously liable for the contractor's wrongful acts. Ga. Messenger Serv., 715 S.E.2d at 702 (internal citations and quotations omitted).

In Georgia,

> [t]he test for determining whether an employer is exercising a degree of control over an independent contractor's work such that the law will deem the independent contractor to be a servant of that employer . . . is whether "the contract gives, or the employer assumes, the right to control the time, manner, and method of the performance of the work, as distinguished from the right to merely require certain definite results in conformity with the contract."

Id. (quoting Slater v. Canal Wood Corp. of Augusta, 345 S.E.2d 71, 72 (Ga. Ct. App. 1986)). The essential question is "whether the contractor has a bona fide existence apart from the employer or functions instead as the employer's alter ego." Id. (quoting Slater, 345 S.E.2d at 72). "The right to control the time means the employer has assumed the right to control the person's actual hours of work." Schriver v. N. Fulton Emergency Physicians, LLC, 922 S.E.2d 464, 466 (Ga. Ct. App. 2025) (internal quotation omitted). "The right to control the manner and method means the employer has assumed the right to tell the person how to perform all details of the job, including the tools he should use and the procedures he should follow." Id. (internal quotation omitted). Importantly, the "general right to order

the work stopped or resumed, to inspect its process or to receive reports, to make suggestions or recommendations and to prescribe alterations and deviations of the work performed . . . *does not establish* that the proprietor exercised control over the manner in which the independent contractor did its work." Orton v. Masquerade, Inc., 716 S.E.2d 764, 767 (Ga. Ct. App. 2011) (internal citation omitted). Instead, "there must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Id. (internal citation omitted) (alteration adopted). Whether a contractor is truly independent of the employer is generally a question of fact, though there are cases where the issue may be decided as a matter of law. Slater, 345 S.E.2d at 72.

As ADG/Huff note, the work at issue here is Hunter's piloting of the Aircraft during the accident flight. (Doc. 438-1, p. 13.) ADG/Huff thus aver that their liability "turns on whether they either: (1) retained the right to direct or control the time and manner of executing the flight, or (2) interfered and assumed control over the flight so as to create a master-servant relationship or so that the injury is traceable to the interference." (Id.) ADG/Huff contend that neither option applies here. (Id.)

Here, the undisputed evidence—as recited in the Background Section, supra—establishes that Hunter was independent of ADG/Huff and was not their employee. That Hunter owned the Aircraft, carried his own insurance, operated his own independent aviation business, was paid by the job, and was free to work for others all weigh strongly in favor of finding that he was an independent contractor. See Perry v. Soil Remediation, Inc., 471 S.E.2d 320, 321 (Ga. Ct. App. 1996); Yancey v. Watkins, 308 Ga. App. 695, 708 S.E.2d 539, 543 (2011) (pilot "operat[ing] his flying service as an independent business" which worked for numerous clients supports independent contractor status). While not determinative, it is also relevant that both Hunter and ADG appear to have considered Hunter to be an independent contractor, with Hunter presenting himself as self-employed on his tax returns and not listing any wages

from ADG. See Knox v. Kadenzo Enter., Inc., No. 1:20-CV-04948-SCJ, 2022 WL 22889496, at *11 (N.D. Ga. Sept. 8, 2022).

Plaintiffs note that there is evidence that ADG/Huff controlled the time of the work, telling Hunter when the flights were to occur. (Doc. 478, p. 36.) While this evidence does weigh against Hunter being an independent contractor, it is not determinative where the record does not show that ADG/Huff controlled the manner and method of executing the work. See Larmon v. CCR Enters., 647 S.E.2d 306, 307 (Ga. Ct. App. 2007) (delivery driver found to be independent contractor where contract stated that delivery was to occur at a certain time and to conform to applicable requirements, "but, the manner and method of performing the contract were left to the driver's discretion"); see also Orton., 716 S.E.2d 764, 767 (Ga. Ct. App. 2011) (defendant's right to determine the approximate time a performance would take place could not create a genuine issue of material fact as to performer's employment status where there was no evidence that defendant controlled the manner and method of the performance). The flight also times were not controlled by ADG/Huff but were requested by Decedents. (See doc. 478-2, p. 8; doc. 478-11.) Plaintiffs themselves note that the timing of the flights was based on Decedents' desires. (Doc. 478, p. 36.) Although there is evidence that Decedents would ask Huff about which aircraft they were to fly in, (see doc. 478-71, p. 3), there is no evidence that Huff unilaterally made such decisions or that Hunter had no say. Thus, the undisputed evidence establishes that Hunter was an independent contractor.

As Hunter was an independent contractor, Plaintiffs' claims for negligent selection and retention fail as a matter of law as such claims do not apply to independent contractors. O'Dell v Mahoney, 750 S.E.2d 689, 695 (Ga. Ct. App. 2013); Mason v. Gracey, 375 S.E.2d 283, 287 (Ga. Ct. App. 1988) ("[W]here . . . the facts establish that the one hired was an independent contractor, the plaintiff may not recover on a theory of negligent hiring."). Because Hunter was an independent contractor, the Court

**GRANTS** ADG/Huff's Motion for Summary Judgment as to Plaintiffs' claims for negligent hiring and retention in Counts V and VI.

**B. Whether Hunter was an Apparent Agent of ADG/Huff**

That Hunter was an independent contractor and thus not an actual agent of ADG/Huff does not entitle ADG/Huff to summary judgment on Plaintiffs' vicarious liability claim. Instead, Plaintiffs may recover under an apparent agency theory, which is distinct from an actual agency theory of liability. Franza v. Royal Caribbean Cruises, Ltd., 772 F.3d 1225, 1249 (11th Cir. 2014). "Unlike actual agency, the doctrine of apparent agency allows a plaintiff to sue a principal for the misconduct of an independent contractor who only reasonably appeared to be an agent of the principal." Id. (citing Crowe v. Hertz Corp., 382 F.2d 681, 688 (5th Cir. 1967)). Plaintiffs contend that there is enough evidence that Hunter was the apparent agent of ADG/Huff to preclude granting summary judgment on their vicarious liability claims. (Doc. 478, pp. 34–37.)

To establish vicarious liability under a theory of apparent agency, a plaintiff must show: (1) that the alleged principal held out another as its agent; (2) justifiable reliance on the care or skill of the alleged agent based on the alleged principal's representation; and (3) that this justifiable reliance led to the injury. Butkus v. Putting Greens Int'l Corp., 475 S.E.2d 693, 695 (Ga. Ct. App. 1996) (citing Richmond Cnty. Hosp. Auth. v. Brown, 361 S.E.2d 164,165–66 (Ga. 1987)); see also Franza, 772 F.3d at 1252. To establish these elements, it is not enough that Decedents *believed* that an agency relationship existed between ADG/Huff and Hunter; rather, it must be established that ADG/Huff held Hunter out as its agent. Butkus, 475 S.E.2d at 663 (internal citation omitted).

ADG/Huff argue that "[t]here is no genuine issue of material fact as to any of these elements." (Doc. 438-1, p. 25.) In arguing this, ADG/Huff rely heavily on Huff's deposition in which he stated that Hunter was the owner of the Aircraft and that Decedents knew this. (Id. (citing doc. 438-3, p. 12).)

ADG/Huff further stress that Hunter was wearing a Hunter Aviation shirt during the flight and that it was Hunter's "practice" to wear the shirt of the company he was flying for. (Id. (citing doc. 438-7, p. 7).) These arguments are unpersuasive. Even assuming that Decedents knew that Hunter owned the aircraft, it does not necessarily follow that Huff never held Hunter out as his agent. Instead, the record supports the conclusion that ADG/Huff made representations that Hunter was their agent. Huff referred to Hunter as "our Bonanza pilot" and told Catherine Cocke that Hunter was not a contract pilot but was instead "full time" with ADG. (Doc. 478-10; doc. 478-11, p. 3.) Decedents received invoices for their flights with Hunter from ADG, the invoices were on ADG letterhead, and thanked Decedents for their business, with one invoice to Byron Cocke thanking him for "flying with [ADG]." (Doc. 478-3; doc. 478-4; doc. 478-5; doc 478-6, p. 2; doc. 478-7, p. 2; doc. 478-8, p. 2.) Hunter also emailed Decedents from an ADG email address with a signature block indicating that he was employed by ADG. (Doc. 478-62; doc. 478-63.) Hunter's shirt on the day of the accident does not establish the lack of a material dispute. While Hunter was wearing a shirt "with Hunter Aviation on the left breast," (doc. 438-23, p. 5), and "usually would wear a shirt for who he flew with," (doc. 438-7, p. 7), there is nothing to indicate that Decedents understood the significance (if any) of Hunter's sartorial choice that day. Moreover, an apparent agency theory focuses on the actions of the alleged *principal* rather than those of the alleged agent, and so Hunter's actions are not determinative here. See Williams v. Jet One Jets, Inc., 755 F. Supp. 2d 1281, 1288 (N.D. Ga. 2010) ("The conduct of the agent alone cannot bind the principal. The principal must act in such a manner as to legitimate the agent's charade of authority." (quoting Synergy Worldwide, Inc. v. Long, Haymes, Carr, Inc., 44 F. Supp. 2d 1348, 1355 (N.D. Ga. 1998))). There is thus a genuine factual dispute over whether ADG/Huff held out Hunter as their agent.

There is also a genuine dispute of material fact as to Decedents' reliance on these representations. While ADG/Huff claim that "there is no evidence that ADG or Huff made any representations to

Decedents regarding Hunter's care and skill as a pilot," (doc. 438-1, pp. 25–26), that is directly contradicted by the record, (see doc. 478-11, pp. 3–4). Huff assured Catherine Cocke of Hunter's strong qualifications as a pilot, stating that he "would not send them out on [a flight] without a highly trained crew." (Id. at p. 4.) While ADG/Huff argue that Decedents relied only on their private conversations with Hunter in choosing to fly on the Aircraft, (doc. 438-1, p. 26), they cite no evidence establishing this claim. Instead, ADG/Huff rely solely on the self-serving statements of Huff, which are hardly conclusive proof of Decedents' understanding of the situation.

Noting that Decedents flew with Hunter twenty times during their brief relationship with him and eventually began scheduling flights with Hunter directly, ADG/Huff argue that "[e]ven if [Decedents] had originally relied upon some representation from ADG or Huff, by the time of the accident . . . they could no longer be justifiably relying upon anything they were told as a matter of law." (Id.) It is unclear how Hunter's frequent interactions with Decedents would preclude the factfinder from concluding that an apparent agency existed, and ADG/Huff cite no authority in support of this argument.

ADG/Huff further urge that the third element of causation cannot be established here because "[a]ny representations made by ADG or Huff as to Hunter's care or skill did not lead to Decedents' injuries—the failure of the Aircraft's engine did." (Id.) ADG/Huff contend that "[t]he evidence conclusively establishes that Hunter was a well-qualified pilot who had carefully and skillfully piloted [the] Aircraft for years without incident," thus no injury would have occurred had the engine not failed unexpectedly. (Id.) But this argument misses the mark. To establish an apparent agency, Plaintiffs must show that "the injury would not have occurred but for the injured party's justifiable reliance on the apparent agency." Brown v. Coastal Emergency Servs., Inc., 354 S.E.2d 632, 636 (Ga. Ct. App. 1987). Assuming that the first two elements can be established, a reasonable jury could conclude that but for ADG/Huff's representations, Decedents would not have developed their professional relationship with

Hunter and boarded the Aircraft on the day of the fateful flight. Further, ADG/Huff's assertion that the engine failure is the sole but-for cause of the accident is unpersuasive as questions of fact remain as to whether Hunter negligently flew the Aircraft and whether the crash could have been avoided but for his alleged negligence.

ADG/Huff have thus have not established that Plaintiffs' apparent agency theory fails as a matter of law. Genuine factual disputes exist as to all three elements required for an apparent agency relationship. Therefore, while Hunter may have been an independent contractor, Plaintiffs may still bring their vicarious liability claims under a theory of apparent agency. Accordingly, the Court **DENIES** ADG/Huff's Motion for Summary Judgment as to Counts IV and V.

### C. Whether ADG/Huff Maintained Operational Control Over the Flight

Plaintiffs assert that "[s]ince ADG had 'operational control' of the [Aircraft] under the FAR[], it is directly liable for the accident flight." (Doc. 478, p. 30.) The FAR distinguishes between "operating" an aircraft and having "operational control" of an aircraft. 14 C.F.R. § 1.1. To "operate" an aircraft means to "use, cause to use or authorize to use aircraft." Id. "Operational control" on the other hand means "the exercise of authority over initiating, conducting or terminating a flight." Id. Regardless of whether ADG/Huff operated the Aircraft during the accident flight, Plaintiffs claim that ADG/Huff exercised operational control through their acts in "arranging, coordinating, initiating and/or scheduling" the flight and may be held liable on that basis. (Doc. 478, p. 31.)

The concept of "operational control" typically applies in the context of aircraft leases, with lessors who retain operational control over their leased aircraft facing liability for a lessee's wrongdoings. See United States v. Midwestern Pouch Exp., Inc., 662 F. Supp. 207, 212 (D. N.J. 1987) (citing Aircrane, Inc. v. Butterfield, 369 F. Supp. 598, 611–12 (E.D. Pa.1974)); United States v. King, 524 F. Supp. 3d 668, 675 (S.D. Tex. 2020) (lessors who provide the crew, fuel, and maintenance for a

leased aircraft face liability for the lessee's violations of safety regulations); see also 49 U.S.C. § 44112(b) (aircraft lessors liable for injuries only when the aircraft is "in [their] actual possession or operational control"). The concept is particularly relevant when an aircraft owner seeks to avoid liability related to an aircraft by pointing to a purported "dry lease" of the aircraft to another entity despite retaining control over the aircraft's operation.[1] See King, 524 F. Supp. 3d at 674–77; see also Decruz v. Elwell, 751 F. App'x 1, 4–5 (D.C. Cir. 2018).

In determining whether a party maintains operational control over an aircraft, courts are to look beyond the form of any contractual agreements and instead examine the real-world circumstances of the flight and the parties' relationship. King, 524 F. Supp. 3d at 674–75. Relevant factors for determining which party retains operational control include:

1. who decides to assign crewmembers and aircraft, accepts flight requests, and initiates, conducts, and terminate[s] flights;
2. who do the pilots work for;
3. who maintains the aircraft, and where is it maintained;
4. who ensures the flight, aircraft, and crew comply with regulations before departure;
5. who decides when or where to perform maintenance, and who directly pays it;
6. who determines weather and fuel requirements, and who directly pays for fuel; and
7. who directly pays for airport fees, parking and hangar costs, food service, or rental cars.

Id. at 675 (citing FED. AVIATION ADMIN., U.S. DEP'T OF TRANSP., AC 91-37B, TRUTH IN LEASING (Feb. 10, 2016)). For a party to have operational control of an aircraft, it is not enough for them to posses authority over the aircraft or its operations in the abstract. Rather, there must be an actual, concrete

[1] A "dry lease" occurs where an aircraft owner provides an aircraft to a lessee without providing a flight crew. It is distinguished from "wet leases," where the lessor provides both the aircraft and the crew. See Gregory J. Reigel, *What's the Difference Between a 'Wet' and 'Dry' Aircraft Lease?*, AOPA PILOT PROTECTION (Apr. 1, 2017), https://pilot-protection-services.aopa.org/news/2017/april/01/wet-and-dry-aircraft-lease [https://perma.cc/EAF8-VQ6K]. In a true dry lease, the lessor surrenders operational control of the aircraft to the lessee. Id. Many cases imposing liability based on operational control of the aircraft involve purported dry leases which were actually wet leases. See, e.g., King, 524 F. Supp. 3d at 674–75.

exercise of that authority during the flight in question. Blue Air Training Corp. v. Hadley, No. 2:23-CV-0734-KG-JHR, 2025 WL 2691157, at *5 (D.N.M. Sept. 19, 2025) (citing Escobar v. Nevada Helicopter Leasing LLC, No. CV 13-00598 HG-WRP, 2020 WL 1076107, at *4 (D. Haw. Mar. 6, 2020)).

Plaintiffs' operational control argument is somewhat unusual here where there is no evidence that ADG/Huff leased the Aircraft to Hunter and where Hunter is the undisputed owner of the Aircraft. (Doc. 478-76, p. 9.) Liability based on operational control is usually imposed on aircraft lessors who retain significant authority over relevant flights despite the apparent lease. See, e.g., FAA v. Landy, 705 F.2d 624, 629–31 (2d Cir. 1983) (defendant lessor retained operational control of aircraft despite lease as it controlled operation of the flights, supplied flight crews, and performed maintenance); Decruz, 751 F. App'x at 4–5 (defendant lessor retained operational control over aircraft because defendant, and not the lessee, made all relevant decisions for the flights). The doctrine is often invoked where the lease at issue was in some sense fraudulent or it is invoked to avoid liability under FAA regulations. See King, 524 F. Supp. 3d at 672 (lease alleged to be "sham lease designed to avoid" FAA regulations); Decruz, 751 F. App'x at 4–5 (rejecting defendant lessor's argument that he could not be in control of flights because of supposed dry lease, noting that the law "is not fooled by mere labels.") In short, the typical operational control case alleges that the lessor should be liable for the actions of the lessee. Plaintiffs here argue the opposite case: that Hunter leased the Aircraft to ADG/Huff and that, as lessees, ADG/Huff are liable for the negligence of the lessor. (Doc. 387, p. 25; doc. 478-74, p. 65.) Marc Fruchter, Plaintiff's expert on aviation industry standards, concludes that Huff had operational control because of this alleged lease, basing this opinion solely on invoices Hunter submitted to ADG for the "lease" of the Aircraft. (Id. at pp. 66–67.) The situation here is therefore distinguishable from the typical operational control case. Nevertheless, the Court must look beyond the alleged relationship of the parties and

examine whether ADG/Huff actually exercised operational control over the accident flight. King, 524 F. Supp. 3d at 674–675.

Plaintiffs assert that the record establishes that ADG/Huff exercised considerable control over the flights such that there is a factual question about whether they had operational control. (Doc. 478, pp. 30–31.) ADG/Huff respond that "[t]he summary judgment evidence conclusively establishes that at the time of the accident, the Aircraft was under the exclusive control of Hunter." (Doc. 525, p. 5.)

The record here is mixed as to how involved ADG/Huff were in the flights that Decedents took with Hunter. ADG/Huff would schedule flights with Decedents, sometimes without Hunter's knowledge. (See doc. 478-70; doc. 478-71; doc. 478-72.) Huff may have also made decisions as to which plane Decedents would take on their flights. (Doc. 478-71, p. 3.) Although ADG/Huff insist that they had nothing to do with scheduling the accident flight, (doc. 525, p. 7), and suggest that ADG/Huff's role in scheduling flights for Decedents gradually diminished over time, (see doc. 438-2, pp. 5–6), the record is ambiguous. ADG/Huff argue that Fruchter "admitted ADG did not exercise authority over initiating, conducting, or terminating the accident flight," noting Fruchter's acknowledgment that Hunter was the pilot in command of the accident flight and that Catherine Cocke scheduled the accident flight with Hunter directly. (Doc. 525, pp. 5–6 (quoting doc. 441-2, pp. 5, 7).) However, Plaintiffs note that Catherine Cocke tried to contact Huff before she contacted Hunter to schedule the accident flight, and that Hunter contacted Huff after speaking with Catherine Cocke about the accident flight. (Doc. 478, pp. 13–14 (citing docs. 478-48 & 478-49).) There is thus some evidence that ADG/Huff maintained operational control of the Aircraft. See Decruz, 751 F. App'x at 4–5 (defendant's decisions in planning flights and determining the type of aircraft to be flown support finding that he exercised operational control). Moreover, Hunter reportedly told his wife that he would fly Decedents on the day of the

accident flight because Huff needed him to. (Doc. 478-51, pp. 3–4.) Whether ADG/Huff exercised control over initiating the accident flight is therefore a factual question.

Generally, where defendants have been found liable based on operational control, the evidence of their control was far stronger than the evidence for ADG/Huff's control here. See, e.g., Landy, 705 F.2d at 630 (operational control established where lessor "performed virtually all of the functions necessary to operate the aircraft, and the [lessees] were almost entirely excluded from any responsibility for the aircraft or its operation"). Nevertheless, because there is support in the record for finding that ADG/Huff exercised control over the accident flight, a genuine dispute of material fact exists. As a result, ADG/Huff's Motion for Summary Judgment is **DENIED** as to Plaintiffs' direct negligence claims in Counts III and IV.

## II. Whether Huff can be Held Liable in His Individual Capacity

ADG/Huff argue that Huff cannot be held liable in his individual capacity and is therefore personally entitled to summary judgment. (Doc. 438-1, pp. 27–28.) Generally, an individual's status as a member and manager of an LLC will not support holding him personally liable for the torts of the LLC absent some evidence that the corporate form should be disregarded. Morris v. Real Est. Expert Advisors, LLC, 880 S.E.2d 218, 221 (Ga. Ct. App. 2022). ADG/Huff are thus correct that Huff may not be held liable for ADG's alleged torts merely by virtue of his membership status. This principle applies even though Huff is ADG's sole operator. Birch Prop. Partners, LLC v. Simpson, 874 S.E.2d 814, 830–31 (Ga. Ct. App. 2022). However, the corporate form will not protect Huff from liability if he personally and directly participated in any of ADG's allegedly tortious conduct. See Morris, 880 S.E.2d at 221; see also Jennings v. Smith, 487 S.E.2d 362, 363 (Ga. Ct. App. 1997) (corporate officer who takes part in the commission of a tort by the corporation may be held personally liable); Birch Prop. Partners, 874 S.E.2d at 831 ("[A]n LLC member may be held individually liable if he or she personally participates or

cooperates in a tort committed by the LLC or directs it to be done.") (internal citation omitted). The relevant inquiry is not whether Huff was acting in an individual capacity at the time of any alleged participation, but simply whether he "specifically directed" or "participated in" tortious conduct. Woodstone Townhouses, LLC v. S. Fiber Worx, LLC, 855 S.E.2d 719, 738 (Ga. Ct. App. 2021); Dal Motors, Inc. v. Orosco, 908 S.E.2d 264, 267–68 (Ga. Ct. App. 2024) ("A corporate officer's liability does not depend on whether he or she acted on their own behalf, or on behalf of the corporation, or if the corporation is also found liable.").

Plaintiffs argue that the record establishes that Huff "participated in or specifically directed" negligent acts and omissions which caused their injuries. (Doc. 478, p. 43.) Plaintiffs specifically note that Huff represented that Hunter was ADG's pilot and put Decedents on flights with Hunter. (Id.) Further, Plaintiffs argue that "it was Huff who orchestrated, participated in and directed ADG's conducting of unlawful and illegal 'demonstration flights' and 'shared expense' flights in violation of the FARs," which caused the injury. (Id. at p. 44.) Plaintiffs contend that, at a minimum, a genuine dispute of material fact exists as to the extent of Huff's personal involvement in the torts allegedly committed by ADG and that summary judgment is thus inappropriate. (Id. at pp. 43–44.)

Plaintiffs' argument for holding Huff individually liable for Hunter's conduct is unpersuasive. Even granting that Huff held out Hunter as ADG's agent and directly participated in the creation of the apparent agency, it does not follow that Huff may be held personally liable for Hunter's alleged negligence. A finding that Hunter was the apparent agent of ADG such that ADG can be held vicariously liable for Hunter's torts is not enough to warrant holding Huff liable in his personal capacity. There is no evidence that Huff participated in or directed any of the negligent acts and omissions that Hunter allegedly committed. Creating an apparent agency relationship is not in itself tortious, and the alleged negligence for which Plaintiffs seek recompense is Hunter's. Count III's negligence claim largely

depends on Hunter's alleged negligence in piloting the Aircraft during the emergency, (doc. 387, p. 26), yet there is no allegation or evidence that Huff participated in Hunter's negligent piloting or directed the manner in which Hunter piloted the Aircraft. C.f. Birch Prop. Partners, 874 S.E.2d at 831 (sole member of LLC could be held personally liable for LLC's negligent construction "if he specifically directed the manner in which the house was constructed or participated or cooperated in its negligent construction"). The situation here is plainly distinguishable from the cases Plaintiffs cite, (doc. 478, p. 44), which involve shareholders and members directly participating in torts for which their corporations are directly (rather than vicariously) liable. See, e.g., Jennings, 487 S.E. 2d at 767 (corporate officer specifically directed negligent construction); Brown v. Rentz, 441 S.E.2d 876, 878 (Ga. Ct App. 1994) (officer personally performed defective subcontract work). The Court thus rejects Plaintiffs' claim that Huff may be held individually liable based on Hunter's acts as an apparent agent of ADG. ADG/Huff's Motion for Summary Judgment is **GRANTED** as to Huff's vicarious liability for Hunter's alleged negligence.

However, the record does not support a blanket finding that Huff may not be held personally liable at all. As discussed above, there are questions of fact as to whether ADG/Huff had operational control of the Aircraft and as to the degree to which Huff was responsible for planning Decedents' flights. See Discussion Section IV, supra. As such, there may be wrongful conduct for which ADG/Huff is directly liable and in which Huff directly participated. Additionally, Plaintiffs argue that Huff "orchestrated, participated in and directed ADG's conducting of unlawful and illegal 'demonstration flights' and . . . illegal commercial operations or charter flights in violation of the FARs" by allowing Hunter to pilot the flights despite lacking the heightened qualification requirements for those commercial flights. The Court thus **DENIES** ADG/Huff's Motion for Summary Judgment as to Huff's direct individual liability in Counts III and IV.

## III. Plaintiffs' Claim for Punitive Damages (Count VII)

ADG/Huff contend that, to the extent that any of Plaintiffs' claims survive summary judgment, they are nevertheless entitled to summary judgment on Plaintiff's claim for punitive damages. (Doc. 438-1, pp. 28–30.) Under Georgia law, "[p]unitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b). As ADG/Huff note, "negligence alone, even gross negligence," cannot support a claim for punitive damages under Georgia law. (Doc. 438-1, pp. 28–29 (quoting MDC Blackshear, LLC v. Littell, 537 S.E.2d 356, 361 (Ga. 2000)).) Further, employers may only be vicariously liable for punitive damages arising from the acts or omissions of their employees or agents where the relevant conduct is committed "in the course of the employer's or principal's business, within the scope of the servant's or agent's employment, and is sufficient to authorize a recovery of punitive damages under O.C.G.A. § 51-12-5.1." Fowler v. Smith, 516 S.E.2d 845, 847–48 (Ga. Ct. App. 1999). According to ADG/Huff, the record establishes that neither ADG nor Huff had anything to do with the accident flight and that punitive damages are therefore inappropriate. (Doc. 438-1, pp. 29–30.)

Plaintiffs' Response on this point consists entirely of the conclusory statement that, "[s]ince the evidence clearly and convincingly shows that ADG/Huff's actions constitute willful misconduct, fraud, wantonness, oppression or an entire lack of care rising to the level of conscious indifference, an award of punitive damages is warranted." (Doc. 478, p. 44.) Plaintiffs do not identify any conduct by ADG/Huff which could rise to the level of justifying punitive damages under O.C.G.A. § 51-12-5.1, nor do they offer substantive argument.

Examining the record as a whole, the evidence at most establishes that ADG/Huff were negligent. The record does not show that they engaged in the sort of intentional or wanton wrongdoing necessary to justify imposing punitive damages and lacks evidence which would entitle the factfinder to conclude that the "clear and convincing" standard of O.C.G.A. § 51-12-5.1 has been met. There is no evidence that would entitle the factfinder to award them punitive damages. Accordingly, the Court **GRANTS** ADG/Huff's Motion for Summary Judgment as to Plaintiffs' claim for punitive damages, Count VII.

## CONCLUSION

For the reasons stated above, the Court **GRANTS in part** and **DENIES in part** ADG/Huff's Motion for Summary Judgment. (Doc. 438.) The Court **GRANTS** ADG/Huff's Motion as to Plaintiffs' negligent selection and retention claims, Counts V and VI, and as to Plaintiffs' punitive damages claim, Count VII. The Court **GRANTS** ADG/Huff's Motion as to Huff's personal vicarious liability for Hunter's negligent acts in Count III. As factual questions remain as to whether ADG may be held vicariously liable for Hunter's actions under an apparent agency theory and whether ADG and/or Huff exercised operational control of the Aircraft, the Court otherwise **DENIES** ADG/Huff's Motion as to the negligence and vicarious liability claims in Counts III and IV.

**SO ORDERED**, this 30th day of October, 2026.

R. STAN BAKER, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA